UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MASSACHUSETTS

C.A. NO. 05-11221 NG

-----------------------------------------------------------

SEAN ELLIS

           Plaintiff

V.

KATHLEEN M. DENNEHY, LOIS RUSSO,
in their official capacities as a Commissioner and
Superintendent respectively of the Commonwealth of Massachusetts;
THE COMMONWEALTH OF MASSACHUSETTS
DEPARTMENT OF CORRECTION

           Defendants

-----------------------------------------------------------


PLAINTIFF S MOTION FOR PRELIMINARY INJUNCTION


Based upon the trial judge s factual findings in a five-day trial in the Southern District of
New York on the same legal issues, prison policies, and essential facts presented in this Action
by a different plaintiff, Plaintiff moves for an evidentiary hearing to determine that the Plaintiff s
beliefs as a member of The Nation of Gods and Earths ( NGE ) is both sincere and religious in
nature and that a preliminary injunction then issue ordering the Defendant Massachusetts
Department of Correction to allow the Plaintiff access to the NGE s core religious publications
called The 120 Degrees, The Supreme Alphabet, and the Supreme Mathematics, and to allow the
Plaintiff to receive the NGE s monthly newspaper called The Five Percenter.

1

STATEMENT OF FACTS

In the case of <u>Rashaad Marria v. Dr. Raymond Broaddus, et al.</u>, 2003 WL21782633 (SDNY), the United States District Court for the Southern District of New York held a five-day bench trial on that plaintiff s challenges to the New York Department of Corrections  policy classifying the Nation [NGE] as an  unauthorized  or  security threat  group and the DOC s consequent prohibition on [plaintiff s] receipt of Nation materials and literature, including the group s central texts and its newspaper, and ban on formal gatherings with other members of the group.   The plaintiff in <u>Marria</u> just as the Plaintiff in this case sought declaratory and injunctive relief pursuant to 42 US Code § 1983 alleging violations of the First and Fourteenth Amendments to the United States Constitution, the Religious Land Use and Institutionalized Persons Act of 2000 (RLUIPA), the New York State Constitution, and state law.  After this five-day bench trial, Southern District of New York found the Nation s teachings to be religious in nature and the plaintiff s sincerely held beliefs in those teachings to be entitled to First Amendment and RLUIPA protection.  A copy of the findings in their entirety is attached as *Exhibits A & B* with the Judgment and final relief provisions attached as *Exhibits C & D.*.

In summary, the Court found the following.

The Nation of Gods and Earths, commonly referred to as the  Five Percenters , was founded in New York forty years ago as an offshoot to the Black Muslim movement and the Nation of Islam and shares some of its central teachings and its central text known at the 120 Degrees with the Nation of Islam. *Exhibit A* at p. 2. In 1964, The Nation s founder Clarence 13X Smith broke with the Nation of Islam. <u>Id.</u>

The 120 Degrees along with two documents known as the Supreme Alphabet and the Supreme Mathematics are the core of the Nation s teaching.  The 120 Degrees are lessons that are also common to the Nation of Islam and consist of questions and answers to represent the teachings of Nation of Islam founder Master Frad Muhammad and Eligah Muhammad.  The

Supreme Alphabet and the Supreme Mathematics assign a word to each letter of the alphabet and provide a guide to normative principles by which adherents to the Nation are to go guide their lives. Id at pp. 3-4. For example, In the Supreme Mathematics the number 1 represents knowledge , the number 2 represents wisdom , and the number 3 represents understanding . One example of how Nation members apply this numerological learning system to their lives is that 1 (knowledge) and 2 (wisdom) must precede 3 (understanding). Id at p. 4 from note 5. Id. The Supreme Alphabet and Mathematics and the 120 Degrees have not changed in the 40 years since they have become widely available by the Nation of Islam and others and are publicly available to anyone with access to the internet or willing to pay the $20 annual subscription fee for delivery of The Five Percenter newspaper. Id., *Exhibit F.*

The Five Percenter is a monthly newspaper published by the Allah Youth Center in new York that contains articles and current events relative to the NGE, information about community activities, letters, editorials, and elaborations on the lessons and teachings of the 120 Degrees, the Supreme Alphabet, and the Supreme Mathematics. Much of the Five Percenter is directed specifically towards prison inmates, including messages advising them to better themselves and follow prison rules while incarcerated. Id at p. 4. As a religious community that lacks a dogmatic organizational structure or fixed placed of worship, The Five Percenter newspaper serves as an essential link and mechanism of communication. Id at p. 13.

All of the above-referenced numerological devises and The Five Percenter newspaper are widely available to the public, to the law enforcement community, on the internet, and elsewhere. For a $20.00 annual fee, anyone can subscribe to The Five Percenter newspaper. Id. Whatever possibility there is for these numerological devices to be used as a code, it is a code that is publicly available and it has been publicly available for 40 years and is much less susceptible to being used as a code as would the use of a foreign language by bilingual inmates that is not commonly practiced by correctional officers. *Exhibit A,* p. 21. Such an accusation of a code would be just as true for Jewish inmates using Yiddish or Hebrew or for Catholic inmates using

3

Latin. *See* Id at p. 21.

The attached affidavit of anthropologist Ted Swedenburg further strengthens the Court s findings by providing the anthropological opinion that the Nation of Gods and Earths, though not a traditional religion, is anthropologically a distinct religion.

Ted Swedenburg is Professor of Anthropology and Middle East Studies at the University of Arkansas-Fayetteville. *Exhibit E.* From the perspective of the discipline of anthropology, the Nation of Gods and Earths clearly constitutes a religion.  Anthropologist John Bowen, in a standard text (*Religions in Practice:  An Approach to the Anthropology of Religion*, 2002), defines religion as "ideas and practices that postulate reality beyond that which is immediately available to the senses." (p. 5.)  As far as a relation to the divine or the sacred, the Nation teaches that divinity resides within, that the Black Man himself (one who has knowledge of self) is a God.  Divinity, according to the Nation, is manifest here on earth, in humanity, and does not reside in some other, supernatural dimension. The Nation distinguishes itself from other religions (chiefly Christianity) that assert the existence of a Supreme Being external to humanity. These religions, according to the Nation, have used the notion of a  mystery god  and an afterlife to hoodwink, suppress, and enslave black people. In the understanding of the Nation, traditional Judeo-Christian views of the afterlife serve to mollify and pacify the masses.

The Nation asserts that it is not a religion but a  way of life.  It should be understood that this claim is made in order to distinguish the Nation from religions which have used the notion of a  mystery god  to exploit black people. The Nation also wants to assert its distinction from  religions  which have been the cause of sectarian strife and conflict. From an anthropological point of view, this claim in no way negates the Nation s essential religious character. Instead, such assertions simply constitute another facet of the Nation s belief system, and confirm the Nation s religious character. Id.

The use of numbers and letters to divine the secrets of the universe is also a practice shared by other religions. Such beliefs are basic to the Jewish Kabbala, and are also shared by

4

Isma ilis and Druze, esoteric offshoots from mainstream Islamic Shi ism. The catechistic organization of the 120 Degrees ( Lost-Found Muslim Lessons ) is similar in structure to the Roman Catholic catechism and that used by the Masons. The Nation is eclectic in its influences, and draws on a number of sources in its system of beliefs and practices. Members of the Nation read the Quran and the Bible for relevant lessons and teachings. Such a combination of apparently heterogeneous elements in the making of a religious belief system is very common cross-culturally, and is given the name of  syncretism  by anthropologists. Id.

The following facts are established in the Plaintiff s Verified Complaint.

The Plaintiff, Sean Ellis, is a Massachusetts state prisoner currently incarcerated at Souza Baranowski Correctional Center ( SBCC ) and at all times relevant to the alleged events was confined at SBCC, 1 Harvard Road, P.O. Box 8000, Shirley, Mass. 01464. The Defendant, Kathleen M. Dennehy ( Dennehy ) is the Commissioner of the Commonwealth of Massachusetts Department of Correction ( DOC ). This Defendant is being sued in her official capacity. The Defendant Lois Russo ( Russo ) is the Superintendent at SBCC. This Defendant is being sued in her official capacity. Defendants at all times relevant to this action were and are acting under color of state law.  DOC is a state agency. The DOC receives federal assistance.

Plaintiff is a member of the Nation. He has been a member of the Nation since August 1999. Plaintiff sincerely holds the beliefs described in paragraphs 11 through 25 fo the Verified Complaint. The Plaintiff s beliefs and way of life as a member of the Nation hold the same significance to him that Christianity does to an observant Christian, or that Judaism does to an observant Jew. Plaintiff observes the holy days.

Plaintiff needs access to the Five Percenter lessons, Supreme Alphabet, and 120 Degrees, and other teachings specific to the Nation, including *The Five Percenter* newspaper, to continue to grow and prosper in his way of life.  There is no substitute for the lessons that these Five Percenter materials provide.  Plaintiff has been denied access to all of these materials by DOCS officials.

5

In or about April of 2003, during a shakedown at SBCC, the Unit H-2 correctional officer ( CO ) after concluding a shakedown of cell 60 (Ellis assigned cell) confiscated personal NGE material. Within a day or two, Ellis was called to the Inner Perimeter Security ( IPS ) office and questioned about the confiscated material by IPS CO Melendez after which Ellis was given a portion back and informed that he was now under suspicion of being a Security Threat Group (STG) member. Sometime later on the morning of April 1, 2003, IPS Melendez served Ellis with two papers, one stating that Ellis had been identified as a STG member (i.e. Five Percenter) and the other which he signed and returned to dispute the STG claim.

Ellis initiated a grievance (#320) on April 4, 2003, therein seeking the confiscated papers and destigmatization as a result of the STG identification.  That grievance was denied on April 29, 2003. Ellis appealed the denial on May 5, 2003. That appeal was denied on or about May 22, 2003 reasoning that the identification as a STG member is not giveable. In accordance with 103 CMR 491, the grievance and grievance appeal #320 were further reviewed on or about 8-22-03 and the denial of the grievance was finalized.

On or about June 23, 2003, at a meeting with IPS Melendez and subordinates was held wherein Ellis disputed any STG involvement and expressed his adherence to the tenets of the NGE.  Ellis furthermore expressed that the NGE was not a STG nor affiliated with any STG. As a result of the meeting on July 28, 2003 via mail IPS informed Ellis that he had been validated as a member of a STG. Responding to the STG appeal, the office of the DOC superintendent reaffirmed the STG validation on August 26, 2003.

On or about September 5, 2003, Ellis requested a special diet (i.e. Kosher meal) as a result of his sincere Cultural belief. The DOC answered this request on September 16, 2003, by stating that the NGE was not listed as a DOC approved religion to receive the Kosher diet and thus Ellis must complete another special diet request form listing his religion differently in order to be considered for the Kosher diet. October 30, 2003, Ellis filled out an Inmate Religious Service Request form with a supporting affidavits wherein he outlined in detail the history and

6

teaching of the NGE.  Within the Inmate Religious Service Request form, Ellis specifically requested that he be given his material back as stated in grievance No. 320, that his dietary request be granted, that there be recognition of the NGE as a Culture which is legally afforded 1st Amendment protection, and that he be allowed to adhere to its principles and tenets, and that he be allowed to assemble with other adherents. Lastly he requested that he as an adherent of the NGE that he be free from the STG stigma. In the interim, on November 21, 2003, Ellis requested that he be allowed to consume a Kosher meal at least until the Religious Service Request Committee ( RSRC ) rendered a decision. The DOC responded by telling Ellis that he could not approve Ellis for a Kosher diet until a decision had been made regarding the matter. After failing to receive a response from the RSRC, on January 2, 2004 Ellis filed a grievance No. 2282 grieving all matters put before the RSRC with the exception of the issues previously exhausted in grievance No. 320. The DOC denied the grievance No. 2282 with the reason being that the RSRC would render a decision soon. Sometime thereafter, Ellis received correspondence from Dennehy informing him that his request for a Kosher diet as a member of the NGE was denied, and the request that the NGE be recognized by the DOC was denied as well.

On March 10, 2004, Ellis appealed the matters of grievance No. 2282 requesting that the DOC acknowledge his First Amendment rights by granting everything requested in grievance No. 2282. The DOC denied the appeal on April 14, 2004 stating that the grievance in question had been thoroughly reviewed and the inmate was properly denied his Kosher diet and his religious affiliations.

On March 8, 2004, sometime between 1:00-1:30 p.m., Ellis was called to the IPS office by Melendez and questioned about the arrival of The Five Percenter Newspaper. During this encounter IPS CO Melendez stated he was aware of Ellis  attempts to gain recognition for NGE and that he felt that Ellis was disrespecting him by ordering a subscription of the newspaper. Melendez said that he could shakedown Ellis  cell and find a reason to lug him and have him transferred to MCI Walpole. Ellis was later asked how he wished to dispose of the newspaper, to

which he told Melendez to follow protocol regarding contraband mail. The following day, Ellis received a contraband notice from the mail room staff that stated that as a whole, or in significant part, the newspaper violated the provisions of Code of Mass. Regulation 103 CMR 481.15(2)(E) and (F). Ellis wrote to the DOC on March 15, 2004, pursuant to 103 CMR 481.16(4), requesting to view the relevant portion for the purpose of filing a meaningful appeal. The DOC denied the request. The denial of the chance to review the relevant portion of the newspaper and the decision to contraband it was appealed on March 27, 2004. The DOC denied the appeal on April 2, 2004, and Ellis mailed out the newspaper. Ellis grieved the matter (grievance No. 3573) and this grievance was denied by concurring with the previous administrative decisions. Ellis appealed this denial which was also denied on May 20, 2004.

Another issue of the newspaper arrived on June 19, 2004, and was contra banded by a C.O. Burke per 103 CMR 430. Ellis appealed the decision to contraband newspaper to Defendant Russo on June 24, 2004, arguing 103 CMR 430, was not applicable. That appeal was denied the appeal on July 7, 2004.

At approximately 8:50 a.m., July 20, 2004, Ellis was summoned to the IPS office per order of a Captain Brannan to receive some advice and the opportunity to inspect the newspaper. The IPS officer failed to show Ellis a specific article or page identified as contraband, but informed Ellis that the newspaper itself was considered contraband by the DOC. Ellis was advised via insinuation that he would be punished if he continued to grieve this matter as such actions could not be tolerated at the institution. Instead it was stated at that meeting that the DOC considered the newspaper itself as contraband.

The Defendants are continuing to deny Plaintiff access to the Five Percenter newspaper, the 120 Degrees, the Supreme Alphabet and the Supreme Mathematics, and the ability to meet with others sharing his beliefs based upon the previous grievance and appeal denials made by their predecessors in office.

8

IF THIS COURT FINDS THE PLAINTIFF S BELIEFS TO BE SINCERE BY AN
EVIDENTIARY HEARING, THE FACTS WARRANT A PRELIMINARY INJUNCTION
GRANTING HIM ACCESS TO THE CORE DOCUMENTS OF HIS RELIGION.

The considerations for granting preliminary injunctive relief are 1) whether the plaintiff

has made a strong showing of success on the merits, 2) whether the plaintiff will be irreparably

harmed without injunctive relief, 3) whether the issuance of an injunction will injure other

parties, and 4) where the public interest lies.  Acevedo-Garcia v. Vera-Monroig, 296 F.3d 13 (1st

Cir. 2002).   [The] guarantee of free exercise is not limited to beliefs which are shared by all

members of a religious sect.   Thomas v. Review Board of Indiana Employment, 450 US 707,

715-16, 101 S.Ct. 1425 (1981).  A court s scrutiny of claims of asking for protection of the free

exercise of religion does not involve the verity of a plaintiff s religious belief but solely whether

a plaintiff s believes are   sincerely held and whether they are, in the scheme of things religious.

United States v. Seeger, 380 US 163-185, 85 S. Ct. 850 (1965); Patrick v. LeFevre, 745 F 2d

153-157 (2nd Cir. 1984), Jolly v. Coughlin, 76 F 3d 468, 476 (2nd Cir. 1996).  This   sincerity

analysis   tries to determine the solely objective good faith of a plaintiff and is guided by facts

such as the purported religion s size and history, whether the plaintiff is seeking material gain or

hiding ulterior interests behind a false claim of religious belief, and whether the plaintiff has

acted in a manner inconsistent with his professed beliefs.  International Society for Krishna

Consciousness v. Barber, 350 F 2nd 430, 441 (2nd Cir. 1981).  The courts are not permitted to ask

whether a particular belief is appropriate or true regardless of how unusual or unfamiliar the

belief may be.  Id.

Under RLUIPA, religious exercise is defined as   any exercise of religion, whether or not

compelled by, or central to, a system of religious belief.    RLUIPA § 2000 CC-5(7)(A).

RLUIPA requires a plaintiff to show that the right to free exercise of religion has been

substantially burdened.  A substantial burden is defined as the denial by the state of an important

benefit derived from conduct mandated by religious belief,   thereby putting substantial pressure

on an adherent to modify his behavior and to violate his beliefs.  While the compulsion may be indirect, the infringement upon free exercise is nonetheless substantial.  Thomas v. Review Board of Indiana Employment, 450 US 707, 717-18, 101 S. Ct. 1425 (1981).

After a five day trial, the federal court in the Southern District of New York made findings that the NGE is a religion and Plaintiff respectively submits that such findings establish a reasonable likelihood of success on the merits in this Action dealing with all of the same essential facts, law, and prison policies except this involves a different believer in the NGE.

The three documents at issue in this Action are the core documents of the Plaintiff s religion:  The 120 Degrees, The Supreme Mathematics and The Supreme Alphabet.  These three documents along with the lessons found within The Five Percenter are not only an integral part of the Nation s daily practice of their religion but The Five Percenter provides the only link available between members of the religion and access to their religious community especially for incarcerated adherents of this religion.  Therefore, the Massachusetts Department of Corrections denial of the Plaintiff of access to these four core documents and the only documents of his religion is a substantial burden on him,.

The Department of Corrections  cannot merely brandish the words  security  and  safety and expect that their actions will automatically be deemed constitutionally permissible conduct. Campos v. Koughlin 854 F Supp. 194,  204 (S.D.N.Y. 1994). RLUIPA requires that  inadequately formulated prison regulations and policies grounded on mere speculation, exaggerated fears, or post-hoc rationalizations will not suffice to meet the act s requirements.  Id. at 207.

The four documents are  publicly available and have been so available for over 40 years now and are available on a monthly basis by subscription. The lessons available in these public documents are a  code  in the same way that any religion s dogma can be used as a code and is much less likely to be used as a code than the use of languages unfamiliar to prison officials. Similarly, just because some members of a religion are criminals, that does not mean that the

10

religion is a criminal organization.

The granting of an injunction giving the Plaintiff access to the core documents of his religion within the guidelines established by the federal district court in the <u>Marria</u> case and attached as *Exhibits C & D* will injure no one but would be in the public interest by protecting religious freedom.

THEREFORE, Plaintiff moves that an evidentiary hearing on the sincerity of his beliefs be held and that a preliminary injunction then issue granting him access to the core documents of those beliefs.

Plaintiff by his attorney,

<u>/s/ Valeriano Diviacchi</u>
Valeriano Diviacchi
BBO# 555940
Diviacchi Law Office
59 Temple Place    Suite 507
Boston, MA 02111
(617) 542-3175                                    Date: 30 June 05



Not Reported in F.Supp.2d
2003 WL 21782633 (S D N Y.)
**(Cite as: 2003 WL 21782633 (S.D.N.Y.))**
**H**

Page 1

Motions, Pleadings and Filings

Only the Westlaw citation is currently available.

United States District Court,
S.D. New York.
Rashaad **MARRIA**, Plaintiff,
v.
Dr. Raymond BROADDUS, Deputy Commissioner of
Programs; G. Blaetz, Chairperson
of Green Haven Correctional Facility Media Review
Committee; Warith Deen Umar,
Coordinator for Islamic Affairs; and Glenn Goord,
Commissioner of the New York
State Department of Corrections, Defendants.
No. 97 Civ.8297 NRB.

July 31, 2003.

Prisoner brought action against New York State
Department of Correctional Services (DOCS) and
various officials alleging violation of his rights under
First Amendment and Religious Land Use and
Institutionalized Persons Act (RLUIPA). The District
Court, Buchwald, J., held that: (1) prisoner's beliefs as
a member of the Nation of Gods and Earths were both
sincere and "religious in nature" and therefore entitled
to Religious Land Use and Institutionalized Persons
Act (RLUIPA) and First Amendment, and (2) DOCS'
classification of Nation of Gods and Earths as a
security threat group and its absolute ban on Nation
literature violated prisoner's free exercise rights under
First Amendment and RLUIPA.

Order in accordance with opinion.

West Headnotes

[1] Constitutional Law ⚖84.2
92k84.2
A court's scrutiny of whether a plaintiff deserves free
exercise protection extends only to whether a claimant
sincerely holds a particular belief and whether the
belief is religious in nature  U.S.C.A Const.Amend. 1.

[2] Constitutional Law ⚖84.2
92k84.2
Analysis of whether a claimant sincerely holds a
particular belief and whether the belief is religious in
nature, and thus subject to protection under free
exercise clause of First Amendment, seeks to determine
the subjective good faith of an adherent in performing

certain rituals and can be guided by such extrinsic
factors as a purported religious group's size and
history, whether the claimant appears to be seeking
material gain by hiding secular interests behind a veil
of religious doctrine, and whether the claimant has
acted in a manner inconsistent with his professed
beliefs, however, courts are not permitted to ask
whether a particular belief is appropriate or true,
however unusual or unfamiliar the belief may be.
U.S.C.A. Const.Amend. 1.

[3] Constitutional Law ⚖84 5(14)
92k84.5(14)

[3] Prisons ⚖4(14)
310k4(14)
Prisoner's beliefs as a member of the Nation of Gods
and Earths were both sincere and "religious in nature"
and therefore entitled to Religious Land Use and
Institutionalized Persons Act (RLUIPA) and First
Amendment protection under the free exercise clause;
despite Nation members' reluctance to call the Nation
of Gods and Earths a "religion," prisoner lived by the
Nation's teachings and observed the Nation's holy days
to the extent possible under corrections regulations,
Nation carried the same significance for its members as
Christianity, Judaism, and Islam did for their adherents,
and Nation's contrasting belief system meant that one
could not be a part of those religions and the Nation
simultaneously  U.S.C.A. Const.Amend. 1; 42 U.S.C.
§ 2000cc-3(g)

[4] Constitutional Law ⚖84.5(14)
92k84.5(14)

[4] Prisons ⚖4(14)
310k4(14)
Department of Correctional Services' (DOCS)
classification of Nation of Gods and Earths as a
security threat group and its absolute ban on Nation
literature violated prisoner's free exercise rights under
First Amendment and Religious Land Use and
Institutionalized Persons Act (RLUIPA); Department
failed to establish that its complete ban on Nation
materials, literature, and activities furthered a
compelling security interest and was the least
restrictive means of doing so under RLUIPA   42
U.S.C. § 2000cc-1(a).

OPINION AND ORDER

BUCHWALD, J

© 2005 Thomson/West. No Claim to Orig U S Govt Works.

Not Reported in F.Supp.2d
(Cite as: 2003 WL 21782633 (S.D.N.Y.))

*1 Plaintiff Intelligent Tarref Allah, formerly known as Rashaad **Marria** [FN1] (hereinafter "plaintiff"), has been an inmate in the custody of the New York State Department of Correctional Services ("DOCS") since June 1995. For the duration of his incarceration within DOCS, plaintiff has been a member of the Nation of Gods and Earths ("Nation"), which he joined in August of 1994 while awaiting trial at Rikers Island. Defendants are DOCS employees sued in their individual and official capacities: defendant Glenn S. Goord ("Goord") is current the Commissioner of DOCS; defendant Dr. Raymond Broaddus ("Broaddus") was the Deputy Commissioner for Program Services of DOCS at all times relevant to this action; defendant G. Blaetz ("Blaetz") was a Senior Counselor and the Media Review Committee Chairperson at DOCS' Green Haven Correctional Facility ("Green Haven"); and defendant Warith Deen Umar ("Umar") was the Coordinator for Islamic Affairs at DOCS at all times relevant to this action (collectively, "defendants" or "DOCS").

FN1. Plaintiff legally changed his name in December 2001. *See* Trial Transcript ("Trial Tr.") at 38:14-18. Apparently, he had also sought to do so approximately two years earlier, but without success. *See id* at 38.21-39.7.

Plaintiff challenges DOCS' policy classifying the Nation as an "unauthorized" or "security threat" group and DOCS' consequent prohibition on his receipt of Nation materials and literature, including the group's central texts and its newspaper, and ban on formal gatherings with other members of the group. He seeks declaratory and injunctive relief pursuant to 42 U.S.C § 1983, alleging violations of the First and Fourteenth Amendments to the United States Constitution, the Religious Land Use and Institutionalized Persons Act of 2000 ("RLUIPA"), the New York State Constitution, and state law. Plaintiff's federal due process and analogous state law claims were dismissed on qualified immunity grounds at the summary judgment stage of this case. *See Marria v Broaddus*, 200 F.Supp 2d 280, 301-302 (S.D.N Y.2002).

The Court held a five-day bench trial during which the parties presented evidence bearing on the issue of whether plaintiff's beliefs as a member of the Nation are entitled to Constitutional protection and, if so, what proper the scope of protection would be. Having reviewed the testimony and evidence that has been presented, we find that plaintiff's sincerely-held beliefs as a member of the Nation are entitled to First Amendment and RLUIPA protection, and thus grant

plaintiff's requested injunctive relief in part and remand in part for further consideration and action by DOCS not inconsistent with this decision. [FN2] Our findings of fact and conclusions of law are set forth below.

FN2. It should be clear that in protecting plaintiff's constitutional rights to practice his adopted religion, we are fulfilling our sworn duty and in no way endorsing or heralding the Nation's tenets, several of which we find repugnant to the principles of tolerance and equality that are fundamental to our Constitution and the ethos of our country. *See Thomas v Review Board of Indiana Employment Security Division*, 450 U S 707, 714, 101 S.Ct. 1425, 67 L.Ed.2d 624 (1981) ("religious beliefs need not be acceptable, logical, consistent, or comprehensible to others in order to merit First Amendment protection")

## BACKGROUND

The Nation's history, teachings, and practices are largely not contested, nor are the existence and application of DOCS' policies concerning the Nation.

### A. The Nation of Gods and Earths

The Nation, whose adherents are commonly referred to as "Five Percenters," the "Five Percent", or the "Five Percent Nation," was founded in New York nearly 40 years ago. The Nation traces its roots to the Black Muslim movement that emerged in the midtwentieth century and most directly to the Nation of Islam ("NOI")--a group that DOCS classifies as a religion pursuant to the settlement in *Muhammad v. Coughlin*, No 91 Civ 6333 (S.D N.Y), and one with which the Nation shares some teachings and its central text (known to Nation members as the 120 Degrees). [FN3] *See* Trial Tr at 162·11-17; Trial Tr. at 56:18-23. The concept of the "Five Percent" from which the Nation derives its colloquial name was first set forth by NOI leader Elijah Muhammad, who separated the world's population into three categories: the Five Percent, the Ten Percent, and the Eighty-Five Percent. *See* Trial Tr. at 54:6-20. According to Elijah Muhammad, the Ten Percent teach the Eighty-Five Percent to believe in the existence of a "mystery God" and thereby keep the Eighty-Five Percent enslaved by having them worship something that they cannot see. *See id.* Muhammad characterized the remaining Five Percent as the poor, righteous teachers who do not believe in the teachings of the Ten Percent and instead teach the identity of the true and living God, as well as freedom, justice, and equality to all human families of the planet earth. *See id.* The term "Five Percenter," while commonly used to

© 2005 Thomson/West No Claim to Orig U S Govt Works

Not Reported in F.Supp.2d
(Cite as: 2003 WL 21782633, *1 (S.D.N.Y.))

describe members of the Nation, can be used more generally to describe a person who subscribes to the belief that humankind can be broken down into the Five Percent, the Ten Percent, and the Eighty-Five Percent. Thus, not all people who might nominally identify themselves as "Five percenters" are necessarily members of the Nation of Gods and Earths. *See* Trial Tr. at 55:15-25.

> FN3. While the NOI and the Nation differ in their interpretation of the 120 Degrees, referred to as the "Book of Supreme Wisdom" or "Lost-Found Muslim Lessons" by the NOI, both groups study them. *See* April 12, 2001 Decl. of A. Blocker ("Blocker Decl.") ¶¶ 8-11 DOCS permits the Book of Supreme Wisdom to be issued to any inmate who is a registered member of NOI, but Nation members who have not registered as members of the NOI are not permitted to view these materials. *See id.*

*2 The Nation of Gods and Earths began in 1964 when its founder Clarence 13X Smith broke with the NOI. *See* Trial Tr. at 56:18-23. In contrast to the NOI's belief that Allah (God) appeared on Earth solely in the person of its founder Master Fard Muhammad, Smith and his followers professed the central belief that every black man is an embodiment of God with the proper name Allah and that every black woman is "Earth," from which life springs. *See* Trial Tr. at 56.24-57.7. Thereafter, with the assistance of the City of New York and the Urban League, Smith and his followers created the "Allah School in Mecca," a headquarters that also houses the "Allah Youth Center in Mecca," in Harlem, New York as a street academy designed to bring the Nation's message to urban youth. *See* Trial Tr. at 56:18-23; *see also generally* April 30, 2001 Decl. of Elise Zealand ("Zealand Decl.") Ex. N (article discussing the history of the Nation), April 27, 2001 Decl. of Rashaad **Marria** ("**Marria** Decl.") ¶ 15 & Ex. D (discussing the Nation's relationship with the Urban League and New York City). The Center, which enjoys 501(c)(3) not-for-profit tax status and a favorable ninety-nine year lease from the City paid at the rate of twenty dollars per month, continues to operate in Harlem as do several similar centers elsewhere. *See* Trial Tr at 316:9-13. Among the activities sponsored by the Allah School and Youth Center are substance abuse programs, after-school tutoring for children, and youth trips to show children that "there is more to life than what they see in the ghettos." *See* Trial Tr. at 313:17-315:21. Aside from its headquarters in Harlem, the Nation does not have a formal structure or hierarchy beyond preaching respect

for "elders"--i.e ., those with the most extensive knowledge of the group's beliefs and lessons. *See* Trial Tr. at 94:12- 24.

As we previously mentioned, some of the Nation's beliefs and practices overlap with those of the NOI as a result of the two groups' shared belief in the lessons that comprise the 120 Degrees. Both groups, for example, believe that the black man is the "original Asiatic man." Both the Nation and NOI also believe that the white man is "the devil," made through a selective breeding process referred to as "grafting," as all of these teachings are set forth in the 120 Degrees. *See* Trial Tr. at 165:12-21; Trial Tr. at 302:15-20; Pl. Trial Ex. 180 (anthropological "syncretism" created by plaintiff witness Ted Swedenberg comparing the Nation of Gods and Earths to various religious traditions): Blocker Decl ¶ 8. Members of both groups also observe dietary restrictions, such as refraining from eating pork, and fast on holy days. [FN4] Finally, the Nation's emblem, known to members as the "Universal Flag," is reminiscent of the one used by NOI. *Compare* Pl. Trial Ex. 1 (cover of *Five Percenter* newspaper containing the "Universal Flag") *with* http:// www.noi.org/ (visited May 26, 2003) (NOI web page displaying crescent emblem)

> FN4 Holy days observed by the Nation include the anniversaries of the birth and death of Clarence 13X Smith and the birthdays of Elijah Muhammad and Fard Muhammad. *See* Trial Tr. at 62:6-8, 18. The Nation, however, does not participate in Ramadan, Jumma, and some other traditional Islamic customs practiced by NOI members *See* Pl. Trial Ex. 180.

*3 Although plaintiff asserts that his belief system as a member of the Nation would be commonly understood as a religion, he and other nation members reject the label "religion" in describing the Nation because they believe that the term "religion" connotes "belief in the mystery God"--i.e., the false religious belief systems promulgated by the Ten Percent to enslave the minds of others. *See* Trial Tr. at 106:13-16 Therefore, plaintiff and other Five Percenters commonly describe the Nation as a "way of life or culture," not a "religion." *See* Trial Tr. at 58:2-13.

The 120 Degrees, along with two numerology devices known as the Supreme Alphabet and Supreme Mathematics, forms the core of the Nation's literature. The 120 Degrees are lessons arranged in a question and answer format that represent the teachings of NOI founder Master Fard Muhammad and Elijah

© 2005 Thomson/West. No Claim to Orig. U S. Govt. Works.

Muhammad. The Supreme Alphabet and Supreme Mathematics assign a word to each letter of the alphabet (almost all of which begin with the letter to which they correspond) and ten "righteous" principles to each number from 0 to 9. They are used as the keys "to understand[ing] man's relationship to the universe and Islam," as well as to understanding and interpreting the 120 Degrees [FN5] **Marria** Decl. ¶ 13. There is no dispute that the Supreme Alphabet and Mathematics have not changed since they were created by Clarence 13X Smith in the 1960's and are made widely available by the Nation and others. Members of the Nation use these sources in conjunction with one another to attain "knowledge of self," which is central to their membership in the Nation, and they must be understood and applied on a daily basis in order to live righteously. Hence, just as Nation members are required to fast on holy days and follow dietary restrictions, they are also required to study the lessons in these teachings on a regular basis both individually and in group sessions. The Nation's beliefs are also based on the Koran and the Bible, which serve as secondary texts, *see* Trial Tr. at 65:7-66:15, and "plus lessons" consisting of written commentary by Five Percenters aimed at fostering further insight into the group's texts and teachings. *See* Trial Tr. at 64:17-20, 64:25-65:6.

> FN5. For example, in the nomenclature of the Supreme Alphabet, the letter "A" stands for "Allah," "B" stands for "Be," and "C" stands for "See" or "Cee." In the Supreme Mathematics, the number "1" represents "Knowledge," the number "2" represents "Wisdom," and the number "3" represents "Understanding." *See id.* One example of how Nation members apply this numerological system to their lives, according to plaintiff, is that "1" ("Knowledge") and "2" ("Wisdom") must precede "3" ("Understanding"). *See* Trial Tr. at 98:8-24 (plaintiff explaining how he uses the Supreme Alphabet and Mathematics to understand the world).

One additional piece of Nation literature specifically at issue in this case is *The Five Percenter*, a monthly newspaper published by the Allah Youth Center. It contains articles about current events relevant to the Nation, information about community activities, letters to the editor, editorials, and Five Percenter lessons and "plus lessons," including teachings from the 120 Degrees, the Supreme Alphabet, and the Supreme Mathematics. *See e.g.*, Pl. Trial Ex. 3 (copy of the October 1995 issue of *The Five Percenter* received in evidence); Pl. Trial Ex. 6 (copy of the June 1996 issue of *The Five Percenter* received in evidence). Some of

*The Five Percenter's* content is directed specifically towards prison inmates, including messages advising them to better themselves and follow prison rules while incarcerated. [FN6] Plaintiff asserts that *The Five Percenter* also serves as the principal and vital link for him to communicate with members of the Five Percenter community outside prison. *See* Trial Tr at 69:24-70:17, *see also* Trial Tr. at 154:24- 155:6 (plaintiff's expert anthropologist Ted Swedenberg explaining that *The Five Percenter* shows Nation members how the group's abstract principles can be applied in life); Trial Tr. at 292:17-293:15 (Nation representative Cee Aaquil Allah Barnes discussing the importance of *The Five Percenter* as a link to the community for prison inmates who are members of the Nation); Pl. Trial Ex. 4 (December 1995 issue of *The Five Percenter* containing a "Correspond with a God Column" for readers who wish to correspond with incarcerated members of the Nation).

> FN6. One such article instructs inmates. " 'Don't serve time, but make time serve you.' is the principle that you should adopt internally in order to return back to your family and community as an asset and not a continued liability ... When you serve time negatively, you waste precious moments of your life." *See* Pl Trial Ex 3 (article entitled "Belly of the Beast" from the October 1995 issue of *The Five Percenter* ) The article further instructs inmates to "participate to the best of your ability within the rules of your respective prison and reap what you sow in this righteousness " *See id*

*4 Practicing members of the Nation also have various congregate gatherings. For example, the Nation conducts "Civilization Classes," in which more senior members--i.e., those who have studied the lessons longer than others--educate newer members about the lessons and how they can be applied. *See* Trial Tr. at 291:17-23. Such classes are held regularly at the Allah Youth Center. *See* Trial Tr. at 314:25-315:3. Nation members also gather regularly for "Parliaments" and "Rallies." During these gatherings, members come together to help one another learn their lessons, to educate one another by conversing about the lessons' meaning and application (which they call "building"), and to make decisions as a community. *See* Trial Tr. at 59:25-60:10; Trial Tr. at 287:25-288:8; Trial Tr. at 291:2-10.

Finally, as we mentioned earlier, the Nation has an official symbol referred to as the a Universal Flag, consisting of an eight-pointed star containing a number

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

7, a crescent, a smaller five-pointed star, and the words "In the Name of Allah." *See* Trial Tr. at 155:16-23.

B. DOCS' Policies Concerning the Nation

DOCS deems the "Five Percenters" to be an "unauthorized" or "security threat" group, which is the nomenclature that DOCS uses to describe a gang or other group that it views as an organized threat to prison safety and security. [FN7] As a result, though DOCS' correctional philosophy is primarily "behavior based," Nation members like plaintiff are regarded as gang members within the New York State correctional system and are consequently prohibited from receiving or possessing any of the group's literature or symbols, as well as from engaging in any organized activities associated with the Nation.

> FN7. In doing so, DOCS does not distinguish between "Five Percenters" and members of the Nation of Gods and Earths. *See e.g.*, Def. Proposed Findings of Fact and Conclusions of Law ("Def.Findings") ¶ 36 ("Plaintiff is able to participate in DOCS' educational and rehabilitative programs in spite of the fact that he is a member of the Five Percenters."). As previously noted, however, DOCS and plaintiff do not necessarily use the term "Five Percenter" to identify the same individuals.

DOCS' policies concerning the Nation stem from its nonrecognition policy designed for security threat group management, which seeks to diminish gangs' power and importance by refusing to legitimize their existence. DOCS does not officially recognize unauthorized or security threat groups, even by tracking their activities internally, because it believes that "to do so would give them undue credibility and attention and embellish their importance." Def. Findings at ¶ 45 (citing Trial Tr. at 340:18-341:19). Pursuant to its non-recognition policy, and to further prevent the growth and/or proliferation of security threat groups through recruiting, DOCS implemented Rule 105.12 of its Standards of Inmate Behavior, which states that inmates "shall not engage or encourage others to engage in unauthorized organizational activities or meetings, display, wear, possess, distribute, or use unauthorized organizational insignia or materials." Def. Trial Ex. I. Rule 105.12 defines an unauthorized organization as "any gang, or organization which has not been approved by the Deputy Commissioner for Program Services." *Id.* Materials violating Rule 105.12 are considered contraband and are not subject to the "Media Review" process DOCS has implemented for determining the

acceptability of the majority of other printed and written materials received by prisoners. *See* Trial Tr. at 360:21-361:9. DOCS has also implemented a zero-tolerance gang policy, under which any kind of behavior deemed to be part of gang activity, including possession of written materials or gang-associated emblems or logos, will subject an inmate to discipline. *See* Trial Tr. at 342:13-19.

**\*5** Applying its complete ban on "Five Percenter" literature pursuant to its non-recognition policy, DOCS forbids plaintiff from having lessons from the 120 Degrees, possessing the Supreme Alphabet and Mathematics, or receiving or possessing *The Five Percenter* and other materials that are either associated with the Nation or contain its symbols. [FN8] DOCS' designation of the Nation as an unauthorized group also means that plaintiff can meet with no more than four other Five Percenter inmates at a time, and can only do so sporadically. *See* Trial Tr. at 63:6-18. He is thus prohibited from attending or organizing Civilization Classes, Parliaments, or Rallies. Finally, plaintiff is not permitted to eat his meals after sundown on fast days or to meet with other inmates on those days in order to break the fast, privileges that are extended to inmates who adhere July 16, 2003 to authorized religions like Nation of Islam members and Orthodox Muslims *See* Trial Tr. at 62:11-63:5.

> FN8. According to plaintiff and a supporting affidavit submitted for summary judgment purposes by an inmate NOI minister, members of the Nation are also unable to obtain the 120 Degrees in bound format from NOI members, as only inmates registered with an NOI temple outside of prison are permitted to have those lessons. *See* Trial Tr. at 57:8-15, Blocker Decl. ¶¶ 10-11.

Because DOCS' procedures for becoming "authorized" explicitly exclude religious groups, there does not appear to be an established process by which an unrecognized group like the Nation can attain recognition as a religion from DOCS in order to avoid gang treatment . [FN9] We surmise from the trial testimony, however, that a religious group could become effectively "authorized" in a manner equivalent to becoming an authorized group directly through the Department of Program Services by attaining a favorable recommendation for accommodations from DOCS' Division of Ministerial and Family Services that is subsequently approved by executive level DOCS officials. *See* Trial Tr. 525:25-526:15, 530:3-6 (former Director of Ministerial and Family Services John LoConte describing his role in investigating and

Not Reported in F.Supp.2d
**(Cite as: 2003 WL 21782633, \*5 (S.D.N.Y.))**

making subsequent recommendations to executive level DOCS officials concerning inmate requests for religious accommodations). It has apparently been DOCS' practice upon receiving an inmate request for religious accommodations to attempt to "verify the religious practice, whether or not it is something that is understandable in light of organized operational religious communities." Trial Tr. 512:17-21, and to "reach out to the outside religious community of the inmates [making the claim]" in order to confirm the practices' legitimacy and seek assistance in providing accommodations. Trial Tr. at 513:1-2. However, DOCS did not introduce any evidence to indicate that it has made such investigative or outreach efforts with respect to the Nation, despite having received a number of requests for religious accommodation. [FN10] Moreover, in defending this lawsuit, DOCS has consistently avoided this issue by insisting that plaintiff cannot seek religious recognition because the Five Percenters are, in its view, a gang and not a religion.

> FN9. DOCS Directive 4670, which deals with inmate organizations, makes it clear that religious groups seeking to meet regularly for worship or prayer services cannot apply for inmate organization status. *See* Def. Trial Ex. F2 (Directive 4670) at ¶ II(C)(2). Trial testimony reflected some confusion concerning exactly how a group claiming to be religious in nature like the Nation can become "authorized." *Compare* Trial Tr. at 390:18-25 (DOCS official Richard Roy testifying that he did not know the answer to plaintiff's counsel's question about whether there was a way for a group claiming religious status to become authorized by DOCS short of litigation) *with* Trial Tr. 416:9-22 (Richard Roy testifying that, though he was not familiar with the details, there is a procedure by which religious groups can become recognized within DOCS through the Division of Ministerial and Family Services) *and* Trial Tr at 525:25-528:7 (former DOCS Director of Ministerial and Family Services John LoConte discussing generally how he handled requests for religious accommodation within DOCS, but stating that he did not make the final decision about accommodating religious requests and that "[o]ur recognition I don't believe is that important.") The evidence introduced at trial also indicates that at least two other Black Muslim groups, the Nation of Islam and Moorish Science Temple, resorted to litigation similar to this one before DOCS ceased treating them as "unauthorized groups" and began classifying them as religious groups. Both cases were settled without court rulings on the plaintiffs' claims

for injunctive relief from DOCS' non-recognition of the groups in question. *See* Trial Tr 389:6-20; 533:8-535:25; *see also Muhammad v Coughlin*, No 91 Civ 6333 (S.D.N.Y.) (Nation of Islam); *Gilmore-Bey v Coughlin*, No. 93 Civ. 6592 (S.D.N.Y.) (Moorish Science Temple).

> FN10. *See e.g., Breland v. Goord*, No. 94 Civ. 3696, 1997 WL 139533 (S.D.N.Y. March 27, 1997); *Graham v Cochran*, No. 96 Civ. 6166, 2000 U S. Dist. LEXIS 1477, (S.D.N.Y. February 14, 2000) (Ellis, M.J.); *Lord Natural-Self Allah v. Annucci*, No. 97 Civ. 607, 1999 WL 299310 (W.D.N.Y. March 25, 1999) (Heckman, M.J.); Pl. Trial Exhibit 182 (October 29, 1996 letter from DOCS Deputy Commissioner for Program Services Raymond Broaddus to an inmate regarding a request for religious accommodations stating "I have been informed that the Five Percent Nation is not a religion. Therefore, there is no religious faith to practice."), Pl. Trial Ex. 81 (October 19, 1998 letter from defendant Warith Deen Umar, DOCS coordinator for Islamic Affairs, to plaintiff stating that "there are no directives or rules and regulations regarding the Five Percenters. The reason for this is the courts have ruled the Five Percenters are not a legitimate religious group").

C. Conflicting Claims About the Nature of the Nation

While plaintiff claims that DOCS' ban on Nation materials and gatherings violates his free exercise rights under the Constitution and RLUIPA, DOCS argues that his beliefs and practices as a member of the Nation are not protected because they are not sincere or religious in nature, and in any event that its ban of the Nation's literature is justified by violence associated with Five Percenter inmates. The parties' conflicting claims boil down to widely disparate characterizations of the nature of the Nation of Gods and Earths.

**\*6** DOCS, on the one hand, takes the position that "the Five Percenters," including purported members of the Nation of Gods and Earths, is a violent organization that, like some other gangs, utilizes symbols and seemingly innocuous literature touting the group's positive aspects to identify its members and "territory," as well as to recruit new members into its violent and illegal activities. [FN11] Such activities include assaults, intimidation, extortion, drug dealing, and retaliation against fellow members who attempt to leave the group or act against other Five Percenters,

© 2005 Thomson/West. No Claim to Orig. U S. Govt. Works.

Not Reported in F.Supp.2d
**(Cite as: 2003 WL 21782633, \*6 (S.D.N.Y.))**

*See* Def. Findings ¶¶ 56- 58. DOCS additionally asserts that Five Percenters utilize the Supreme Alphabet and Mathematics as a code in furtherance of its disruptive activities. *See* Def Findings ¶¶ 61-63, 103-104. DOCS' stance in this case represents a shift from its previous litigation position that the content of the Nation's literature itself is dangerous. [FN12] Here, DOCS concedes that the Nation's literature is innocuous, but claims that its ban on Nation materials is still necessary to preserve prison safety and security because the materials are used to facilitate the recruiting efforts and illegal activities of a violent and disruptive organization. Furthermore, according to DOCS, it would give the Five Percenters and other security threat groups increased legitimacy and status, contrary to its non-recognition strategy, if inmates were permitted access to the groups' materials. *See* Def. Findings ¶¶ 42, 52, 90-92, 94-95 (outlining this justification for DOCS' non-recognition strategy in general and for its specific application to the Five Percenters).

> FN11. According to DOCS, "[j]oining a gang such as the Five Percenters is about money, power and respect," Def. Findings ¶ 87, and "[t]he Five Percenter newspaper is used as a tool by inmates to recruit other gang members and sometimes inmates are recruited into joining the Five Percenters without realizing that they may be asked to participate in violent or illegal activities." *See id.* ¶ 91.

> FN12 In previous litigation arising from the same time period as this one, DOCS claimed that Five Percenter literature incited violence against white people with messages like "kill the White devils and their families" and asserted that a statement urging Nation members to "struggle to get out of prison houses" through education was an incitement to escape (in full, the statement read "we've experienced the trials and tribulations of his prison house and we must now struggle to get out of his prison houses and remove the veil that has been placed over our people's minds. This can only be done through education, i.e., proper education"). *See Breland v Goord,* No. 94 Civ. 3696, 1997 WL 139533, at \*2 (S.D.N.Y. March 27, 1997). DOCS' content-based justification for banning the Nation's literature was rejected by Judge Baer of this Court, who found that the Nation's literature contained no such incitements to violence and that DOCS had "unfairly characterized the material at issue" and "unfortunately focused on the non-traditional nature of plaintiff's religion." *See id.* at \*2, \*6.

Plaintiff, on the other hand, asserts that the Nation is not a gang, but rather a legitimate religious group whose beliefs extol lawfulness, righteousness, freedom, justice, equality, and peace and whose literature focuses largely on positive messages, such as education, self-improvement, self-worth, and responsibility. *See* Pl. Proposed Findings of Fact ("Pl.Findings") ¶¶ 19-21, 35-36. According to plaintiff and other Nation members, "[a]ny purported member who engages in violent or disruptive activities is violating the tenets of the Nation." Pl. Findings ¶ 35, *see also* Trial Tr. at 287:9-288:8. He further asserts that the Supreme Alphabet and Mathematics are a religious numerology system, not a secret code, *see* Pl. Findings ¶¶ 16-19; *see also* Trial Tr. 47.13-16, and that Nation members are allowed to leave the group without reprisals. [FN13] *See* Pl. Proposed Conclusions of Law ("Pl.Conclusions") 26; *see also* Trial Tr. at 96:4-23; Trial Tr. at 385:6-386:11. Plaintiff thus argues that allowing him to receive the group's literature poses no threat to prison safety or security.

> FN13. At the summary judgment stage of this case, plaintiff submitted the declarations of numerous Nation members, living both within and outside the DOCS system, asserting that the Nation is not a gang and does not promote violence or retaliate against members who leave See June 26, 2001 Decl. of Cee Aaquil Allah Barnes (detailing the activities of the Allah Youth Center and asserting that the Five Percenters are not a gang); April 12, 2001 Decl. of Wendell Williams (asserting that Five Percenters are not a gang and do not engage in gang like activities); April 13, 2001 Decl. of Terayus Jones (same); April 25, 2001 Decl. of Rahiem Buford (same); April 18, 2001 Decl. of Gabriel Clausen (same); October 6, 200 Decl of H. Khalif Khalifah (same).

In evaluating these contradictory positions, we make further factual findings below as they become relevant.

## DISCUSSION

### A. Sincerity and Religious Nature of Plaintiff's Beliefs

\*7 As a threshold matter, we discuss DOCS' position that plaintiff may not seek the protections of the First Amendment or RLUIPA because he has failed to demonstrate either the sincerity of his professed beliefs or that they otherwise merit religious protection.

[1][2] The Second Circuit set forth the scope of this Court's inquiry into a plaintiff's beliefs in *Patrick v.*

Not Reported in F.Supp.2d
(Cite as: 2003 WL 21782633, *7 (S.D.N.Y.))

*LeFevre*, a previous free exercise case brought by a Five Percenter inmate, by emphasizing the "limited function of the judiciary in determining whether beliefs are to be accorded first amendment protection" as follows:

> It cannot be gainsaid that the judiciary is singularly ill-equipped to sit in judgment on the verity of an adherent's religious beliefs. Mindful of this profound limitation, our competence properly extends to determining "whether the beliefs professed by a [claimant] are sincerely held and whether they are, in his own scheme of things, religious."

*Patrick v. LeFevre*, 745 F.2d 153, 157 (2d Cir.1984) (quoting *United States v. Seeger*, 380 U.S. 163, 185, 85 S.Ct. 850, 13 L.Ed.2d 733 (1965)). Hence, a court's scrutiny of whether a plaintiff deserves free exercise protection "extends only to whether a claimant sincerely holds a particular belief and whether the belief is religious in nature." *Jolly v. Coughlin*, 76 F.3d 468, 476 (2d Cir.1996) (discussing this standard in the context of a free exercise claim brought under the Religious Freedom Restoration Act). Sincerity analysis "seeks to determine the subjective good faith of an adherent in performing certain rituals" and can be guided by such extrinsic factors as a purported religious group's size and history, whether the claimant appears to be seeking material gain by hiding secular interests behind a veil of religious doctrine, and whether the claimant has acted in a manner inconsistent with his professed beliefs. *Int'l Soc'y for Krishna Consciousness v. Barber*, 650 F.2d 430, 441 (2d Cir.1981). However, "courts are not permitted to ask whether a particular belief is appropriate or true-- however unusual or unfamiliar the belief may be." *Jolly*, 76 F.3d at 476. *Patrick v. LeFevre* further instructs us that deciding such subjective issues as the sincerity and the perceived nature of beliefs requires the factfinder--the Court in this case--to assess the claimant's demeanor at trial and "delve into the internal operations of the claimant's mind and in turn assess the sincerity of the held beliefs and the place occupied by such beliefs in the plaintiff's life." *Patrick*, 745 F.2d at 158, *see also id.* at 159. In this regard, the Circuit has cited with approval the definition of religion espoused by philosopher William James--"the feelings, acts, and experiences of individual men in their solitude, so far as they apprehend themselves to stand in relation to whatever they may consider the divine." *Id.* at 158 (quoting W. James, *The Varieties of Religious Experiences* 31 (1910)). Having heard plaintiff's testimony and observed his demeanor throughout the week-long trial, we find that plaintiff meets the two *Patrick v. LeFevre* criteria.

i. Sincerity Analysis

**\*8** [3] We find that the trial record contained ample evidence of plaintiff's sincerity in his beliefs and that DOCS' arguments to the contrary are unpersuasive. Plaintiff, who is incarcerated for murder, testified that the Nation had "resurrected" him "from .. a life of total unrighteousness." Trial Tr. at 100:8-9. He also described the manner in which his life is guided by his Five Percenter beliefs--specifically the 120 Degrees, Supreme Alphabet, and Supreme Mathematics--and his efforts to conform his life to his beliefs as follows:

> When I look at that first degree in the student enrollment [the first few lessons of the 120 Degrees] and I see the black man is the God of the universe, it's endowed me with the power to know the sky's the limit I manifested, I make changes in my life. I don't do things I did before. I became a vegan, stopped eating animals. I enhanced my discipline level. My mother's, she's amazed I've been locked up so long and haven't even had a fight I learn to conduct myself in matters where people respect me for who I am. I don't have to be bothered no more because people respect intelligence, and once they see you living what you say, they respect that. And I learn to conduct myself in a manner which I don't put myself in predicaments that would lead to altercations and things of that nature.

Trial Tr. at 100:14-101:1. He reports that in doing so he has gone from being a person who was "trying to take things to the extreme, you know, on a negative aspect" to being a "very disciplined person, a person that's constantly striving to obtain righteousness" who has "learned and grown to have respect for other people's feelings." Trial Tr. at 43:5-17. Examples of ways in which plaintiff has conformed his life and daily activities with his beliefs as a member of the Nation include memorizing and studying his lessons to the extent possible under DOCS' complete ban, eschewing pork and pork byproducts, fasting on holy days, and officially changing his name from Rashaad **Marria** to a "righteous" one reflecting Nation values and custom (Intelligent Tarref Allah), not to mention diligently pursuing this litigation since 1997 and engaging in a letter-writing campaign to recover confiscated copies of *The Five Percenter* prior to that. *See* Trial Tr. at 38:14-18; 100:17-20. When one considers the totality of plaintiff's testimony, it is apparent that he has structured his daily lifestyle in conformity with the rigors of membership in the Nation for some time. This conclusion is underscored by plaintiff's record of conduct as a prisoner, which includes earning his GED,

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works

Not Reported in F Supp.2d
(Cite as: 2003 WL 21782633, *8 (S.D.N.Y.))

participating in numerous other classes and programs, serving on the Inmate Liaison Committee, [FN14] and no incidents of violence or disruptive conduct. *See* Trial Tr. at 126:12-14; June 18, 2001 Reply Decl. of Rashaad **Marria** Exs. F-J (certifications and letter of commendation documenting various classes and programs in which plaintiff participated while incarcerated).

> FN14. We note that, according to DOCS witness Superintendent Joseph Smith, serving on the Inmate Liaison Committee is the kind of "positive" activity through which a charismatic inmate can become a "stabilizing influence" within a prison facility. Ironically, Smith sought to contrast this kind of positive activity with his negative perception of Five Percenter inmates *See* Trial Tr. at 652:25-653:7

*9 Plaintiff's sincerity was further substantiated at trial by the largely unchallenged testimony of Cee Aaquil Allah Barnes and Born Justice Allah, representatives of the Allah Youth Center, concerning the Nation's apparent legitimacy outside prison. [FN15] *See* Trial Tr. at 296:17-298:13 (DOCS' extremely limited cross examination of Mr. Barnes); Trial Tr. at 323:10-12 (DOCS declining to cross examine Mr. Justice Allah). There was no suggestion by DOCS that either of these representatives was involved in a criminal organization. Nor did DOCS contest the testimony that the Nation's non-incarcerated members include police officers, doctors, lawyers, and other professionals who would presumably not be part of a violent gang. *See* Trial Tr. at 294:17-21. Moreover, the Allah Youth Center's 501(c)(3) tax status and the favorable lease that it continues to receive from New York City, neither of which DOCS disputes, are strong indications that the Nation itself is not believed to be a criminal organization outside prison. [FN16] The various community-oriented programs and activities the representative described as taking place at the Allah School and Youth Center are also consistent with plaintiff's claims that the Nation is a sincere, legitimate religious group. *See* Trial Tr. at 290:16-25 (Cee Barnes testifying about health and book fairs taking place at the Allah Youth Center), 292:1-16 (Cee Barnes testifying about the Nation's prison outreach and assistance given to former inmates), Trial Tr. at 313:17-315:19 (Born Justice Allah testifying about the youth programs run at the Allah School).

> FN15. Mr. Barnes is the Center's Chairman and Mr. Justice Allah serves as an elder and administrator.

> FN16. DOCS does argue that "Five Percenters outside of prison have engaged in criminal activity." *See* Def. Findings ¶ 80. However, this argument--relying solely on Shawangunk Superintendent Joseph Smith's recollections of supervising several Five Percenters as a probation officer in the 1970's, Investigator Ron Holvey's experiences with alleged Five Percenter gangs in New Jersey, and an inmate's testimony that he participated in Five Percenter gang activities outside prison after joining the group in a boys home--does not really address or challenge the Nation representatives' testimony to the effect that the Nation is a legitimate organization engaged in constructive and lawful activities outside prison.

The Nation thus appears to be in the somewhat unique position of having a legitimate existence outside prison while being classified exclusively as a security threat group within DOCS. [FN17]

> FN17. According to DOCS' former Director of Ministerial and Family Services John LoConte, the existence of an established, legitimate religious community outside of prison would have been an important factor in his determination of whether a prisoner deserved religious accommodations during his tenure as DOCS Director of the Division of Ministerial and Family Services. *See* Trial Tr at 536:23-538:8, 538:17- 840:2; *see also* Trial Tr. 543:4-13 (LoConte testifying that DOCS recognizes Wiccans as a religion because of their "visible presence," complete with articulated doctrine, dogma, traditions, and rituals, outside prison).

In support of its position that plaintiff is insincere, DOCS makes a series of unpersuasive arguments. Several concern instances in which DOCS claims plaintiff did not conform his conduct to his professed Five Percenter tenets and thereby suggests that he is essentially faking them in order to gain the legitimacy that religious protection would afford his gang participation. *See* Def. Findings ¶¶ 21-32. DOCS first cites three instances in which plaintiff was disciplined by prison authorities for nonviolent conduct: (1) giving false information to a corrections officer, to wit, falsely telling the officer that he had received legal pads from the prison commissary, (2) failing to obey a direct order from a guard who apparently told him to stay away as he was attempting to observe another inmate's grievance meeting in the sergeant's office as the

Not Reported in F.Supp.2d
(Cite as: 2003 WL 21782633, *9 (S.D.N.Y.))

Page 10

representative of the Inmate Liaison Committee; and (3) possessing an "altered item"--a toothbrush that plaintiff testified he used as a makeshift screwdriver by outfitting it with the sliding metal piece from the inside of a pair of headphones--that could be used as a weapon. *See* Def. Findings ¶¶ 29-31; Trial Tr. at 124:22-129.9. Whether or not one believes plaintiff's assertions that he was disciplined unjustly in the first two instances, they are a far cry from the kind of marked or regular departure from professed beliefs that would lead us to find a plaintiff insincere. *Cf. Int'l Soc'y for Krishna Consciousness v. Barber*, 650 F.2d 430, 441 (2d Cir.1981) (citing, as an example of the type of inconsistent act that would lead a court to find an adherent insincere, a Jewish adherent claiming a free exercise violation from being compelled to appear in court on the Sabbath who otherwise works on Saturdays). In the case of the altered item, which no one disagrees constituted contraband, we find credible plaintiff's explanation that he was simply using it as a makeshift screwdriver, given that he did not alter the rounded, blunt tip of the headphone piece and made no real attempt to conceal the item, which was found in a bucket filled with radio parts and other knick-knacks where it was regularly kept. *See* Def. Trial Exhibit OO (photocopy of "altered item"). [FN18]

> FN18. Plaintiff's expert on prison administration, former federal prison warden Toni Bair, reached a similar conclusion upon examination of the photocopy during his testimony. *See* Trial Tr. at 220.18-221:15.

**\*10** Other evidence of inconsistent conduct, according to DOCS, includes plaintiff's mentioning only that the Nation's dietary restrictions require him to eschew pork while Cee Barnes testified that the Nation's tenets require one "not to eat pork and if you go a little bit further ... not to eat any type of scavenger, and a scavenger is like shrimp or tuna fish," Def. Findings ¶ 28; *see also* Trial Tr. at 287:7-8, plaintiff's allowing his subscription to *The Five Percenter* lapse for a time in 1996, *see* Def. Findings at ¶ 26, and plaintiff's adopting a NOI religious designation during a period in which he attended a number of NOI services. *See* Def. Findings ¶ 27. The purported inconsistencies raised by the first two arguments seem sufficiently minor that we need not address them in detail here, except to note that DOCS does not contest plaintiff's testimony that he has adhered to a vegan diet since becoming a Nation member (meaning that he does not eat shrimp or tuna) and that the lapse in plaintiff's subscription occurred during a period in which DOCS began to confiscate the newspaper as illegal contraband. [FN19]

> FN19. In a similar vein, we reject DOCS' argument that plaintiff's insincerity is evidenced by his failure to formally request parliaments and other gatherings until 2000, *see* Def. Findings ¶ 22, since DOCS' complete ban on the Nation's materials and previous denials of plaintiff's requests to receive them made it fairly clear that such a request would not have been granted and plaintiff has represented that he did so merely to ensure that he had exhausted his administrative remedies.

With respect to DOCS' argument about the NOI designation, plaintiff testified that he sporadically attended both NOI and other groups' services while remaining a member of the Nation in order to "get an understanding of what separates the two and why people think the way they think," Trial Tr. at 67:3- 5, but that NOI was the only group for which DOCS required him to sign a religious designation form in order to be allowed to attend the services. *See* Trial Tr. at 67:22-68:16. He emphatically, and credibly, denied that his attendance at any other group's services constituted a commitment to be a part of a religious community other than the Nation. *See id.* We find it unsurprising that a member of the Nation, which builds on related religious traditions, like plaintiff would seek to attend NOI services and correspondingly sign up as a NOI adherent when DOCS treats the Nation itself as an unauthorized group, especially since this is exactly what DOCS encouraged him to do in response to his requests for religious accommodations. [FN20] *Cf. Campos v. Coughlin*, 854 F.Supp. 194 (S.D.N.Y.1994) (finding "not persuasive" DOCS' attempt to cast doubt on the sincerity of Santeria adherents' religious beliefs because they had previously self-identified as "Catholic"). Moreover, DOCS' argument that we should find plaintiff insincere because he signed up for and attended NOI services is in tension with its claim, discussed *infra*, that plaintiff's beliefs are not substantially burdened by its policies because he can gain access to the Nation's lessons through the NOI (presumably in part by attending their services).

> FN20. In response to his inquiries concerning confiscated copies of the *Five Percenter* newspaper, DOCS Coordinator for Islamic Affairs, Warith Deen Umar responded as follows. Dear brother:
> This responds to your letter of September 22, 1998. There are no directives or rules and regulations regarding Five Percenters. The reason for this is because the courts have ruled that Five Percenters are not a legitimate

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works

Not Reported in F.Supp.2d
**(Cite as: 2003 WL 21782633, \*10 (S.D.N.Y.))**

religious group. The New York State
Department of Correctional Services does not
acknowledge the claims of inmates who
designate themselves as Five Percenters. *You
may want to explore some of the teaching of
the Muslims and the Nation of Islam in your
facility*

Your brother in Islam, Imam Warith Deen
Umar Ministerial Program Coordinator
Ministerial and Family Services

Pl. Trial Ex. 81 (emphasis added). We note
that, to the Court's knowledge, no case law
existed to substantiate Imam Umar's assertion
that "the courts have ruled that Five
Percenters are not a legitimate religious
group."

Ultimately, the point of sincerity analysis is to
"provide[ ] a rational means of differentiating between
those beliefs that are held as a matter of conscience and
those that are animated by motives of deception and
fraud." *Patrick,* 745 F.2d at 157 (citation omitted).
Having engaged in such an analysis, and while we do
not find it inconceivable that a gang or other group
might seek to cloak itself in a purported "religion" in
order to increase its legitimacy, we find DOCS' attempt
to cast doubt upon the sincerity of the plaintiff's beliefs
in this case singularly unpersuasive.

ii Religious Nature of Plaintiff's Beliefs

**\*11** DOCS' claims that plaintiff's beliefs are not
"religious in nature" are similarly unpersuasive. DOCS'
argument on this issue throughout this litigation has
been a semantic one, focusing on plaintiff's and other
Nation members' reluctance to call the Nation of Gods
and Earths a "religion." *See **Marria** v. Broaddus,* 200
F.Supp.2d 280, 292 (S.D.N.Y.2002). DOCS asserts
that Nation members' refusal to call the group a
"religion" indicates that it should not be treated as one
and that plaintiff's statements that he believes that the
Nation fits the legal definition of a religion are merely
a self-serving tactic to further this litigation. *See* Def.
Findings ¶¶ 3-7, 23-25. In support of this argument,
DOCS notes that plaintiff stated at his first deposition
that the Five Percenters are not a religion, but rather a
way of life. *See id.* ¶ 24; *see also* Feb. 12, 2001 Decl.
of Dale Artus Ex. Q (issue of *The Five Percenter* with
headline and article entitled "We Are Not A
Religion").

The weakness of DOCS' semantic argument is evident.
While it is somewhat understandable that a group that
refuses to describe itself as a "religion" did not inspire
immediate outreach from DOCS officials, the law of
the Free Exercise Clause does not turn on mere

semantic distinctions *Cf Graham v Cochran,* 96 Civ.
6166. 2000 U.S. Dist LEXIS 1477, at \*30 (S.D.N.Y.
February 14, 2000) (Ellis, M.J.) (noting, in a similar
case brought by a Five Percenter inmate, that "just as
calling one's beliefs a 'religion' does not make it such
for constitutional purposes, failure to label one's beliefs
a 'religion' does not prohibit constitutional protection").
The significance of plaintiff's beliefs in his life is
considerably more relevant than what plaintiff and
other members of his community choose to call their
beliefs--"a rose by any other name," as the saying goes,
"would smell as sweet." As already described in some
detail, plaintiff has submitted substantial evidence that
he has been a practicing member of the Nation since
August of 1994 and that he lives by the Nation's
teachings and observes the Nation's holy days to the
extent possible under DOCS regulations. Furthermore,
plaintiff, the Allah School representatives, and an
expert cultural anthropologist all testified that the
Nation carries the same significance for its members as
Christianity, Judaism, and Islam do for their adherents,
and that the Nation's contrasting belief system means
that one could not be a part of those religions and the
Nation simultaneously. Overall, plaintiff has
convincingly demonstrated the central significance of
the Five Percenter belief system in his daily life and his
understanding of that which he considers divine, which
is in accordance with the William James definition of
religion. Finally, it would be incongruous for us to
reject the notion that the Nation's belief system is
"religious in nature" when it is, in several respects,
more orthodox in both its practices and notions of the
"divine" than the belief systems espoused by other
groups that currently receive religious protections.
[FN21]

FN21. Despite markedly different
conceptions of "the divine" from most
Americans, heterodox groups like
Rastifarians, Wiccans, and Hare Krishnas
have all been afforded free exercise
protection. Here, the Nation's doctrine is
predicated on a an essentially monotheistic
belief in God, its central and secondary
texts--including the 120 Degrees, Bible, and
Koran--are largely identical to those of other
accepted religions, the Supreme Mathematics
and Supreme Alphabet are reminiscent of
other religions' use of numerology devices to
understand the world, and the nature of its
observances is far from uncommon.
Moreover, the Nation appears to be a close
relative of an officially recognized religion,
the Nation of Islam.

**\*12** For these reasons, we find that plaintiff's beliefs as

Not Reported in F Supp 2d
(Cite as: 2003 WL 21782633, *12 (S.D.N.Y.))

a member of the Nation of God's and Earths are both sincere and "religious in nature" and therefore entitled to RLUIPA and First Amendment protection under the free exercise clause. *Cf. Patrick v. LeFevre,* 745 F.2d 153 (2d Cir.1984) (finding for summary judgment purposes that an inmate's beliefs as a Five Percenter were constitutionally protected); *Breland v. Goord,* No. 94 Civ. 3696, 1997 WL 139533 (S.D.N.Y. March 27, 1997) (same); *Graham v. Cochran,* No. 96 Civ. 6166, 2000 U.S. Dist. LEXIS 1477, (S.D.N.Y. February 14, 2000) (same); *Lord Natural-Self Allah v. Annucci,* No. 97 Civ. 607, 1999 WL 299310 (W.D.N.Y. March 25, 1999) (Heckman, M.J.) (finding, for purposes of a preliminary injunction, that "Five Percenterism, in its pure uncorrupted form, represents a system of beliefs which, outside the prison context, does not advocate or promote violence").

B. Religious Land Use and Institutionalized Persons Act

Congress enacted the Religious Land Use and Institutionalized Persons Act ("RLUIPA") in response to the Supreme Court's holding in *City of Boerne v. Flores,* 521 U.S. 507, 117 S.Ct. 2157, 138 L.Ed.2d 624 (1997), declaring unconstitutional the Religious Freedom Restoration Act ("RFRA"), 42 U.S.C. § 2000bb-1(b). [FN22] RLUIPA applies both to programs or activities that receive federal financial assistance and to substantial burdens on religious exercise having an effect on interstate commerce. 42 U.S.C. § 2000cc-1(b). Although other courts have debated the statute's constitutionality, *see e.g., Mayweathers v. Newland,* 314 F.3d 1062 (9th Cir.2002) (finding RLUIPA constitutional); *Madison v. Riter,* 240 F.Supp.2d 566 (W.D.Va.2003) (ruling that RLUIPA violates the Establishment Clause), defendants in this case have never made such a constitutional challenge. RLUIPA's constitutionality, moreover, was assumed in our earlier opinion at the case's summary judgment stage, *see **Marria** v Broaddus,* 200 F.Supp.2d 280 (S.D.N.Y.2002), without subsequent objection by either side, and we maintain that assumption for purposes of this decision. RLUIPA provides:

> FN22. The constitutional controversy surrounding RFRA and the subsequent congressional enactment of RLUIPA have been discussed extensively elsewhere, *see e.g., Madison v. Riter,* 240 F .Supp.2d 566, 568-70 (W.D.Va 2003), and familiarity with RLUIPA's history is assumed.

No government shall impose a substantial burden

on the religious exercise of a person residing in or confined to an institution ... even if the burden results from a rule of general applicability, unless the government demonstrates that imposition of the burden on that person -

(1) is in furtherance of a compelling governmental interest; and

(2) is the least restrictive means of furthering that compelling governmental interest.

42 U.S.C. § 2000cc-1(a). Under RLUIPA, once a plaintiff produces prima facie evidence to support a free exercise violation, the plaintiff bears the burden of persuasion over whether the regulation substantially burdens his or her exercise of religion and the state bears the burden of persuasion on all other elements. 42 U.S.C. § 2000cc-2(b).

By its terms, RLUIPA is to be construed to favor broad protection of religious exercise. *See* 42 U.S.C. § 2000cc-3(g). The statute defines religious exercise as "any exercise of religion, whether or not compelled by, or central to, a system of religious belief." *Id* § 2000cc-5(7)(A). This reflects an extension of the definition provided in RFRA, which defined exercise of religion as "the exercise of religion under the First Amendment to the Constitution." 42 U.S.C. § 2000bb-2(4); *Kikumura v. Hurley,* 242 F.3d 950, 960 (10th Cir.2001) (noting the change in definition); *Henderson v. Kennedy,* 265 F.3d 1072, 1073-74 (D.C.Cir.2001) (noting that the definition of religious exercise in RLUIPA expanded upon the protections of RFRA). The otherwise similar language of RFRA and RLUIPA, however, suggests that cases decided under RFRA may guide this Court's inquiry in this case *See Wyatt v. Terhune,* 315 F.3d 1108, 1115 (9th Cir 2003) (noting that RLUIPA "provides rights similar to those delineated in RFRA").

*13 In seeking to defeat plaintiff's RLUIPA claim, DOCS argues that the record does not establish that its ban on Five Percenter literature and gatherings substantially burdens the exercise of plaintiff's beliefs. *See* Def. Findings ¶¶ 9-20. DOCS further asserts that its regulations are in furtherance of a compelling governmental interest in prison security and that the ban on Five Percenter literature and congregative gatherings is the least restrictive means of effectively controlling security threat group behavior. *See* Def. Findings at 24-25.

C. Evaluating DOCS' Treatment of the Five Percenters Under RLUIPA

i. Substantial Burden

Not Reported in F.Supp.2d
(Cite as: 2003 WL 21782633, *13 (S.D.N.Y.))

[4] Like its predecessor RFRA, RLUIPA requires a plaintiff to demonstrate that his right to free exercise of religion has been substantially burdened. The Supreme Court has defined a substantial burden in this context as "[w]here the state ... denies [an important benefit] because of conduct mandated by religious belief, thereby putting substantial pressure on an adherent to modify his behavior and to violate his beliefs. While the compulsion may be indirect, the infringement upon free exercise in nonetheless substantial." *Thomas v. Review Bd. of the Indiana Employment Sec. Div.*, 450 U.S. 707, 717-18, 101 S.Ct. 1425, 67 L.Ed.2d 624 (1981); *Jolly*, 76 F.3d at 477 (citing this passage of *Thomas* with approval in considering Rastafarian inmate's RFRA claim). Despite DOCS' treatment of the Nation exclusively as a security threat group and complete ban on Nation materials and literature, defendants argue that plaintiff's Five Percenter beliefs are not substantially burdened because he can still practice certain aspects of his beliefs. These include possessing the Bible and Koran, gathering informally with five or fewer Five Percenters at certain times of day, learning the Supreme Alphabet and Mathematics orally, gaining access to lessons through NOI, celebrating certain holidays informally, and communicating with Nation members outside prison (though not through the *Five Percenter* newspaper). *See* Def. Findings ¶¶ 9-20.

Defendants' arguments are untenable. Throughout this litigation, plaintiff has credibly maintained that the study (alone and with others) of the 120 Degrees, Supreme Mathematics, the Supreme Alphabet, as well as other lessons found in *The Five Percenter*, is an integral part of the daily practice of the Nation's beliefs, and his testimony was substantiated by that of other Nation representatives. Furthermore, in a religious community that lacks both a formal organizational structure and a fixed place of worship, *The Five Percenter* newspaper serves as a central link and mechanism of communication, clearly falling within RLUIPA's broad protections of religious exercise "whether or not compelled by, or central to, a system of religious belief." 42 U.S.C. § 2000cc-5(7)(A). There is no question that under DOCS' regulations plaintiff may not possess these materials and study them with other inmates and is denied the opportunity to gather with other Nation members other than informally. [FN23] The evidence at trial also established that the Bible and Koran serve only as secondary religious sources for Nation members, refuting DOCS' argument that plaintiff can meaningfully practice his religion while possessing only these texts. [FN24] Finally, DOCS' contentions

that plaintiff is able to obtain the 120 Degrees through NOI and fast on holy days contradict the evidence that plaintiff cannot receive the lessons from NOI without being an official member registered with an NOI temple outside prison, [FN25] *see* Trial Tr. at 57:8-15; Blocker Decl. ¶¶ 10-11, and that he is not permitted to eat his prison meal after sundown on holy days or gather for that meal (as are NOI and Orthodox Muslim inmates), but must do so using food he has saved from the prison commissary. *See* Trial Tr. at 62.11-63.5.

FN23. According to John LoConte, DOCS' former Director of Ministerial and Family Services, such informal gatherings "wouldn't be enough" to allow Catholic inmates to practice their religion while in prison. *See* Trial Tr. at 532.11-17. Moreover, DOCS admitted the importance of formal gatherings in plaintiff's belief system at an earlier stage of this litigation when, in attempting to show that plaintiff is not a sincere believer in the Nation's tenets because he has never attended a parliament (despite having banned him from doing so), DOCS asserted that parliaments are "a fundamental ritual" for Nation members that, if consistently skipped, would be equivalent to "a Catholic never going to Mass." Defs.' Summ. J. Reply Mem. at 9.

FN24. DOCS' argument is tantamount to arguing that a Christian's or Muslim's beliefs would not be substantially burdened if he or she were permitted to possess the Jewish Bible, but not the New Testament or the Koran. The courts have recognized, however, that it is the free exercise of a *plaintiff's* religion, not someone else's, that the First Amendment and RLUIPA protect. *See Breland v. Goord*, No. 94 Civ. 3696, 1997 WL 139533, at *5 (S.D.N.Y. March 27, 1997) (citing *Thornburgh v. Abbott*, 490 U.S. 401, 418, 109 S.Ct. 1874, 104 L.Ed.2d 459 (1989) and *O'Lone v. Shabazz*, 482 U.S 342, 352, 107 S.Ct. 2400, 96 L.Ed.2d 282 (1987)). *But cf. Fraise v. Terhune*, 283 F.3d 506, 519-20, (3d Cir.2002) (accepting such an argument in ruling that alternatives means existed for inmates to practice their beliefs under New Jersey's treatment of Five Percenters exclusively as a security threat group)

FN25. In making its argument that plaintiff can gain access to the 120 Degrees from NOI members, DOCS apparently relies on plaintiff's testimony that NOI conducts introductory classes for non-members, similar to the Nation's civilization classes, at which the lessons are sometimes discussed. *See*

Trial Tr. at 60:20-61:14: Def Findings ¶ 19 However, plaintiff's immediately following testimony makes it clear that he is not able to obtain the 120 Degrees, or even consistent study of them, merely by attending such classes *See* Trial Tr at 61;15-24.

**\*14** We thus find that plaintiff's free exercise of his religious beliefs are substantially burdened by DOCS' current policies concerning Five Percenters.

ii. Compelling Interest and Least Restrictive Means Tests

Moreover, DOCS has failed to establish that its complete ban on Five Percenter materials, literature, and activities furthers a compelling security interest and is the least restrictive means of doing so under RLUIPA. It is undisputed that maintaining the safety, security, and internal order of prisons is a compelling governmental interest. *See Campos v. Coughlin,* 854 F.Supp. 194, 207 (S.D.N.Y.1994) ("prison security and penological institutional safety goals are indeed a most compelling governmental interest"), *Muhammad v. Coughlin,* 904 F.Supp. 161 (S.D.N.Y.1995) (finding compelling interest in internal order in prisons); *Breland v. Goord,* No. 94 Civ. 3696, 1997 WL 139533 , at \*4 (S.D.N.Y. March 27, 1997) ("[t]here is no question that prison safety and security are legitimate penological interests"). We are also mindful of the well-established judicial tradition of giving heightened deference to the experience and judgment of prison officials on such "central" issues in the context of inmate First Amendment claims. *Duamutef v. Hollins,* 297 F.3d 108, 112 (2d Cir.2002) (citing *Giano v. Senkowski,* 54 F.3d 1050, 1054 (2d Cir.1995) and *Thornburgh v. Abbott,* 490 U.S. 401, 415, 109 S.Ct. 1874, 104 L.Ed.2d 459 (1989) *quoting Pell v. Procunier,* 417 U.S. 817, 823, 94 S.Ct. 2800, 41 L.Ed.2d 495 (1974) for the proposition that prison security is "central to all other corrections goals"). However, it is equally well-established that "[p]rison walls do not form a barrier separating prison inmates from the protections of the Constitution," *Turner v. Safley,* 482 U.S. 78, 84, 107 S.Ct. 2254, 96 L.Ed.2d 64 (1987), and our tradition of deference on security matters does not require this Court to altogether abdicate its role in constitutional cases brought by inmates. Hence, while prison officials "must be given latitude to anticipate the probable consequences of certain speech, and must be allowed to take reasonable steps to forestall violence," *Giano v. Senkowski,* 54 F.3d 1050, 1055 (2d Cir.1995), they "cannot merely brandish the words 'security' and 'safety' and expect that their actions will automatically be deemed

constitutionally permissible conduct." *Campos,* 854 F.Supp. at 204. *Cf Jolly v. Coughlin,* 76 F.3d 468, 479 (2d Cir.1996) ("The DOCS policy is not insulated from scrutiny merely because the defendants brandish the concepts of public health and safety."). Congress also made it clear in ,enacting RFRA/RLUIPA that "inadequately formulated prison regulations and policies grounded on mere speculation, exaggerated fears, or post-hoc rationalizations will not suffice to meet the [A]ct's requirements." *Campos,* 854 F.Supp. at 207 (quoting the Senate Report to RFRA); *Jolly,* 76 F.3d at 479 (1996) (same). Even the less restrictive test set forth in *Turner v. Safley* that governed prisoner free exercise claims prior to the enactment of RFRA/ RLUIPA recognized that deference is not warranted when a prison regulation represents an exaggerated response to security objectives. *See Turner,* 482 U.S. at 97-98 ("No doubt legitimate security concerns may require placing reasonable restrictions upon an inmate's right to marry, and may justify requiring approval of the superintendent. The Missouri regulation, however, represents an exaggerated response to such security objectives.").

**\*15** Here, DOCS proposes to treat exclusively as a gang a group that has had a law-abiding existence outside prison for the better part of 40 years, that is an offshoot of another group that DOCS considers a religion, and that has practices that largely resemble those of recognized religious groups, with the consequence that DOCS has banned literature which it concedes is facially innocuous as well as any other expression of religious identity associated with the group In order for such a ban to be upheld, there ought to be some sense that DOCS is substantially correct in its decision to treat the group exclusively as a gang and not a religion. *Cf Jolly,* 76 F.3d at 479 (holding in a RFRA analysis that "the connection between the application of a policy to an individual and the furtherance of the government's goals must be clear"). [FN26] The evidence DOCS presented at trial, however, failed to justify such treatment.

FN26. DOCS places undue reliance on the Second Circuit's decision in *Giano v. Senkowski,* 54 F.3d 1050 (2d Cir.1995), which held that it was unnecessary for DOCS to establish an explicit link between such "emotionally charged" materials as nude photographs of inmates' wives and girlfriends and violence in order to justify its ban on such materials. *See Giano,* 54 F.3d at 1055; Def. Findings at 20-21. Here, unlike instances in which common sense would indicate that prohibited materials may pose a threat to

Not Reported in F.Supp.2d
(Cite as: 2003 WL 21782633, *15 (S.D.N.Y.))

Page 15

security, DOCS predicates its policy banning any and all religious expressions associated with the Nation on the group's allegedly violent nature, which is not simply a matter of common sense.

First, DOCS failed to provide any evidence that its decision to treat "Five Percenters" as a security threat group was either reasoned or informed. The trial record is almost entirely devoid of evidence concerning DOCS' initial decision to treat the Nation as a gang and not a religion. DOCS possesses no records whatsoever setting forth the basis for its decision or even documenting its decision-making process concerning the Five Percenters. None of the DOCS officials who testified at trial were the decision-makers, nor could they do more than speculate about who the decision-makers were, when the decision was made, how it was made, or what information was deemed relevant. [FN27] Moreover, DOCS admits that its classification of Five Percenters as a security threat group is not based on any guidelines or specific criteria. *See* Trial Tr. at 340:16. Nor, pursuant to its non-recognition policy, does DOCS maintain statistics concerning gang activity or even the rough number of gang members in the system. *See* Trial Tr. at 341:16-19, 345:10-13. Rather, its decision to label the Nation itself as a security threat was based on the subjective sense of the decision-makers--whomever they were--that the group as a whole was a gang. However, it is clear that DOCS knows little about the Nation's seemingly legitimate existence outside prison, [FN28] and DOCS failed to present any evidence concerning how it came to the conclusion that the Nation of Gods and Earths is not a religion in spite of the fact that several inmates have sought religious accommodations for their beliefs as members of the Nation. *See* Footnote 10 *supra.* It is also worth noting that DOCS' previous litigation position claiming that the Nation's literature contained violent messages indicates that it was misinformed about at least that aspect of the Nation at the time it made its classification and suggests that its treatment of the Nation exclusively as a gang may be based on either exaggerated fears or speculation.

FN27. Although DOCS claims that its classification of the Five Percenters as a gang is based on a history of violence and disruptive activities associated with the group, as well as its employees' day-to-day reporting of such activities, Def. Findings ¶ 53; Trial Tr. at 378:7-15, DOCS official Richard Roy testified that there was probably no stack of materials that was reviewed by DOCS' decision-makers at the time they classified the Nation as unauthorized. *See*

Trial Tr. at 408.2-18.

FN28. DOCS official Richard Roy, for example, testified that he did not believe that there was a connection between the members of DOCS' alleged "Five Percenters" prison gang and an outside organization called the Nation of Gods and Earths, *see* Trial Tr. at 346:16-19, while another official, Dale Artus, testified that "[t]he term "Nation of Gods and Earths" is not in my vocabulary. It is nothing I've been--it is just--it doesn't come about in the course of my private life or in my professional life other than this litigation." *See* Trial Tr. at 481:8-10.

Lacking a record for its decision, DOCS has attempted to justify its absolute ban *post hoc* by arguing that the evidence it has compiled in preparation for this litigation demonstrates that "the Five Percenters" are indeed a security threat group, and hence that the mere presence of the Nation's materials in the prison setting or any other forms of "recognition" pose a security threat by legitimating the group and facilitating its recruiting efforts. Several DOCS corrections officers and officials who testified at trial professed a general understanding from their training and experience that Five Percenters in prison were associated with violence and disruption, but had personal knowledge of only a few incidents involving inmates identified as Five Percenters despite their decades of combined experience. [FN29] *See* Def. Findings ¶¶ 66-68, 70-71, 74. Ron Holvey, a corrections official from the New Jersey Department of Corrections with expertise in gangs and related security issues, testified that the New Jersey prison system considers the Five Percenters to be its largest security threat group and that, after reviewing the materials and statements DOCS compiled for this litigation, he would support New York's ban on the Nation's literature as a security threat. *See* Trial Tr. at 710:1-2, 722:17-21. Mr. Holvey, however, admitted that he had never spoken with a member of the Nation of Gods and Earths in New York or set foot inside a DOCS prison. *See* Trial Tr. at 729:24-730:5. Moreover, he went on to testify that his perception of the Nation outside prison is that it is not a religion because "[t]hey don't have temples or mosques or churches. They don't have a minister that comes in. There is nothing formal about their organization. They don't have priests. They don't have rabbis. They don't have imams. They don't--they worship--they consider themselves to be God." *See* Trial Tr. at 741:10-14. Additional DOCS evidence concerning alleged Five Percenter gang activity came from two inmate-witnesses who claimed to have

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works

experienced violence and threats at the hands of Five Percenters. Their testimony, however, lacked consistency and credibility, leaving us with little reliable evidence beyond the fact that these two inmates regarded the Five Percenters as a gang. [FN30]

> FN29. The most credible of these accounts in light of the evidence concerning the Nation's legitimate existence outside prison was that of Deputy Superintendent for Security Services at Collins Correctional Facility Sibato Khahaifa, who testified that, as an Orthodox Muslim who grew up in Brooklyn, he understood the Nation to be a religious group that had split from the NOI prior to joining DOCS. See Trial Tr at 756:3-9. In recounting his experiences as a corrections officer in several DOCS facilities, Khahaifa also drew a distinction between some Five Percenter inmates who he perceived as sincere adherents of the Nation and others who appeared to be behaving in a gang-like fashion. See Trial Tr. at 757:11- 758:5, 766:11-18.

> FN30. One, who claimed to be a former member and participant in illegal activities on behalf of the Five Percenters, also admitted to having participated in numerous stabbings and other acts of violence, including altercations with members of the Latin Kings gang and inmates he identified as "the Muslims," even after the period he was allegedly a Five Percenter. See Trial Tr at 814:9-816:7, 818:3-820:12, 823:8-824:8, 826:5- 20. Yet, he claimed that his safety is at risk because Five Percenters were seeking to retaliate against him for "going against" the gang in a fight and thereafter leaving the group. See Trial Tr. at 799:22-800:2; Trial Tr at 805:18-806:11. The other, a former Latin Kings gang "captain," admitted to having "snitched" on four other Latin Kings members after they had killed a fellow prisoner who was a Five Percenter, making it difficult for us to gauge his claims that he feared for his safety because of the potential for retaliation from Five Percenters in addition to the Latin Kings. See Trial Tr. at 846:10-20, 851:20-852:1, 853:7-854:1.

*16 DOCS' principal form of "hard evidence" concerning the nature of the Five Percenters consisted of compilations of facility reports concerning unusual incidents, inmate transfer requests, and inmate separation requests that contain gang-like references to Five Percenters and sometimes report violent acts attributed to individuals or groups identified as Five

Percenters. See Trial Tr at 363:23-364:10, 472:9-10, 502:5-8; Def. Trial Exhibit A (inmate transfer requests not received into evidence); Def. Trial Ex. B (sample separatee reports not received into evidence); Def. Trial Exhibit C (unusual incident reports not received into evidence); Def. Trial Exhibit D (protective custody reports received into evidence); Def. Trial Ex. M (summary of separatee report "hits" for "Five Percenters" and other groups from 1990 to 1999 not received into evidence). Although there is no evidence to suggest that DOCS' decision-makers ever reviewed these reports, DOCS argues that they constitute the kind of evidence that its decision-makers would have known about when determining that the Five Percenters were a security threat group and provide an objective basis for its decision to treat the Nation exclusively as a gang. See Def. Findings ¶¶ 77-78, 82. The transfer reports were excluded at trial because they contained hearsay within hearsay and did not otherwise exhibit indicia of reliability. [FN31] See Trial Tr. at 434:11-453:3; Fed. R. Enid. 802; Parsons v. Honeywell, Inc., 929 F.2d 901, 907 (2d Cir.1991) (quoting with approval the Ninth Circuit's opinion in United States v. Passant, 703 F.2d 420, 424 (9th Cir.1983) stating that "[it is well established that entries in a police report which result from the officer's own observations and knowledge may be admitted but that statements made by third persons under no business duty to report may not." (emphasis added by Second Circuit)); Giles v. Rhodes, No. 94 Civ. 6835, 2000 WL 1425046, at *8-*9 (S.D.N.Y. Sept.27, 2000) (ruling that prison unusual incident reports are inadmissible hearsay not subject to the Business Record Exception under Fed. R. Enid. 803(6)). There are, in fact, several additional reasons to doubt their reliability, as well as the reliability of the reports underlying DOCS' summary chart of separatee "hits" for the term "Five Percenters," which was similarly excluded due to DOCS' failure to comply with the Federal Rules of Evidence by providing plaintiff with the underlying documents. [FN32] See Trial Tr. at 468:17- 480.25, Fed. R. Enid. 1006 (stating that voluminous evidence "may be presented in the form of a chart, summary or calculation," but that the underlying documents "shall be made available for examination or copying, or both, by other parties"). Among the unusual incident reports--which document occurrences of violence or other serious disturbances--the number of relevant "hits" for references to Five Percenters was only 67 out of approximately 102,000 incidents over the ten year period from 1990 to 1999. See Trial Tr. at 241:13- 24.

> FN31 We note that, according to plaintiff's

prison security and administration expert Toni Bair, such reports are "[o]ne of the most unreliable sources of information we have in prisons" because they are obtained from individuals ("snitches") who are often desperate to get themselves out of some kind of trouble and view it as beneficial to name groups rather than individuals in order to insure that they be placed in protective custody. Trial Tr. at 244:10-245:14.

FN32 First, there are a substantial number of duplicates among the transfer requests that DOCS submitted as trial exhibits, *see e.g.*, Def. Trial Ex. A at Bates Nos. 018 & 023, 019 & 024, 010 & 026, 012 & 027, 013 & 028, and it is possible that such duplicates could be affecting the number of "hits" contained in DOCS' separatee chart as well. Second, some of the transfer requests and unusual incident reports were of questionable relevance to the Five Percenter gang activities that were alleged, raising similar concerns about the relevance of the separatee reports underlying DOCS' summary chart of relevant "hits." *See e.g.*, Def. Trial Ex. A at Bates Nos. 032, 109, 116 (transfer requests), Def. Trial Ex. C at Bates Nos. 006, 043 (unusual incidents). Third, DOCS has defined the Five Percenters as a security threat group for some time and apparently trains its employees to recognize them as such, which undoubtedly affects the reports. *See* Trial Tr. at 488:12-19 (Dale Artus explaining that DOCS' crisis intervention unit devotes a four-hour portion of its two week basic training specifically to unauthorized groups), Trial Tr. at 632:19-23 (Superintendent Joseph Smith testifying that his understanding of the Five Percenters as a gang came in part "from training"). Fourth, because DOCS treats any organizing activity associated with an unauthorized group as a threat to prison safety and security, its classification of the Five Percenters as "unauthorized" is in some sense self-fulfilling. Activities that would be permissible were they conducted by a religious group, such as recruiting, gathering, passing on literature, are deemed threatening and fuel both the group's and individuals' negative reputations reflected in the various reports. *See e.g.*, Trial Tr. 521:20-24 (John LoConte explaining that, at the time he first learned about the Nation, he was hearing that "[both the Nation of Islam, the Nation of Gods and Earths ... they were attempting to infiltrate the Muslim community in order to establish a congregation the opportunity to the [sic ] meet together. They were problematic."); Def. Trial Ex. D at Bates No.

014 (stating--with a negative connotation-- that the Five Percenters were going to "take some action to establish themselves in the facility"); Def. Findings ¶¶ 89-90 (treating as negative the notion that plaintiff's alleged religious beliefs would require him to teach civilization to others).

*17 Thus, DOCS' *post hoc* justifications for its ban are inadequate to establish that it has a principled basis for labeling the Nation a security threat group. Finding DOCS' absolute ban to be justified based on the episodic accounts of its witnesses and unreliable facility reports would require us to make a speculative leap concerning the nature of an entire group based on spotty evidence about some of its supposed members that would be in tension with what we have learned about the group's legitimate existence outside prison. We stress that we are not saying that there are not prisoners who would describe themselves as Five Percenters who have committed crimes or otherwise violated prison regulations. However, the limitations of this "fact" should be obvious. *Cf. Breland v. Goord,* No. 94 Civ. 3696, 1997 WL 139533, at *5 (S.D.N .Y. March 27, 1997) ("The mere fact that inmates identified as Five Percenters have been involved in altercations with other inmates and guards does not establish that the literature at issue here caused those incidents."). There are prisoners who would describe themselves as Catholics, Protestants, Jews, Muslims, NOI, etc. who likewise violate prison regulations, and it is easy to imagine a situation where the common ethnic or religious bond shared by members of a group could serve as the impetus for some to band together and at times act cohesively, but no one would suggest that such facts preclude the classification of these recognized groups as religions deserving of First Amendment protection. [FN33]

FN33. For example, one of the inmates who testified on DOCS' behalf in this case referred repeatedly to altercations between himself and "Muslims" and replied "Yes sir" when he was asked whether there were any Muslim gangs. *See* Trial Tr. at 814:9-10. We also note that a number of the unusual incident reports containing the term "Five Percenter" proffered by DOCS also contain the term "Muslim." *See* Trial Tr. 243:16-21. Clearly, however, none of this would lead us to conclude either that Islam is not a religion or that Muslims would properly be classified by DOCS as a security threat group.
Additionally, at least one Second Circuit decision appears to document a street gang whose teenage founders were apparently Five Percenters, but nonetheless existed separately

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp 2d
(Cite as: 2003 WL 21782633, *17 (S.D.N.Y.))

from the Nation of Gods and Earths. *See United States v. Miller,* 116 F.3d 641 (2d Cir.1997) (discussing the formation of the "Supreme Team" gang by a group of teenage Five Percenters in the mid-1980's).

A hypothetical dealing with a more mainstream group further illustrates the point: imagine, for example, that one or several gangs of inmates were to form within the New York State Correctional system each of whose membership is united by a common religious/ethnic identity--Judaism. The gangs could either be formal disruptive organizations or simply the result of an agreement among some Jewish inmates to "get each other's back" in a pinch. Imagine further that the members of the Jewish gang(s) identify themselves by displaying the Star of David, utilize Hebrew letters (which also stand for numbers) as a "code" similar to Five Percenters' alleged use of the Supreme Alphabet and Mathematics, and sometimes recruit new members by using the Bible and other traditional Jewish texts. DOCS' records would soon be replete with reports containing statements that "the Jews" were involved in violent and disruptive activities and such groups would clearly pose a security threat to prison staff and inmates. But would this transform Judaism from a religion into a security threat group? Would DOCS, in such a situation, ban anyone who identified themselves as a Jew from possessing a Hebrew Bible and Alphabet or from displaying a Star of David? The trial testimony of DOCS officials convinces us that it would not, or that it would at least exhaust other avenues of redress before subjecting the "sincere believers" of a mainstream group to the type of blanket treatment that Nation members currently receive. [FN34]

FN34. The Court posed a similar hypothetical to Shawangunk Superintendent Joseph Smith, *see* Trial Tr. at 646:2-21, who replied: "[are we going to say that we are no longer going to permit religious services or participation in religious holidays, I would say, no, that would be very unlikely, because I am going to go on a limb and say that this group that you have described would be limited to a few, and that once we were able to take proper action we should be able to go on as business as usual." Trial Tr. at 646:22-647:3. Superintendent Smith added, with regard to the Five Percenters: "Well, I can only answer that as we deal with them today. They are not an authorized religion at this point within our system." Trial Tr. at 647:25-648:2. Similarly, plaintiff's counsel posed hypothetical questions concerning violence by members of the NAACP to Dale Artus, the former director of DOCS' crisis intervention unit,

who testified that he would recommend that the violent individuals "be held individually accountable for their acts" and "would not recommend that the overall program be disbanded" because he viewed the overall NAACP program as positive and it was, unlike the Five Percenters, an authorized organization. *See* Trial Tr. at 491:13-493:13. The DOCS officials' testimony stands in sharp contrast to that of Ron Holvey, who DOCS called as an expert on gangs and gang management, as well as the status Five Percenters in the New Jersey State Correctional system (which segregates those identified as "core members" from the rest of its prison population). When asked whether he would declare the Catholic Church to be a security threat group if numerous prisoners identified as Catholics were being written up for violent acts, he responded: "Within the prison, we would have to, yeah, oh yeah, and I'm sure I would be sitting in another courtroom for that one." Trial Tr. at 748:23-749:4.

*18 While we do not question the sincerity of the witnesses who testified as to their belief that there is a Five Percenters gang, their convictions alone are not sufficient. There must be admissible evidence to justify DOCS' policies, and no such evidence was introduced. Particularly lacking was evidence concerning the structure of the alleged Five Percenters gang. We are also troubled by the "Catch-22" aspect of its policies concerning the Nation, whereby the group's "unauthorized" classification leads DOCS to train its employees to recognize Five Percenters exclusively as gang members and otherwise innocuous literature and activities as threatening. [FN35] As such, we find the anecdotal evidence that DOCS has presented insufficient to justify after the fact its decision to treat the Nation solely as a gang under RLUIPA. Moreover, the trial testimony and submissions throughout this case suggest that, while DOCS now formally concedes that the Nation's literature does not contain violent or disruptive content, its officials' perception of the threat posed by the Nation and its literature was and potentially still is affected by their belief that it espouses an objectionable racist ideology. [FN36] *Cf Marria v. Broaddus,* 240 F.Supp.2d 280, 295 (S.D.N.Y.2002) ( " 'DOCS' argument that it bans Nation literature because of what it represents and not what it says seems disingenuous given DOCS' prior position in past litigation from the same time period that the literature itself encourages violence."). Whether or not these lingering objections are justified as a matter of principle, they raise questions about whether DOCS' absolute ban on Nation literature is

unrelated to the literature's content *See generally Turner,* 482 U.S. at 90 ("We have found it important to inquire whether prison regulations restricting inmates' First Amendment rights operated in a neutral fashion, without regard to the content of the expression."); *Church of the Lukumi Babalu Aye, Inc. v. City of Hialeah,* 508 U.S. 520, 547, 113 S.Ct. 2217, 124 L.Ed.2d 472 (1993) ("The Free Exercise Clause commits government itself to religious tolerance, and upon even slight suspicion that proposals for state intervention stem from animosity to religion or distrust of its practices, all officials must pause to remember their own high duty to the Constitution and to the rights it secures. Those in office must ... ensure that the sole reasons for imposing the burdens of law and regulation are secular.").

FN35. For example, in addition to testifying that his perception of the Five Percenters as a gang came in part "from training," see Trial Tr. 632:19-23, Shawangunk Superintendent Joseph Smith agreed that the Nation's unauthorized status makes it "easy" for him to treat the whole group as a gang when he would otherwise fail to distinguish sincere believers from disruptive members of a mainstream religious group. Trial Tr. at 647:25- 648:6. Similarly, in response to plaintiff's counsel's questioning about DOCS' basis for treating the Nation as a gang in comparison to other authorized groups, DOCS official Richard Roy responded. "I would go the other way; they were not an authorized organization, so therefore they could not participate as an organization." Trial Tr. at 390:10-12.

FN36. DOCS official Richard Roy, for example, testified that he found an article in *The Five Percenter* expressing the opinion that the death penalty was a form of legalized genocide and that the white man has always used his laws to justify "devilishment" potentially dangerous to prison security because it was hateful toward members of another race, and moreover that he and other DOCS employees reviewed the content of *The Five Percenter* when DOCS was making the decision to ban the Nation's materials. *See* Trial Tr. 419:15-412:14. Joseph Smith also agreed that he believes that the Five Percenter materials are dangerous. *See* Trial Tr. 673:16-18. Ron Holvey--though not a DOCS official--testified that he found the racist aspects of the Nation lessons a threat to prison security and that he objected to the Nation's beliefs because "the overall nature of the group promotes violence," but that these

views had nothing to do with his characterization of the Nation as a security threat group *See* Trial Tr. at 737:7-738:19.

As a result of the foregoing, we cannot find, based on the trial record, that DOCS' classification of the Nation as a security threat group and absolute ban on Nation literature further a compelling security interest and is the least restrictive means of doing so. [FN37]

FN37. We acknowledge that there is some case law in tension with our decision in this case. *See Fraise v. Terhune,* 283 F.3d 506 (3d Cir.2002) (finding the New Jersey Department of Corrections' treatment of Five Percenters as a security threat group justified for summary judgment purposes under a *Turner v. Safley* analysis); *In re Long Term Administrative Segregation of Inmates Designated as Five Percenters,* 174 F.3d 464 (4th Cir.1999) (same with regard to the South Carolina Department of Corrections), *Lord Natural-Self Allah v. Annucci,* No. 97 Civ. 607, 1999 WL 299310 (W.D.N.Y. March 25, 1999) (Heckman, M.J.) (finding for preliminary injunctive purposes that DOCS' ban on Five Percenter materials was justified under *Turner* ); *Buford v. Goord,* 258 A.D.2d 761, 686 N.Y.S.2d 121 (3d Dep't 1999) (dismissing, in an Article 78 proceeding, a *pro se* litigant's claim that DOCS' policies banning his receipt of Five Percenter materials violated his first amendment rights). Each of these cases, however, applied a more deferential standard of review than the RLUIPA analysis we apply in this decision, and the three federal case involving free exercise claims all assumed that Five Percenter beliefs would receive free exercise protection, which accords with our ruling in this case. Moreover, these other courts do not appear to have had an equally well-developed evidentiary record concerning the Nation's legitimate existence outside prison as we did in this case. Finally, we simply disagree with some of the findings and conclusions reached by those courts, most fundamentally the notion that prison policies classifying and treating an entire group as a gang can be upheld despite the fact that they are predicated on a faulty assumption that the group has no legitimate existence as a religion.

### D. Relief

This case, like others in which prison inmates have asserted their First Amendment right to practice non-mainstream religions while incarcerated, "underscores

the complex nature and difficulty of accommodating various religious belief systems and tenets within a prison system, wherein violence is a real and daily threat." *Campos v Coughlin,* 854 F.Supp. 194, 197 (S.D N.Y. 1994). We have found that plaintiff is a sincere adherent to a religious belief system that qualifies for First Amendment protection, but are also prepared to accept for the purposes of this decision DOCS' claims that prison inmates identified as "Five Percenters" have been associated with instances of violence and disruption. This raises the possibility that "the Five Percenters" may somewhat uniquely connote *both* a religion *and* a gang in the New York State prison system (though the sincere religious adherents and gang members may not be the same inmates).

*19 It is apparent, however, that in pursuing its non-recognition policy DOCS has never fully considered the possibility or the policy consequences of the Nation qualifying for First Amendment protections, and did not do so at any time during the pendency of this case. Based on our review of the evidence and applying RLUIPA's compelling interest and least restrictive means tests in light of our determination that plaintiff is entitled to free exercise protection, we have concluded that plaintiff has clearly established his right to some of the relief requested With respect to other of plaintiff's requests, given the tradition of judicial deference to the considered judgment of correction officials and the indications that there are some nominal Five Percenter inmates who violate prison rules, we remand them to DOCS in order for DOCS to reevaluate its policies in light of our free exercise ruling and to determine the appropriate accommodations that can be made consistent with security needs. [FN38] Our conclusions are set forth below.

> FN38. Such a remand, which was requested by DOCS at trial, *see* Def. Findings at 26, is consistent with both the federal courts' tradition of deference and the Supreme Court's guidance concerning their appropriate supervisory role in prisoner litigation. "We have said that '[t]he strong considerations of comity that require giving a state court system that has convicted a defendant the first opportunity to correct its own errors also require giving the States the first opportunity to correct the errors made in the internal administration of their prisons." *Preiser v. Rodriguez,* 475 U.S. 475, 492 (1973).

### i. 120 Degrees

In our summary judgment opinion we noted that

DOCS' position concerning the 120 Degrees, "namely, that one religious group may possess the same materials that if possessed by another contribute to gang formation" was "a challenging one to sustain." *See Marria v. Broaddus,* 200 F.Supp.2d 280, 295 (S.D.N.Y.2002). Based on the trial evidence, DOCS cannot properly prevent plaintiff from receiving and possessing the 120 Degrees consistently with the Free Exercise clause and RLUIPA. As the book serves as the central text in plaintiff's religious belief system, he is clearly substantially burdened if he is denied access to it. In any event, its content is identical to the texts DOCS currently permits NOI to use and possess Thus, because the 120 Degrees is associated with more than one group, including a currently "authorized" religious group, DOCS cannot tenably argue that its mere presence in prison legitimizes gang activity Therefore, we order DOCS to permit plaintiff to possess a copy of the 120 Degrees in accordance with his beliefs as a member of the Nation of Gods and Earths, and that his access cannot be conditioned upon his joining the Nation of Islam. [FN39]

> FN39. In accordance with our remand of plaintiff's requests to possess Nation symbols and other materials, we make no ruling at this time concerning what symbols, if any, DOCS must permit plaintiff to receive and display along with the 120 Degrees

### ii. Supreme Alphabet and Mathematics

We similarly grant plaintiff's request to be allowed to possess a copy of the Supreme Alphabet and Mathematics. As we noted earlier, these numerological devices are central aspects of the Nation's beliefs and practices, have remained unchanged since the 1960's, and are widely available to law enforcement on the Internet and elsewhere. DOCS admits that the alleged "code" is a simple one that can be learned by inmates orally even under its current ban, but maintains that the Supreme Alphabet and Mathematics are sometimes used by Five Percenter inmates to send coded messages to one another in furtherance of gang activities and would require the expenditure of significant resources to train officers to recognize and decode if they were disseminated among the inmate population (DOCS has also argued that the *Five Percenter* newspaper poses a security threat because it contains "code") *See* Def. Findings ¶¶ 60-63, 103-104; Trial Tr 407·13-15; Trial Tr. 665.14-19; Trial Tr. 692·9-693·8 While the Supreme Alphabet and Mathematics may indeed be susceptible to being used as a code, DOCS' arguments are unpersuasive. Toni Bair, a professor of criminal justice, former Warden of Virginia's Mecklenburg

Correctional Center "Supermax" facility, and former assistant commissioner of the New York City Department of Corrections who testified as plaintiff's expert on prison security, succinctly refuted DOCS' claims that the Supreme Alphabet and Mathematics threaten prison security:

> *20 It's published. The code is published. It is on the Internet. It is in the newspapers. It's everywhere. In order for a code to be effective and used, you know, covertly to be subversive or create problems in the institution, the code must be unbreakable and must not be, you know, common knowledge.... To ban the Mathematics and Alphabet because it is a code, you know, would be ludicrous. If we do that, why don't we ban Spanish, for example, because I would daresay that there is not a tremendous number of correctional officers in DOCS that are bilingual and yet we allow Spanish not only to be spoken but documents inside institutions that are Spanish ... and they are much more difficult to translate than this code would be.

Trial Tr. at 246:17-247:12.

We are persuaded that the Supreme Alphabet's and Mathematics' primary purpose is a religious one, and that, to they extent inmates might attempt to use them as a code, messages could be translated with minimal effort and training. Furthermore, the ability of inmates to communicate with each other by using the Supreme Alphabet and Mathematics in covert fashion would appear to be more challenging and limited than conversations in a foreign language not spoken by guards. Hence, we see no connection between DOCS' current ban on possessing the Supreme Alphabet and Mathematics and a compelling security interest, and order that plaintiff be permitted to possess them. [FN40]

> FN40. Again, in accordance with our remand of the remainder of plaintiff's claims to DOCS, we make no ruling at this time about whether plaintiff can possess or display Five Percenter symbols in conjunction with his possession of the Supreme Alphabet and Mathematics.

iii. Other Materials and Symbols, Gatherings, and Fasts

We remand the remainder of plaintiff's claims to DOCS to reevaluate its policies concerning the Nation and determine what materials and religious practices it can accommodate in light of our ruling that plaintiff's beliefs as a member of the Nation are entitled to free exercise and RLUIPA protection. It is incumbent upon

DOCS to make a determination about the feasibility of allowing sincere adherents like plaintiff to possess literature and to engage in religious practices in light of its security concerns.

In particular, DOCS must reevaluate how, if at all, it can accommodate plaintiff's request to receive *The Five Percenter.* In this regard, plaintiff has proposed two suggestions addressing DOCS' concerns about permitting security threat group members to use innocuous literature to recruit, control, and intimidate as less restrictive alternatives to a complete ban on the Nation's literature. First, plaintiff suggests that DOCS utilize the existing media review committee process to redact symbols that it views as posing a security threat. Alternatively, plaintiff proposes that DOCS maintain a copy of *The Five Percenter* in the prison library that plaintiff can presumably sign for and read individually during normal library time without removing the copies from the library. At trial, DOCS' efforts to address the library suggestion were particularly unconvincing. [FN41] On remand, because plaintiff has established that his religious beliefs are substantially burdened by DOCS' current ban on *The Five Percenter,* DOCS bears the burden of demonstrating why his proposals are infeasible on remand.

> FN41. DOCS' claims that maintaining a library copy of *The Five Percenter* would be infeasible because it would entail "separating plaintiff from other inmates" and "designating a separate room for plaintiff, and a separate secure space to secure the newspapers, assigning one or more staff members to supervise his movement to and from the room and assigning one or more members to issue him the Newspaper [*sic*] and to retrieve it," as well as elevating the group's statute through such special treatment. *See* Def. Findings ¶¶ 106-108. This "parade of horribles" seems rather exaggerated.

*21 On the issue of congregative gatherings, such as parliaments, rallies, and civilization classes, DOCS has thus far dismissed the possibility of allowing such activities on the assumption that any sanctioned congregation of members of an unauthorized group would elevate that group's status and permit the group's members to conspire to engage in violent activities. Here again, DOCS' position suffers from the incorrect assumption that all Five Percenters are gang members DOCS has also pinned its objections in part on the assumption that the gatherings would be unsupervised. *See* Defs. Findings at ¶ 122 ("Permitting plaintiff to participate in *unsupervised* inmate led parliaments

© 2005 Thomson/West No Claim to Orig U S. Govt. Works.

Not Reported in F.Supp.2d
(Cite as: 2003 WL 21782633, *21 (S.D.N.Y.))

Page 22

would create a security risk in the prison by allow [*sic* ] Five Percenters to organize, recruit additional members and serve as a forum for criminal conspiracy.") (emphasis added); Trial Tr. at 461:3-11 (Dale Artus stating that his understanding of a parliament is "an unsupervised meeting place for the individuals who wish to be involved in this type of activity to be allowed to meet and learn" that he would view as "detrimental to the safety and security of the facility and the department"). Plaintiff's counsel, however, has made it clear that he is not requesting unsupervised parliaments, and we note that Born Justice Allah from the Allah Youth Center testified at trial that he and other Nation members from outside prison would volunteer to assist DOCS in accommodating rallies and parliaments through advice and supervision. *See* Trial Tr. at 316:20-317:9. We recognize, however, that DOCS must consider security concerns, as well as considerations of limited time, space, and resources, in evaluating whether and how accommodations can be made for such gatherings.

Finally, DOCS must determine what can be done consistent with security concerns with respect to plaintiff's requests to receive late meals and gather with other inmates when he fasts in observance of Holy Days.

CONCLUSION

Based on the foregoing, it is ordered that DOCS conform its policies concerning the group known as the Nation of Gods and Earths with this ruling, and further that DOCS report the results of that policy reevaluation to the Court in sixty days. [FN42]

> FN42. We would also be remiss if we failed to express the Court's gratitude to *pro bono* counsel for their excellent effort and professionalism throughout this case and to

Sullivan & Cromwell for its sponsorship of their *pro bono* positions.

IT IS SO ORDERED.

2003 WL 21782633 (S.D.N.Y.)

Motions, Pleadings and Filings (Back to top)

. 2001 WL 34727714T1 (Trial Pleading) Reply Declaration of Rashaad Marria (Jul. 05, 2001)

. 2001 WL 34727849T1 (Trial Motion, Memorandum and Affidavit) Reply Memorandum in Support of Plaintiff's Motion to Exclude Defendants' Expert Testimony and Sur-Reply in Opposition to Defendants' Motion for Summary Judgment and to Exclude Plaintiff's Expert Testimony (Jun. 29, 2001)

. 2001 WL 34727848T1 (Trial Motion, Memorandum and Affidavit) Defendants' Memorandum of Law in Support of Their Motion to Exclude Plaintiff's Expert Testimony and Report and for Summary Judgment (Jun. 05, 2001)

. 2000 WL 34474967T1 (Trial Pleading) Answer to Plaintiff's Amended Complaint (Nov. 30, 2000)

. 2000 WL 34474966T1 (Trial Pleading) Answer to Plaintiff's Amended Complaint (Nov. 17, 2000)

. 2000 WL 34474965T1 (Trial Pleading) Amended Complaint (Nov. 03, 2000)

.          1:97CV08297          (Docket) (Nov. 10, 1997)

END OF DOCUMENT

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

*00620/1353*

O̶R̶IGINAL

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

**88835**

------------------------------------------x

RASHAAD MARRIA,                          :

               Plaintiff,      :      **OPINION AND ORDER**

   - against -                        :      97 Civ. 8297 (NRB)

DR. RAYMOND BROADDUS, Deputy
Commissioner of Programs; G. BLAETZ,
Chairperson of Green Haven
Correctional Facility Media Review
Committee; WARITH DEEN UMAR,           :
Coordinator for Islamic Affairs;
and GLENN GOORD, Commissioner of the   :
New York State Department of
Corrections,                           :

            Defendants.     :

------------------------------------------x

**NAOMI REICE BUCHWALD**
**UNITED STATES DISTRICT JUDGE**

    Plaintiff Intelligent Tarref Allah, formerly known as Rashaad

Marria[1] (hereinafter "plaintiff"), has been an inmate in the

custody of the New York State Department of Correctional Services

("DOCS") since June 1995.  For the duration of his incarceration

within DOCS, plaintiff has been a member of the Nation of Gods and

Earths ("Nation"), which he joined in August of 1994 while awaiting

trial at Rikers Island.  Defendants are DOCS employees sued in

their individual and official capacities: defendant Glenn S. Goord

---

[1]    Plaintiff legally changed his name in December 2001.  See
Trial Transcript ("Trial Tr.") at 38:14-18.  Apparently, he had also
sought to do so approximately two years earlier, but without success.
See id. at 38:21-39:7.

("Goord") is current the Commissioner of DOCS; defendant Dr. Raymond Broaddus ("Broaddus") was the Deputy Commissioner for Program Services of DOCS at all times relevant to this action; defendant G. Blaetz ("Blaetz") was a Senior Counselor and the Media Review Committee Chairperson at DOCS' Green Haven Correctional Facility ("Green Haven"); and defendant Warith Deen Umar ("Umar") was the Coordinator for Islamic Affairs at DOCS at all times relevant to this action (collectively, "defendants" or "DOCS").

Plaintiff challenges DOCS' policy classifying the Nation as an "unauthorized" or "security threat" group and DOCS' consequent prohibition on his receipt of Nation materials and literature, including the group's central texts and its newspaper, and ban on formal gatherings with other members of the group.  He seeks declaratory and injunctive relief pursuant to 42 U.S.C. § 1983, alleging violations of the First and Fourteenth Amendments to the United  States  Constitution,  the  Religious  Land  Use  and Institutionalized Persons Act of 2000 ("RLUIPA"), the New York State Constitution, and state law.  Plaintiff's federal due process and analogous state law claims were dismissed on qualified immunity grounds at the summary judgment stage of this case.  See Marria v. Broaddus, 200 F.Supp.2d 280, 301-302 (S.D.N.Y. 2002).

The Court held a five-day bench trial during which the parties presented evidence bearing on the issue of whether plaintiff's beliefs as a member of the Nation are entitled to Constitutional

2



protection and, if so, what proper the scope of protection would be. Having reviewed the testimony and evidence that has been presented, we find that plaintiff's sincerely-held beliefs as a member of the Nation are entitled to First Amendment and RLUIPA protection, and thus grant plaintiff's requested injunctive relief in part and remand in part for further consideration and action by DOCS not inconsistent with this decision.[2]  Our findings of fact and conclusions of law are set forth below.

## BACKGROUND

The Nation's history, teachings, and practices are largely not contested, nor are the existence and application of DOCS' policies concerning the Nation.

## A.    The Nation of Gods and Earths

The Nation, whose adherents are commonly referred to as "Five Percenters," the "Five Percent", or the "Five Percent Nation," was founded in New York nearly 40 years ago.  The Nation traces its roots to the Black Muslim movement that emerged in the mid-

---

[2]    It should be clear that in protecting plaintiff's constitutional rights to practice his adopted religion, we are fulfilling our sworn duty and in no way endorsing or heralding the Nation's tenets, several of which we find repugnant to the principles of tolerance and equality that are fundamental to our Constitution and the ethos of our country.  See Thomas v. Review Board of Indiana Employment Security Division, 450 U.S. 707, 714 (1981) ("religious beliefs need not be acceptable, logical, consistent, or comprehensible to others in order to merit First Amendment protection").

3

twentieth century and most directly to the Nation of Islam ("NOI") - a group that DOCS classifies as a religion pursuant to the settlement in Muhammad v. Coughlin, No. 91 Civ. 6333 (S.D.N.Y), and one with which the Nation shares some teachings and its central text (known to Nation members as the 120 Degrees).[3]  See  Trial Tr. at 162:11-17; Trial Tr. at 56:18-23.   The concept of the "Five Percent" from which the Nation derives its colloquial name was first set forth by NOI leader Elijah Muhammad, who separated the world's population into three categories: the Five Percent, the Ten Percent, and the Eighty-Five Percent.   See Trial Tr. at 54:6-20. According to Elijah Muhammad, the Ten Percent teach the Eighty-Five Percent to believe in the existence of a "mystery God" and thereby keep the Eighty-Five Percent enslaved by having them worship something that they cannot see.   See id.   Muhammad characterized the remaining Five Percent as the poor, righteous teachers who do not believe in the teachings of the Ten Percent and instead teach the identity of the true and living God, as well as freedom, justice, and equality to all human families of the planet earth. See id.   The term "Five Percenter," while commonly used to describe members of the Nation, can be used more generally to describe a

---

[3]      While the NOI and the Nation differ in their interpretation of the 120 Degrees, referred to as the "Book of Supreme Wisdom" or "Lost-Found Muslim Lessons" by the NOI, both groups study them.   See April 12, 2001 Decl. of A. Blocker ("Blocker Decl.")  ¶¶ 8-11.   DOCS permits the Book of Supreme Wisdom to be issued to any inmate who is a registered member of NOI, but Nation members who have not registered as members of the NOI are not permitted to view these materials.   See id.

4

person who subscribes to the belief that humankind can be broken down into the Five Percent, the Ten Percent, and the Eighty-Five Percent. Thus, not all people who might nominally identify themselves as "Five Percenters" are necessarily members of the Nation of Gods and Earths. See Trial Tr. at 55:15-25.

The Nation of Gods and Earths began in 1964 when its founder Clarence 13X Smith broke with the NOI. See Trial Tr. at 56:18-23. In contrast to the NOI's belief that Allah (God) appeared on Earth solely in the person of its founder Master Fard Muhammad, Smith and his followers professed the central belief that every black man is an embodiment of God with the proper name Allah and that every black woman is "Earth," from which life springs. See Trial Tr. at 56:24-57:7. Thereafter, with the assistance of the City of New York and the Urban League, Smith and his followers created the "Allah School in Mecca," a headquarters that also houses the "Allah Youth Center in Mecca," in Harlem, New York as a street academy designed to bring the Nation's message to urban youth. See Trial Tr. at 56:18-23; see also generally April 30, 2001 Decl. of Elise Zealand ("Zealand Decl.") Ex. N (article discussing the history of the Nation); April 27, 2001 Decl. of Rashaad Marria ("Marria Decl.") ¶ 15 & Ex. D (discussing the Nation's relationship with the Urban League and New York City). The Center, which enjoys 501(c)(3) not-for-profit tax status and a favorable ninety-nine year lease from the City paid at the rate of twenty dollars per

month, continues to operate in Harlem as do several similar centers elsewhere. See Trial Tr. at 316:9-13. Among the activities sponsored by the Allah School and Youth Center are substance abuse programs, after-school tutoring for children, and youth trips to show children that "there is more to life than what they see in the ghettos." See Trial Tr. at 313:17-315:21. Aside from its headquarters in Harlem, the Nation does not have a formal structure or hierarchy beyond preaching respect for "elders" - i.e., those with the most extensive knowledge of the group's beliefs and lessons. See Trial Tr. at 94:12-24.

As we previously mentioned, some of the Nation's beliefs and practices overlap with those of the NOI as a result of the two groups' shared belief in the lessons that comprise the 120 Degrees. Both groups, for example, believe that the black man is the "original Asiatic man." Both the Nation and NOI also believe that the white man is "the devil," made through a selective breeding process referred to as "grafting," as all of these teachings are set forth in the 120 Degrees. See Trial Tr. at 165:12-21; Trial Tr. at 302:15-20; Pl. Trial Ex. 180 (anthropological "syncretism" created by plaintiff witness Ted Swedenberg comparing the Nation of Gods and Earths to various religious traditions); Blocker Decl. ¶ 8. Members of both groups also observe dietary restrictions,

such as refraining from eating pork, and fast on holy days.[4]
Finally, the Nation's emblem, known to members as the "Universal
Flag," is reminiscent of the one used by NOI. Compare Pl. Trial
Ex. 1 (cover of *Five Percenter* newspaper containing the "Universal
Flag") with http://www.noi.org/ (visited May 26, 2003) (NOI web
page displaying crescent emblem).

Although plaintiff asserts that his belief system as a member
of the Nation would be commonly understood as a religion, he and
other nation members reject the label "religion" in describing the
Nation because they believe that the term "religion" connotes
"belief in the mystery God" - i.e., the false religious belief
systems promulgated by the Ten Percent to enslave the minds of
others.    See Trial Tr. at 106:13-16.    Therefore, plaintiff and
other Five Percenters commonly describe the Nation as a "way of
life or culture," not a "religion." See Trial Tr. at 58:2-13.

The 120 Degrees, along with two numerology devices known as
the Supreme Alphabet and Supreme Mathematics, forms the core of the
Nation's literature.    The 120 Degrees are lessons arranged in a
question and answer format that represent the teachings of NOI
founder Master Fard Muhammad and Elijah Muhammad.    The Supreme

---

[4]    Holy days observed by the Nation include the anniversaries of
the birth and death of Clarence 13X Smith and the birthdays of Elijah
Muhammad and Fard Muhammad.    See Trial Tr. at 62:6-8, 18.    The Nation,
however, does not participate in Ramadan, Jumma, and some other
traditional Islamic customs practiced by NOI members. See Pl. Trial Ex.
180.

7

Alphabet and Supreme Mathematics assign a word to each letter of the alphabet (almost all of which begin with the letter to which they correspond) and ten "righteous" principles to each number from 0 to 9.  They are used as the keys "to understand[ing] man's relationship to the universe and Islam," as well as to understanding and interpreting the 120 Degrees.[5]  Marria Decl. ¶ 13.  There is no dispute that the Supreme Alphabet and Mathematics have not changed since they were created by Clarence 13X Smith in the 1960's and are made widely available by the Nation and others. Members of the Nation use these sources in conjunction with one another to attain "knowledge of self," which is central to their membership in the Nation, and they must be understood and applied on a daily basis in order to live righteously.  Hence, just as Nation members are required to fast on holy days and follow dietary restrictions, they are also required to study the lessons in these teachings on a regular basis both individually and in group sessions.  The Nation's beliefs are also based on the Koran and the Bible, which serve as secondary texts, see Trial Tr. at 65:7-66:15, and "plus lessons" consisting of written commentary by Five

---

[5]     For example, in the nomenclature of the Supreme Alphabet, the letter "A" stands for "Allah," "B" stands for "Be," and "C" stands for "See" or "Cee."  In the Supreme Mathematics, the number "1" represents "Knowledge," the number "2" represents "Wisdom," and the number "3" represents "Understanding."  See id.  One example of how Nation members apply this numerological system to their lives, according to plaintiff, is that "1" ("Knowledge") and "2" ("Wisdom") must precede "3" ("Understanding").  See Trial Tr. at 98:8-24 (plaintiff explaining how he uses the Supreme Alphabet and Mathematics to understand the world).

8

Percenters aimed at fostering further insight into the group's texts and teachings. <u>See</u> Trial Tr. at 64:17-20, 64:25-65:6.

One additional piece of Nation literature specifically at issue in this case is *The Five Percenter*, a monthly newspaper published by the Allah Youth Center. It contains articles about current events relevant to the Nation, information about community activities, letters to the editor, editorials, and Five Percenter lessons and "plus lessons," including teachings from the 120 Degrees, the Supreme Alphabet, and the Supreme Mathematics. <u>See</u> e.g., Pl. Trial Ex. 3 (copy of the October 1995 issue of *The Five Percenter* received in evidence); Pl. Trial Ex. 6 (copy of the June 1996 issue of *The Five Percenter* received in evidence). Some of *The Five Percenter*'s content is directed specifically towards prison inmates, including messages advising them to better themselves and follow prison rules while incarcerated.[6] Plaintiff asserts that *The Five Percenter* also serves as the principal and vital link for him to communicate with members of the Five Percenter community outside prison. <u>See</u> Trial Tr. at 69:24-70:17; <u>see</u> <u>also</u> Trial Tr. at 154:24-155:6 (plaintiff's expert

---

[6]    One such article instructs inmates: "'Don't serve time, but make time serve you.' is the principle that you should adopt internally in order to return back to your family and community as an asset and not a continued liability . . . When you serve time negatively, you waste precious moments of your life." <u>See</u> Pl. Trial Ex. 3 at Bates No. 240 (article entitled "Belly of the Beast" from the October 1995 issue of *The Five Percenter*). The article further instructs inmates to "participate to the best of your ability within the rules of your respective prison and reap what you sow in this righteousness." <u>See</u> <u>id</u>.

9

anthropologist Ted Swedenberg explaining that *The Five Percenter* shows Nation members how the group's abstract principles can be applied in life); Trial Tr. at 292:17-293:15 (Nation representative Cee Aaquil Allah Barnes discussing the importance of *The Five Percenter* as a link to the community for prison inmates who are members of the Nation); Pl. Trial Ex. 4 (December 1995 issue of *The Five Percenter* containing a "Correspond with a God Column" for readers who wish to correspond with incarcerated members of the Nation).

Practicing members of the Nation also have various congregative gatherings. For example, the Nation conducts "Civilization Classes," in which more senior members - i.e., those who have studied the lessons longer than others - educate newer members about the lessons and how they can be applied. See Trial Tr. at 291:17-23. Such classes are held regularly at the Allah Youth Center. See Trial Tr. at 314:25-315:3. Nation members also gather regularly for "Parliaments" and "Rallies." During these gatherings, members come together to help one another learn their lessons, to educate one another by conversing about the lessons' meaning and application (which they call "building"), and to make decisions as a community. See Trial Tr. at 59:25-60:10; Trial Tr. at 287:25-288:8; Trial Tr. at 291:2-10.

Finally, as we mentioned earlier, the Nation has an official symbol referred to as the a Universal Flag, consisting of an eight-

pointed star containing a number 7, a crescent, a smaller five-pointed star, and the words "In the Name of Allah." See Trial Tr. at 155:16-23.

## B.   DOCS' Policies Concerning the Nation

DOCS deems the "Five Percenters" to be an "unauthorized" or "security threat" group, which is the nomenclature that DOCS uses to describe a gang or other group that it views as an organized threat to prison safety and security.[7]  As a result, though DOCS' correctional philosophy is primarily "behavior based," Nation members like plaintiff are regarded as gang members within the New York State correctional system and are consequently prohibited from receiving or possessing any of the group's literature or symbols, as well as from engaging in any organized activities associated with the Nation.

DOCS' policies concerning the Nation stem from its non-recognition policy designed for security threat group management, which seeks to diminish gangs' power and importance by refusing to legitimize their existence.   DOCS does not officially recognize

---

[7]     In doing so, DOCS does not distinguish between "Five Percenters" and members of the Nation of Gods and Earths. See e.g., Def. Proposed Findings of Fact and Conclusions of Law ("Def. Findings") ¶ 36 ("Plaintiff is able to participate in DOCS' educational and rehabilitative programs in spite of the fact that he is a member of the Five Percenters."). As previously noted, however, DOCS and plaintiff do not necessarily use the term "Five Percenter" to identify the same individuals.

11

unauthorized or security threat groups, even by tracking their activities internally, because it believes that "to do so would give them undue credibility and attention and embellish their importance." Def. Findings at ¶ 45 (citing Trial Tr. at 340:18-341:19). Pursuant to its non-recognition policy, and to further prevent the growth and/or proliferation of security threat groups through recruiting, DOCS implemented Rule 105.12 of its Standards of Inmate Behavior, which states that inmates "shall not engage or encourage others to engage in unauthorized organizational activities or meetings, display, wear, possess, distribute, or use unauthorized organizational insignia or materials." Def. Trial Ex. I. Rule 105.12 defines an unauthorized organization as "any gang, or organization which has not been approved by the Deputy Commissioner for Program Services." Id. Materials violating Rule 105.12 are considered contraband and are not subject to the "Media Review" process DOCS has implemented for determining the acceptability of the majority of other printed and written materials received by prisoners. See Trial Tr. at 360:21-361:9. DOCS has also implemented a zero-tolerance gang policy, under which any kind of behavior deemed to be part of gang activity, including possession of written materials or gang-associated emblems or logos, will subject an inmate to discipline. See Trial Tr. at 342:13-19.

Applying its complete ban on "Five Percenter" literature

12

pursuant to its non-recognition policy, DOCS forbids plaintiff from having lessons from the 120 Degrees, possessing the Supreme Alphabet and Mathematics, or receiving or possessing *The Five Percenter* and other materials that are either associated with the Nation or contain its symbols.[8] DOCS' designation of the Nation as an unauthorized group also means that plaintiff can meet with no more than four other Five Percenter inmates at a time, and can only do so sporadically. See Trial Tr. at 63:6-18. He is thus prohibited from attending or organizing Civilization Classes, Parliaments, or Rallies. Finally, plaintiff is not permitted to eat his meals after sundown on fast days or to meet with other inmates on those days in order to break the fast, privileges that are extended to inmates who adhereJuly 16, 2003 to authorized religions like Nation of Islam members and Orthodox Muslims. See Trial Tr. at 62:11-63:5.

Because DOCS' procedures for becoming "authorized" explicitly exclude religious groups, there does not appear to be an established process by which an unrecognized group like the Nation can attain recognition as a religion from DOCS in order to avoid

---

[8]    According to plaintiff and a supporting affidavit submitted for summary judgment purposes by an inmate NOI minister, members of the Nation are also unable to obtain the 120 Degrees in bound format from NOI members, as only inmates registered with an NOI temple outside of prison are permitted to have those lessons. See Trial Tr. at 57:8-15; Blocker Decl. ¶¶ 10-11.



gang treatment.[9]   We surmise from the trial testimony, however,

that a religious group could become effectively "authorized" in a

manner equivalent to becoming an authorized group directly through

the Department of Program Services by attaining a favorable

recommendation   for   accommodations   from   DOCS'   Division   of

Ministerial and Family Services that is subsequently approved by

executive level DOCS officials.   See Trial Tr. 525:25-526:15,

530:3-6 (former Director of Ministerial and Family Services John

LoConte describing his role in investigating and making subsequent

recommendations to executive level DOCS officials concerning inmate

requests for religious accommodations).   It has apparently been

_____

[9]     DOCS Directive 4670, which deals with inmate organizations,
makes it clear that religious groups seeking to meet regularly for
worship or prayer services cannot apply for inmate organization status.
See Def. Trial Ex. F2 (Directive 4670) at ¶ II(C)(2).   Trial testimony
reflected some confusion concerning exactly how a group claiming to be
religious in nature like the Nation can become "authorized."   Compare
Trial Tr. at 390:18-25 (DOCS official Richard Roy testifying that he did
not know the answer to plaintiff's question about whether there
was a way for a group claiming religious status to become authorized by
DOCS short of litigation) with Trial Tr. 416:9-22 (Richard Roy testifying
that, though he was not familiar with the details, there is a procedure
by which religious groups can become recognized within DOCS through the
Division of Ministerial and Family Services) and Trial Tr. at 525:25-
528:7 (former DOCS Director of Ministerial and Family Services John
LoConte discussing generally how he handled requests for religious
accommodation within DOCS, but stating that he did not make the final
decision about accommodating religious requests and that "[o]ur
recognition I don't believe is that important.").   The evidence
introduced at trial also indicates that at least two other Black Muslim
groups, the Nation of Islam and Moorish Science Temple, resorted to
litigation similar to this one before DOCS ceased treating them as
"unauthorized groups" and began classifying them as religious groups.
Both cases were settled without court rulings on the plaintiffs' claims
for injunctive relief from DOCS' non-recognition of the groups in
question.   See Trial Tr. 389:6-20; 533:8-535:25; see also Muhammad v.
Coughlin, No. 91 Civ. 6333 (S.D.N.Y) (Nation of Islam); Gilmore-Bey v.
Coughlin, No. 93 Civ. 6592 (S.D.N.Y.) (Moorish Science Temple).

14



DOCS' practice upon receiving an inmate request for religious accommodations to attempt to "verify the religious practice, whether or not it is something that is understandable in light of organized operational religious communities," Trial Tr. 512:17-21, and to "reach out to the outside religious community of the inmates [making the claim]" in order to confirm the practices' legitimacy and seek assistance in providing accommodations.    Trial Tr. at 513:1-2.  However, DOCS did not introduce any evidence to indicate that it has made such investigative or outreach efforts with respect to the Nation, despite having received a number of requests for religious accommodation.[10]  Moreover, in defending this lawsuit, DOCS has consistently avoided this issue by insisting that plaintiff cannot seek religious recognition because the Five Percenters are, in its view, a gang and not a religion.

## C.   Conflicting Claims About the Nature of the Nation

While plaintiff claims that DOCS' ban on Nation materials and

___

[10]    See e.g., Breland v. Goord, No. 94 Civ. 3696, 1997 WL 139533 (S.D.N.Y. March 27, 1997); Graham v. Cochran, No. 96 Civ. 6166, 2000 U.S. Dist. LEXIS 1477, (S.D.N.Y. February 14, 2000) (Ellis, M.J.); Lord Natural-Self Allah v. Annucci, No. 97 Civ. 607, 1999 WL 299310 (W.D.N.Y. March 25, 1999) (Heckman, M.J.); Pl. Trial Exhibit 182 (October 29, 1996 letter from DOCS Deputy Commissioner for Program Services Raymond Broaddus to an inmate regarding a request for religious accommodations stating "I have been informed that the Five Percent Nation is not a religion.    Therefore, there is no religious faith to practice."); Pl. Trial Ex. 81 (October 19, 1998 letter from defendant Warith Deen Umar, DOCS coordinator for Islamic Affairs, to plaintiff stating that "there are no directives or rules and regulations regarding the Five Percenters. The reason for this is the courts have ruled the Five Percenters are not a legitimate religious group").

15

gatherings violates his free exercise rights under the Constitution and RLUIPA, DOCS argues that his beliefs and practices as a member of the Nation are not protected because they are not sincere or religious in nature, and in any event that its ban of the Nation's literature is justified by violence associated with Five Percenter inmates.  The parties' conflicting claims boil down to widely disparate characterizations of the nature of the Nation of Gods and Earths.

DOCS, on the one hand, takes the position that "the Five Percenters," including purported members of the Nation of Gods and Earths, is a violent organization that, like some other gangs, utilizes symbols and seemingly innocuous literature touting the group's positive aspects to identify its members and "territory," as well as to recruit new members into its violent and illegal activities.[11]  Such activities include assaults, intimidation, extortion, drug dealing, and retaliation against fellow members who attempt to leave the group or act against other Five Percenters. See Def. Findings ¶¶ 56-58.  DOCS additionally asserts that Five Percenters utilize the Supreme Alphabet and Mathematics as a code in furtherance of its disruptive activities.  See Def. Findings ¶¶

---

[11] According to DOCS, "[j]oining a gang such as the Five Percenters is about money, power and respect," Def. Findings ¶ 87, and "[t]he Five Percenter newspaper is used as a tool by inmates to recruit other gang members and sometimes inmates are recruited into joining the Five Percenters without realizing that they may be asked to participate in violent or illegal activities." See id. ¶ 91.

61-63, 103-104.  DOCS' stance in this case represents a shift from
its previous litigation position that the content of the Nation's
literature itself is dangerous.[12]   Here, DOCS concedes that the
Nation's literature is innocuous, but claims that its ban on Nation
materials is still necessary to preserve prison safety and security
because the materials are used to facilitate the recruiting efforts
and illegal activities of a violent and disruptive organization.
Furthermore, according to DOCS, it would give the Five Percenters
and other security threat groups increased legitimacy and status,
contrary to its non-recognition strategy, if inmates were permitted
access to the groups' materials.  See Def. Findings ¶¶ 42, 52, 90-
92, 94-95 (outlining this justification for DOCS' non-recognition
strategy in general and for its specific application to the Five
Percenters).

     Plaintiff, on the other hand, asserts that the Nation is not
a gang, but rather a legitimate religious group whose beliefs extol

_____

     [12]    In previous litigation arising from the same time period as
this one, DOCS claimed that Five Percenter literature incited violence
against white people with messages like "kill the White devils and their
families" and asserted that a statement urging Nation members to
"struggle to get out of prison houses" through education was an
incitement to escape (in full, the statement read: "we've experienced the
trials and tribulations of his prison house and we must now struggle to
get out of his prison houses and remove the veil that has been placed
over our people's minds. This can only be done through education, i.e.,
proper education."). See Breland v. Goord, No. 94 Civ. 3696, 1997 WL
139533, at *2 (S.D.N.Y. March 27, 1997).   DOCS' content-based
justification for banning the Nation's literature was rejected by Judge
Baer of this Court, who found that the Nation's literature contained no
such incitements to violence and that DOCS had "unfairly characterized
the material at issue" and "unfortunately focused on the non-traditional
nature of plaintiff's religion." See id. at *2, *6.

17

lawfulness, righteousness, freedom, justice, equality, and peace and whose literature focuses largely on positive messages, such as education, self-improvement, self-worth, and responsibility. See Pl. Proposed Findings of Fact ("Pl. Findings") ¶¶ 19-21, 35-36. According to plaintiff and other Nation members, "[a]ny purported member who engages in violent or disruptive activities is violating the tenets of the Nation." Pl. Findings ¶ 35; see also Trial Tr. at 287:9-288:8. He further asserts that the Supreme Alphabet and Mathematics are a religious numerology system, not a secret code, see Pl. Findings ¶¶ 16-19; see also Trial Tr. 47:13-16, and that Nation members are allowed to leave the group without reprisals.[13] See Pl. Proposed Conclusions of Law ("Pl. Conclusions")26; see also Trial Tr. at 96:4-23; Trial Tr. at 385:6-386:11. Plaintiff thus argues that allowing him to receive the group's literature poses no threat to prison safety or security.

In evaluating these contradictory positions, we make further factual findings below as they become relevant.

---

[13]    At the summary judgment stage of this case, plaintiff submitted the declarations of numerous Nation members, living both within and outside the DOCS system, asserting that the Nation is not a gang and does not promote violence or retaliate against members who leave. See June 26, 2001 Decl. of Cee Aaquil Allah Barnes (detailing the activities of the Allah Youth Center and asserting that the Five Percenters are not a gang); April 12, 2001 Decl. of Wendell Williams (asserting that Five Percenters are not a gang and do not engage in gang like activities); April 13, 2001 Decl. of Terayus Jones (same); April 25, 2001 Decl. of Rahiem Buford (same); April 18, 2001 Decl. of Gabriel Clausen (same); October 6, 200 Decl. of H. Khalif Khalifah (same).

18

## DISCUSSION

### A.   Sincerity and Religious Nature of Plaintiff's Beliefs

As a threshold matter, we discuss DOCS' position that plaintiff may not seek the protections of the First Amendment or RLUIPA because he has failed to demonstrate either the sincerity of his professed beliefs or that they otherwise merit religious protection.

The Second Circuit set forth the scope of this Court's inquiry into a plaintiff's beliefs in Patrick v. LeFevre, a previous free exercise case brought by a Five Percenter inmate, by emphasizing the "limited function of the judiciary in determining whether beliefs are to be accorded first amendment protection" as follows:

> It cannot be gainsaid that the judiciary is singularly ill-equipped to sit in judgment on the verity of an adherent's religious beliefs. Mindful of this profound limitation, our competence properly extends to determining "whether the beliefs professed by a [claimant] are sincerely held and whether they are, in his own scheme of things, religious."

Patrick v. LeFevre, 745 F.2d 153, 157 (2d Cir. 1984) (quoting United States v. Seeger, 380 U.S. 163, 185 (1965)).  Hence, a court's scrutiny of whether a plaintiff deserves free exercise protection "extends only to whether a claimant sincerely holds a particular belief and whether the belief is religious in nature." Jolly v. Coughlin, 76 F.3d 468, 476 (2d Cir. 1996) (discussing this standard in the context of a free exercise claim brought under the

Religious Freedom Restoration Act). Sincerity analysis "seeks to determine the subjective good faith of an adherent in performing certain rituals" and can be guided by such extrinsic factors as a purported religious group's size and history, whether the claimant appears to be seeking material gain by hiding secular interests behind a veil of religious doctrine, and whether the claimant has acted in a manner inconsistent with his professed beliefs. Int'l Soc'y for Krishna Consciousness v. Barber, 650 F.2d 430, 441 (2d Cir. 1981). However, "courts are not permitted to ask whether a particular belief is appropriate or true - however unusual or unfamiliar the belief may be." Jolly,, 76 F.3d at 476. Patrick v. LeFevre further instructs us that deciding such subjective issues as the sincerity and the perceived nature of beliefs requires the factfinder - the Court in this case - to assess the claimant's demeanor at trial and "delve into the internal operations of the claimant's mind and in turn assess the sincerity of the held beliefs and the place occupied by such beliefs in the plaintiff's life." Patrick, 745 F.2d at 158; see also id. at 159. In this regard, the Circuit has cited with approval the definition of religion espoused by philosopher William James - "the feelings, acts, and experiences of individual men in their solitude, so far as they apprehend themselves to stand in relation to whatever they may consider the divine." Id. at 158 (quoting W. James, The Varieties of Religious Experiences 31 (1910)). Having heard

20

plaintiff's testimony and observed his demeanor throughout the week-long trial, we find that plaintiff meets the two <u>Patrick v. LeFevre</u> criteria.

### i. Sincerity Analysis

We find that the trial record contained ample evidence of plaintiff's sincerity in his beliefs and that DOCS' arguments to the contrary are unpersuasive. Plaintiff, who is incarcerated for murder, testified that the Nation had "resurrected" him "from . . . a life of total unrighteousness." Trial Tr. at 100:8-9. He also described the manner in which his life is guided by his Five Percenter beliefs - specifically the 120 Degrees, Supreme Alphabet, and Supreme Mathematics - and his efforts to conform his life to his beliefs as follows:

> When I look at that first degree in the student enrollment [the first few lessons of the 120 Degrees] and I see the black man is the God of the universe, it's endowed me with the power to know the sky's the limit. I manifested, I make changes in my life. I don't do things I did before. I became a vegan, stopped eating animals. I enhanced my discipline level. My mother's, she's amazed I've been locked up so long and haven't even had a fight. I learn to conduct myself in matters where people respect me for who I am. I don't have to be bothered no more because people respect intelligence, and once they see you living what you say, they **respect** that. And I learn to conduct myself in **a manner** which I don't put myself in **predicaments** that would lead to altercations and **things of** that nature.

21

Trial Tr. at 100:14-101:1. He reports that in doing so he has gone
from being a person who was "trying to take things to the extreme,
you know, on a negative aspect" to being a "very disciplined
person, a person that's constantly striving to obtain
righteousness" who has "learned and grown to have respect for other
people's feelings." Trial Tr. at 43:5-17. Examples of ways in
which plaintiff has conformed his life and daily activities with
his beliefs as a member of the Nation include memorizing and
studying his lessons to the extent possible under DOCS' complete
ban, eschewing pork and pork byproducts, fasting on holy days, and
officially changing his name from Rashaad Marria to a "righteous"
one reflecting Nation values and custom (Intelligent Tarref Allah),
not to mention diligently pursuing this litigation since 1997 and
engaging in a letter-writing campaign to recover confiscated copies
of *The Five Percenter* prior to that. See Trial Tr. at 38:14-18;
100:17-20. When one considers the totality of plaintiff's
testimony, it is apparent that he has structured his daily
lifestyle in conformity with the rigors of membership in the Nation
for some time. This conclusion is underscored by plaintiff's
record of conduct as a prisoner, which includes earning his GED,
participating in numerous other classes and programs, serving on
the Inmate Liaison Committee,[14] and no incidents of violence or

---

[14]   We note that, according to DOCS witness Superintendent Joseph
Smith, serving on the Inmate Liaison Committee is the kind of "positive"
activity through which a charismatic inmate can become a "stabilizing

disruptive conduct.  See Trial Tr. at 126:12-14; June 18, 2001

Reply Decl. of Rashaad Marria Exs. F-J (certifications and letter

of commendation documenting various classes and programs in which

plaintiff participated while incarcerated).

Plaintiff's sincerity was further substantiated at trial by

the largely unchallenged testimony of Cee Aaquil Allah Barnes and

Born Justice Allah, representatives of the Allah Youth Center,

concerning the Nation's apparent legitimacy outside prison.[15]  See

Trial  Tr.  at  296:17-298:13  (DOCS'  extremely  limited  cross

examination of Mr. Barnes); Trial Tr. at 323:10-12 (DOCS declining

to cross examine Mr. Justice Allah).  There was no suggestion by

DOCS  that  either  of  these  representatives  was  involved  in  a

criminal organization.  Nor did DOCS contest the testimony that the

Nation's non-incarcerated members include police officers, doctors,

lawyers, and other professionals who would presumably not be part

of a violent gang.  See Trial Tr. at 294:17-21.  Moreover, the

Allah Youth Center's 501(c)(3) tax status and the favorable lease

that it continues to receive from New York City, neither of which

DOCS disputes, are strong indications that the Nation itself is not

---

influence" within a prison facility.    Ironically, Smith sought to
contrast this kind of positive activity with his negative perception of
Five Percenter inmates.  See Trial Tr. at 652:25-653:7.

[15]    Mr. Barnes is the Center's Chairman and Mr. Justice Allah
**serves** as an elder and administrator.

23

believed to be a criminal organization outside prison.[16]    The
various    community-oriented    programs    and    activities    the
representative described as taking place at the Allah School and
Youth Center are also consistent with plaintiff's claims that the
Nation is a sincere, legitimate religious group. See Trial Tr. at
290:16-25 (Cee Barnes testifying about health and book fairs taking
place at the Allah Youth Center), 292:1-16 (Cee Barnes testifying
about the Nation's prison outreach and assistance given to former
inmates); Trial Tr. at 313:17-315:19 (Born Justice Allah testifying
about the youth programs run at the Allah School).

    The Nation thus appears to be in the somewhat unique position
of having a legitimate existence outside prison while being
classified exclusively as a security threat group within DOCS.[17]

---

[16]    DOCS does argue that "Five Percenters outside of prison have
engaged in criminal activity." See Def. Findings ¶ 80.  However, this
argument - relying solely on Shawangunk Superintendent Joseph Smith's
recollections of supervising several Five Percenters as a probation
officer in the 1970's, Investigator Ron Holvey's experiences with alleged
Five Percenter gangs in New Jersey, and an inmate's testimony that he
participated in Five Percenter gang activities outside prison after
joining the group in a boys home - does not really address or challenge
the Nation representatives' testimony to the effect that the Nation is
a legitimate organization engaged in constructive and lawful activities
outside prison.

[17]    According to DOCS' former Director of Ministerial and Family
Services John LoConte, the existence of an established, legitimate
religious community outside of prison would have been an important factor
is his determination of whether a prisoner deserved religious
accommodations during his tenure as DOCS Director of the Division of
Ministerial and Family Services. See Trial Tr. at 536:23-538:8, 538:17-
840:2; see also Trial Tr. 543:4-13 (LoConte testifying that DOCS
recognizes Wiccans as a religion because of their "visible presence,"
complete with articulated doctrine, dogma, traditions, and rituals,
outside prison).

24

In support of its position that plaintiff is insincere, DOCS makes a series of unpersuasive arguments. Several concern instances in which DOCS claims plaintiff did not conform his conduct to his professed Five Percenter tenets and thereby suggests that he is essentially faking them in order to gain the legitimacy that religious protection would afford his gang participation. See Def. Findings ¶¶ 21-32. DOCS first cites three instances in which plaintiff was disciplined by prison authorities for nonviolent conduct: (1) giving false information to a corrections officer, to wit, falsely telling the officer that he had received legal pads from the prison commissary; (2) failing to obey a direct order from a guard who apparently told him to stay away as he was attempting to observe another inmate's grievance meeting in the sergeant's office as the representative of the Inmate Liaison Committee; and (3) possessing an "altered item" - a toothbrush that plaintiff testified he used as a makeshift screwdriver by outfitting it with the sliding metal piece from the inside of a pair of headphones - that could be used as a weapon. See Def. Findings ¶¶ 29-31; Trial Tr. at 124:22-129:9. Whether or not one believes plaintiff's assertions that he was disciplined unjustly in the first two instances, they are a far cry from the kind of marked or regular departure from professed beliefs that would lead us to find a plaintiff insincere. Cf. Int'l Soc'y for Krishna Consciousness v. Barber, 650 F.2d 430, 441 (2d Cir. 1981) (citing, as an example of

25

the type of inconsistent act that would lead a court to find an adherent insincere, a Jewish adherent claiming a free exercise violation from being compelled to appear in court on the Sabbath who otherwise works on Saturdays). In the case of the altered item, which no one disagrees constituted contraband, we find credible plaintiff's explanation that he was simply using it as a makeshift screwdriver, given that he did not alter the rounded, blunt tip of the headphone piece and made no real attempt to conceal the item, which was found in a bucket filled with radio parts and other knick-knacks where it was regularly kept. See Def. Trial Exhibit OO (photocopy of "altered item").[18]

Other evidence of inconsistent conduct, according to DOCS, includes plaintiff's mentioning only that the Nation's dietary restrictions require him to eschew pork while Cee Barnes testified that the Nation's tenets require one "not to eat pork and if you go a little bit further . . . not to eat any type of scavenger, and a scavenger is like shrimp or tuna fish," Def. Findings ¶ 28; see also Trial Tr. at 287:7-8, plaintiff's allowing his subscription to The Five Percenter lapse for a time in 1996, see Def. Findings at ¶ 26, and plaintiff's adopting a NOI religious designation during a period in which he attended a number of NOI services. See Def. Findings ¶ 27. The purported inconsistencies raised by the first

_____

[18] Plaintiff's expert on prison administration, former federal prison warden Toni Bair, reached a similar conclusion upon examination of the photocopy during his testimony. See Trial Tr. at 220:18-221:15.

26

two arguments seem sufficiently minor that we need not address them in detail here, except to note that DOCS does not contest plaintiff's testimony that he has adhered to a vegan diet since becoming a Nation member (meaning that he does not eat shrimp or tuna) and that the lapse in plaintiff's subscription occurred during a period in which DOCS began to confiscate the newspaper as illegal contraband.[19]

With respect to DOCS' argument about the NOI designation, plaintiff testified that he sporadically attended both NOI and other groups' services while remaining a member of the Nation in order to "get an understanding of what separates the two and why people think the way they think," Trial Tr. at 67:3-5, but that NOI was the only group for which DOCS required him to sign a religious designation form in order to be allowed to attend the services. See Trial Tr. at 67:22-68:16. He emphatically, and credibly, denied that his attendance at any other group's services constituted a commitment to be a part of a religious community other than the Nation. See id. We find it unsurprising that a member of the Nation, which builds on related religious traditions, like plaintiff would seek to attend NOI services and

---

[19]    In a similar vein, we reject DOCS' argument that plaintiff's insincerity is evidenced by his failure to formally request parliaments and other gatherings until 2000, see Def. Findings ¶ 22, since DOCS' complete ban on the Nation's materials and previous denials of plaintiff's requests to receive them made it fairly clear that such a request would not have been granted and plaintiff has represented that he did so merely to ensure that he had exhausted his administrative remedies.

27

correspondingly sign up as a NOI adherent when DOCS treats the Nation itself as an unauthorized group, especially since this is exactly what DOCS encouraged him to do in response to his requests for religious accommodations.[20] Cf. Campos v. Coughlin, 854 F.Supp. 194 (S.D.N.Y 1994) (finding "not persuasive" DOCS' attempt to cast doubt on the sincerity of Santeria adherents' religious beliefs because they had previously self-identified as "Catholic"). Moreover, DOCS' argument that we should find plaintiff insincere because he signed up for and attended NOI services is in tension with its claim, discussed infra, that plaintiff's beliefs are not

---

[20]    In response to his inquiries concerning confiscated copies of the *Five Percenter* newspaper, DOCS Coordinator for Islamic Affairs, Warith Deen Umar responded as follows:

> Dear brother:
>       This responds to your letter of September 22, 1998.  There are no directives or rules and regulations regarding Five Percenters. The reason for this is because the courts have ruled that Five Percenters are not a legitimate religious group.  The New York State Department of Correctional Services does not acknowledge the claims of inmates who designate themselves as Five Percenters.  *You may want to explore some of the teaching of the Muslims and the Nation of Islam in your facility.*
>                          Your brother in Islam,
>                          Imam Warith Deen Umar
>                          Ministerial Program Coordinator
>                          Ministerial and Family Services

Pl. Trial Ex. 81 (emphasis added).  We note that, to the Court's knowledge, no case law existed to substantiate Imam Umar's assertion that "the courts have ruled that Five Percenters are not a legitimate religious group."

substantially burdened by its policies because he can gain access
to the Nation's lessons through the NOI (presumably in part by
attending their services).

Ultimately, the point of sincerity analysis is to "provide[]
a rational means of differentiating between those beliefs that are
held as a matter of conscience and those that are animated by
motives of deception and fraud."   Patrick, 745 F.2d at 157
(citation omitted).   Having engaged in such an analysis, and while
we do not find it inconceivable that a gang or other group might
seek to cloak itself in a purported "religion" in order to increase
its legitimacy, we find DOCS' attempt to cast doubt upon the
sincerity of the plaintiff's beliefs in this case singularly
unpersuasive.

## ii.   Religious Nature of Plaintiff's Beliefs

DOCS' claims that plaintiff's beliefs are not "religious in
nature" are similarly unpersuasive.   DOCS' argument on this issue
throughout this litigation has been a semantic one, focusing on
plaintiff's and other Nation members' reluctance to call the Nation
of Gods and Earths a "religion."   See Marria v. Broaddus, 200
F.Supp.2d 280, 292 (S.D.N.Y. 2002).   DOCS asserts that Nation
members' refusal to call the group a "religion" indicates that it
should not be treated as one and that plaintiff's statements that
he believes that the Nation fits the legal definition of a religion

29

are merely a self-serving tactic to further this litigation.  <u>See</u>
Def. Findings ¶¶ 3-7, 23-25.  In support of this argument, DOCS
notes that plaintiff stated at his first deposition that the Five
Percenters are not a religion, but rather a way of life.  <u>See</u> <u>id</u>.
¶ 24; <u>see</u> <u>also</u> Feb. 12, 2001 Decl. of Dale Artus Ex. Q (issue of
*The Five Percenter* with headline and article entitled "We Are Not
A Religion").

    The weakness of DOCS' semantic argument is evident.  While it
is somewhat understandable that a group that refuses to describe
itself as a "religion" did not inspire immediate outreach from DOCS
officials, the law of the Free Exercise Clause does not turn on
mere semantic distinctions.  <u>Cf</u>. <u>Graham v. Cochran</u>, 96 Civ. 6166,
2000 U.S. Dist. LEXIS 1477, at *30 (S.D.N.Y. February 14, 2000)
(Ellis, M.J.) (noting, in a similar case brought by a Five
Percenter inmate, that "just as calling one's beliefs a 'religion'
does not make it such for constitutional purposes, failure to label
one's beliefs a 'religion' does not prohibit constitutional
protection").  The significance of plaintiff's beliefs in his life
is considerably more relevant than what plaintiff and other members
of his community choose to call their beliefs - "a rose by any
other name," as the saying goes, "would smell as sweet."  As
already described in some detail, plaintiff has submitted
substantial evidence that he has been a practicing member of the
**Nation** since August of 1994 and that he lives by the Nation's

30

teachings and observes the Nation's holy days to the extent possible under DOCS regulations. Furthermore, plaintiff, the Allah School representatives, and an expert cultural anthropologist all testified that the Nation carries the same significance for its members as Christianity, Judaism, and Islam do for their adherents, and that the Nation's contrasting belief system means that one could not be a part of those religions and the Nation simultaneously. Overall, plaintiff has convincingly demonstrated the central significance of the Five Percenter belief system in his daily life and his understanding of that which he considers divine, which is in accordance with the William James definition of religion. Finally, it would be incongruous for us to reject the notion that the Nation's belief system is "religious in nature" when it is, in several respects, more orthodox in both its practices and notions of the "divine" than the belief systems espoused by other groups that currently receive religious protections.[21]

For these reasons, we find that plaintiff's beliefs as a

---

[21]    Despite markedly different conceptions of "the divine" from most Americans, heterodox groups like Rastifarians, Wiccans, and Hare Krishnas have all been afforded free exercise protection. Here, the Nation's doctrine is predicated on a an essentially monotheistic belief in God, its central and secondary texts – including the 120 Degrees, Bible, and Koran – are largely identical to those of other accepted religions, the Supreme Mathematics and Supreme Alphabet are reminiscent of other religions' use of numerology devices to understand the world, and the nature of its observances is far from uncommon. Moreover, the Nation appears to be a close relative of an officially recognized religion, the Nation of Islam.

31

member of the Nation of God's and Earths are both sincere and
"religious in nature" and therefore entitled to RLUIPA and First
Amendment protection under the free exercise clause. Cf. Patrick
v. LeFevre, 745 F.2d 153 (2d Cir. 1984) (finding for summary
judgment purposes that an inmate's beliefs as a Five Percenter were
constitutionally protected); Breland v. Goord, No. 94 Civ. 3696,
1997 WL 139533 (S.D.N.Y. March 27, 1997) (same); Graham v. Cochran,
No. 96 Civ. 6166, 2000 U.S. Dist. LEXIS 1477, (S.D.N.Y. February
14, 2000) (same); Lord Natural-Self Allah v. Annucci, No. 97 Civ.
607, 1999 WL 299310 (W.D.N.Y. March 25, 1999) (Heckman, M.J.)
(finding, for purposes of a preliminary injunction, that "Five
Percenterism, in its pure uncorrupted form, represents a system of
beliefs which, outside the prison context, does not advocate or
promote violence").

## B.    Religious Land Use and Institutionalized Persons Act

Congress enacted the Religious Land Use and Institutionalized
Persons Act ("RLUIPA") in response to the Supreme Court's holding
in City of Boerne v. Flores, 521 U.S. 507 (1997), declaring
unconstitutional the Religious Freedom Restoration Act ("RFRA"), 42
U.S.C. § 2000bb-1(b).[22]    RLUIPA applies both to programs or

---

[22]    The constitutional controversy surrounding RFRA and the
subsequent congressional enactment of PLUIPA have been discussed
extensively elsewhere, see e.g., Madison v. Riter, 240 F.Supp.2d 566,
568-70 (W.D.Va. 2003), and familiarity with RLUIPA's history is
assumed.

activities that receive federal financial assistance and to
substantial burdens on religious exercise having an effect on
interstate commerce.    42 U.S.C. § 2000cc-1(b).    Although other
courts have debated the statute's constitutionality, see e.g.,
Mayweathers v. Newland, 314 F.3d 1062 (9th Cir. 2002) (finding
RLUIPA constitutional); Madison v. Riter, 240 F.Supp.2d 566
(W.D.Va. 2003) (ruling that RLUIPA violates the Establishment
Clause), defendants in this case have never made such a
constitutional challenge.    RLUIPA's constitutionality, moreover,
was assumed in our earlier opinion at the case's summary judgment
stage, see Marria v. Broaddus, 200 F.Supp.2d 280 (S.D.N.Y. 2002),
without subsequent objection by either side, and we maintain that
assumption for purposes of this decision.    RLUIPA provides:

> No government shall impose a substantial
> burden on the religious exercise of a person
> residing in or confined to an institution . .
> . even if the burden results from a rule of
> general applicability, unless the government
> demonstrates that imposition of the burden on
> that person –
>
> (1) is in furtherance of a compelling
> governmental interest; and
>
> (2) is the least restrictive means of
> furthering that compelling governmental
> interest.

42 U.S.C. § 2000cc-1(a).    Under RLUIPA, once a plaintiff produces
prima facie evidence to support a free exercise violation, the
plaintiff bears the burden of persuasion over whether the
regulation substantially burdens his or her exercise of religion

33

and the state bears the burden of persuasion on all other elements.
42 U.S.C. § 2000cc-2(b).

By its terms, RLUIPA is to be construed to favor broad
protection of religious exercise.  See 42 U.S.C. § 2000cc-3(g).
The statute defines religious exercise as "any exercise of
religion, whether or not compelled by, or central to, a system of
religious belief."  Id. § 2000cc-5(7)(A).    This reflects an
extension of the definition provided in RFRA, which defined
exercise of religion as "the exercise of religion under the First
Amendment to the Constitution."  42 U.S.C. § 2000bb-2(4); Kikumura
v. Hurley, 242 F.3d 950, 960 (10th Cir. 2001) (noting the change in
definition);  Henderson v. Kennedy, 265 F.3d 1072, 1073-74 (D.C.
Cir. 2001) (noting that the definition of religious exercise in
RLUIPA expanded upon the protections of RFRA).    The otherwise
similar language of RFRA and RLUIPA, however, suggests that cases
decided under RFRA may guide this Court's inquiry in this case.
See Wyatt v. Terhune, 315 F.3d 1108, 1115 (9th Cir. 2003) (noting
that RLUIPA "provides rights similar to those delineated in RFRA").

In seeking to defeat plaintiff's RLUIPA claim, DOCS argues
that the record does not establish that its ban on Five Percenter
literature and gatherings substantially burdens the exercise of
plaintiff's beliefs.  See Def. Findings ¶¶ 9-20.    DOCS further
asserts that its regulations are in furtherance of a compelling
governmental interest in prison security and that the ban on Five

34

Percenter literature and congregative gatherings is the least restrictive means of effectively controlling security threat group behavior. <u>See</u> Def. Findings at 24-25.

**C.    Evaluating DOCS' Treatment of the Five Percenters Under RLUIPA**

   **i.    Substantial Burden**

Like its predecessor RFRA, RLUIPA requires a plaintiff to demonstrate that his right to free exercise of religion has been substantially burdened. The Supreme Court has defined a substantial burden in this context as "[w]here the state . . . denies [an important benefit] because of conduct mandated by religious belief, thereby putting substantial pressure on an adherent to modify his behavior and to violate his beliefs. While the compulsion may be indirect, the infringement upon free exercise in nonetheless substantial." <u>Thomas v. Review Bd. of the Indiana Employment Sec. Div.</u>, 450 U.S. 707, 717-18 (1981); <u>Jolly</u>, 76 F.3d at 477 (citing this passage of <u>Thomas</u> with approval in considering Rastafarian inmate's RFRA claim). Despite DOCS' treatment of the Nation exclusively as a security threat group and complete ban on Nation materials and literature, defendants argue that plaintiff's Five Percenter beliefs are not substantially burdened because he can still practice certain aspects of his beliefs. These include possessing the Bible and Koran, gathering informally with five or fewer Five Percenters at certain times of day, learning the Supreme

Alphabet and Mathematics orally, gaining access to lessons through
NOI, celebrating certain holidays informally, and communicating
with Nation members outside prison (though not through the *Five
Percenter* newspaper). See Def. Findings ¶¶ 9-20.

Defendants' arguments are untenable. Throughout this
litigation, plaintiff has credibly maintained that the study (alone
and with others) of the 120 Degrees, Supreme Mathematics, the
Supreme Alphabet, as well as other lessons found in *The Five
Percenter*, is an integral part of the daily practice of the
Nation's beliefs, and his testimony was substantiated by that of
other Nation representatives. Furthermore, in a religious
community that lacks both a formal organizational structure and a
fixed place of worship, *The Five Percenter* newspaper serves as a
central link and mechanism of communication, clearly falling within
RLUIPA's broad protections of religious exercise "whether or not
compelled by, or central to, a system of religious belief." 42
U.S.C. § 2000cc-5(7)(A). There is no question that under DOCS'
regulations plaintiff may not possess these materials and study
them with other inmates and is denied the opportunity to gather
with other Nation members other than informally.[23] The evidence at

---

[23]    According to John LoConte, DOCS' former Director of
Ministerial and Family Services, such informal gatherings "wouldn't be
enough" to allow Catholic inmates to practice their religion while in
prison. See Trial Tr. at 532:11-17. Moreover, DOCS admitted the
importance of formal gatherings in plaintiff's belief system at an
earlier stage of this litigation when, in attempting to show that
plaintiff is not a sincere believer in the Nation's tenets because he has

trial also established that the Bible and Koran serve only as secondary religious sources for Nation members, refuting DOCS' argument that plaintiff can meaningfully practice his religion while possessing only these texts.[24]  Finally, DOCS' contentions that plaintiff is able to obtain the 120 Degrees through NOI and fast on holy days contradict the evidence that plaintiff cannot receive the lessons from NOI without being an official member registered with an NOI temple outside prison,[25] see Trial Tr. at 57:8-15; Blocker Decl. ¶¶ 10-11, and that he is not permitted to eat his prison meal after sundown on holy days or gather for that meal (as are NOI and Orthodox Muslim inmates), but must do so using

never attended a parliament (despite having banned him from doing so), DOCS asserted that parliaments are "a fundamental ritual" for Nation members that, if consistently skipped, would be equivalent to "a Catholic never going to Mass." Defs.' Summ. J. Reply Mem. at 9.

[24]     DOCS' argument is tantamount to arguing that a Christian's or Muslim's beliefs would not be substantially burdened if he or she were permitted to possess the Jewish Bible, but not the New Testament or the Koran. The courts have recognized, however, that it is the free exercise of *a plaintiff's* religion, not someone else's, that the First Amendment and RLUIPA protect. See Breland v. Goord, No. 94 Civ. 3696, 1997 WL 139533, at *5 (S.D.N.Y. March 27, 1997) (citing Thornburgh v. Abbott, 490 U.S. 401, 418 (1989) and O'Lone v. Shabaaz, 482 U.S. 342, 352 (1987)). But cf. Fraise v. Terhune, 283 F.3d 506, 519-20, (3d Cir. 2002) (accepting such an argument in ruling that alternatives means existed for inmates to practice their beliefs under New Jersey's treatment of Five Percenters exclusively as a security threat group).

[25]     In making its argument that plaintiff can gain access to the 120 Degrees from NOI members, DOCS apparently relies on plaintiff's testimony that NOI conducts introductory classes for non-members, similar to the Nation's civilization classes, at which the lessons are sometimes discussed. See Trial Tr. at 60:20-61:14; Def. Findings ¶ 19. However, plaintiff's immediately following testimony makes it clear that he is not able to obtain the 120 Degrees, or even consistent study of them, merely by attending such classes. See Trial Tr. at 61;15-24.

37

food he has saved from the prison commissary. See Trial Tr. at 62:11-63:5.

We thus find.that plaintiff's free exercise of his religious beliefs are substantially burdened by DOCS' current policies concerning Five Percenters.

### ii.  Compelling Interest and Least Restrictive Means Tests

Moreover, DOCS has failed to establish that its complete ban on Five Percenter materials, literature, and activities furthers a compelling security interest and is the least restrictive means of doing so under RLUIPA. It is undisputed that maintaining the safety, security, and internal order of prisons is a compelling governmental interest. See Campos v. Coughlin, 854 F.Supp. 194, 207 (S.D.N.Y. 1994) ("prison security and penological institutional safety goals are indeed a most compelling governmental interest"); Muhammad v. Coughlin, 904 F.Supp. 161 (S.D.N.Y 1995) (finding compelling interest in internal order in prisons); Breland v. Goord, No. 94 Civ. 3696, 1997 WL 139533, at *4 (S.D.N.Y. March 27, 1997) ("[t]here is no question that prison safety and security are legitimate penological interests"). We are also mindful of the well-established judicial tradition of giving heightened deference to the experience and judgment of prison officials on such "central" issues in the context of inmate First Amendment claims. Duamutef v. Hollins, 297 F.3d 108, 112 (2d Cir. 2002) (citing

38

Giano v. Senkowski, 54 F.3d 1050, 1054 (2d Cir. 1995) and
Thornburgh v. Abbott, 490 U.S. 401, 415 (1989) quoting Pell v.
Procunier, 417 U.S. 817, 823 (1974) for the proposition that prison
security is "central to all other corrections goals"). However, it
is equally well-established that "[p]rison walls do not form a
barrier separating prison inmates from the protections of the
Constitution," Turner v. Safley, 482 U.S. 78, 84 (1987), and our
tradition of deference on security matters does not require this
Court to altogether abdicate its role in constitutional cases
brought by inmates. Hence, while prison officials "must be given
latitude to anticipate the probable consequences of certain speech,
and must be allowed to take reasonable steps to forestall
violence," Giano v Senkowski, 54 F.3d 1050, 1055 (2d Cir. 1995),
they "cannot merely brandish the words 'security' and 'safety' and
expect that their actions will automatically be deemed
constitutionally permissible conduct." Campos, 854 F.Supp. at 204.
Cf. Jolly v. Coughlin, 76 F.3d 468, 479 (2d Cir. 1996) ("The DOCS
policy is not insulated from scrutiny merely because the defendants
brandish the concepts of public health and safety."). Congress
also made it clear in enacting RFRA/RLUIPA that "inadequately
formulated prison regulations and policies grounded on mere
speculation, exaggerated fears, or post-hoc rationalizations will
not suffice to meet the [A]ct's requirements." Campos, 854 F.Supp.
at 207 (quoting the Senate Report to RFRA); Jolly, 76 F.3d at 479



(1996) (same).  Even the less restrictive test set forth in <u>Turner</u> <u>v. Safley</u> that governed prisoner free exercise claims prior to the enactment of RFRA/RLUIPA recognized that deference is not warranted when a prison regulation represents an exaggerated response to security objectives.   See <u>Turner</u>, 482 U.S. at 97-98 ("No doubt legitimate security concerns may require placing reasonable restrictions upon an inmate's right to marry, and may justify requiring approval of the superintendent. The Missouri regulation, however, represents an exaggerated response to such security objectives.").

Here, DOCS proposes to treat exclusively as a gang a group that has had a law-abiding existence outside prison for the better part of 40 years, that is an offshoot of another group that DOCS considers a religion, and that has practices that largely resemble those of recognized religious groups, with the consequence that DOCS has banned literature which it concedes is facially innocuous as well as any other expression of religious identity associated with the group.  In order for such a ban to be upheld, there ought to be some sense that DOCS is substantially correct in its decision to treat the group exclusively as a gang and not a religion.  <u>Cf.</u> <u>Jolly</u>, 76 F.3d at 479 (holding in a RFRA analysis that "the connection between the application of a policy to an individual and

the furtherance of the government's goals must be clear").[26]    The

evidence DOCS presented at trial, however, failed to justify such

treatment.

First, DOCS failed to provide any evidence that its decision

to treat "Five Percenters" as a security threat group was either

reasoned or informed.  The trial record is almost entirely devoid

of evidence concerning DOCS' initial decision to treat the Nation

as a gang and not a religion.  DOCS possesses no records whatsoever

setting forth the basis for its decision or even documenting its

decision-making process concerning the Five Percenters.  None of

the DOCS officials who testified at trial were the decision-makers,

nor could they do more than speculate about who the decision-makers

were, when the decision was made, how it was made, or what

information was deemed relevant.[27]  Moreover, DOCS admits that its

classification of Five Percenters as a security threat group is not

[26]    DOCS places undue reliance on the Second Circuit's decision in
Giano v Senkowski, 54 F.3d 1050 (2d Cir. 1995), which held that it was
unnecessary for DOCS to establish an explicit link between such
"emotionally charged" materials as nude photographs of inmates' wives and
girlfriends and violence in order to justify its ban on such materials.
See Giano, 54 F.3d at 1055; Def. Findings at 20-21.    Here, unlike
instances in which common sense would indicate that prohibited materials
may pose a threat to security, DOCS predicates its policy banning any and
all religious expressions associated with the Nation on the group's
allegedly violent nature, which is not simply a matter of common sense.

[27]    Although DOCS claims that its classification of the Five
Percenters as a gang is based on a history of violence and disruptive
activities associated with the group, as well as its employees' day-to-
day reporting of such activities, Def. Findings ¶ 53; Trial Tr. at 378:7-
15, DOCS official Richard Roy testified that there was probably no stack
of materials that was reviewed by DOCS' decision-makers at the time they
classified the Nation as unauthorized.  See Trial Tr. at 408:2-18.

41

based on any guidelines or specific criteria. See Trial Tr. at 340:16. Nor, pursuant to its non-recognition policy, does DOCS maintain statistics concerning gang activity or even the rough number of gang members in the system. See Trial Tr. at 341:16-19, 345:10-13. Rather, its decision to label the Nation itself as a security threat was based on the subjective sense of the decision-makers - whomever they were - that the group as a whole was a gang. However, it is clear that DOCS knows little about the Nation's seemingly legitimate existence outside prison,[28] and DOCS failed to present any evidence concerning how it came to the conclusion that the Nation of Gods and Earths is not a religion in spite of the fact that several inmates have sought religious accommodations for their beliefs as members of the Nation. See Footnote 10 supra. It is also worth noting that DOCS' previous litigation position claiming that the Nation's literature contained violent messages indicates that it was misinformed about at least that aspect of the Nation at the time it made its classification and suggests that its treatment of the Nation exclusively as a gang may be based on either exaggerated fears or speculation.

---

[28]    DOCS official Richard Roy, for example, testified that he did not believe that there was a connection between the members of DOCS' alleged "Five Percenters" prison gang and an outside organization called the Nation of Gods and Earths, see Trial Tr. at 346:16-19, while another official, Dale Artus, testified that "[t]he term "Nation of Gods and Earths" is not in my vocabulary. It is nothing I've been - it is just - it doesn't come about in the course of my private life or in my professional life other than this litigation." See Trial Tr. at 481:8-10.

42

Lacking a record for its decision, DOCS has attempted to justify its absolute ban *post hoc* by arguing that the evidence it has compiled in preparation for this litigation demonstrates that "the Five Percenters" are indeed a security threat group, and hence that the mere presence of the Nation's materials in the prison setting or any other forms of "recognition" pose a security threat by legitimating the group and facilitating its recruiting efforts. Several DOCS corrections officers and officials who testified at trial professed a general understanding from their training and experience that Five Percenters in prison were associated with violence and disruption, but had personal knowledge of only a few incidents involving inmates identified as Five Percenters despite their decades of combined experience.[29] See Def. Findings ¶¶ 66-68, 70-71, 74. Ron Holvey, a corrections official from the New Jersey Department of Corrections with expertise in gangs and related security issues, testified that the New Jersey prison system considers the Five Percenters to be its largest security threat group and that, after reviewing the materials and statements DOCS

---

[29]     The most credible of these accounts in light of the evidence concerning the Nation's legitimate existence outside prison was that of Deputy Superintendent for Security Services at Collins Correctional Facility Sibato Khahaifa, who testified that, as an Orthodox Muslim who grew up in Brooklyn, he understood the Nation to be a religious group that had split from the NOI prior to joining DOCS.  See Trial Tr. at 756:3-9.    In recounting his experiences as a corrections officer in several DOCS facilities, Khahaifa also drew a distinction between some Five Percenter inmates who he perceived as sincere adherents of the Nation and others who appeared to be behaving in a gang-like fashion. See Trial Tr. at 757:11-758:5. 766:11-18.

43

compiled for this litigation, he would support New York's ban on the Nation's literature as a security threat. See Trial Tr. at 710:1-2, 722:17-21. Mr. Holvey, however, admitted that he had never spoken with a member of the Nation of Gods and Earths in New York or set foot inside a DOCS prison. See Trial Tr. at 729:24-730:5. Moreover, he went on to testify that his perception of the Nation outside prison is that it is not a religion because "[t]hey don't have temples or mosques or churches. They don't have a minister that comes in. There is nothing formal about their organization. They don't have priests. They don't have rabbis. They don't have imams. They don't -- they worship -- they consider themselves to be God." See Trial Tr. at 741:10-14. Additional DOCS evidence concerning alleged Five Percenter gang activity came from two inmate-witnesses who claimed to have experienced violence and threats at the hands of Five Percenters. Their testimony, however, lacked consistency and credibility, leaving us with little reliable evidence beyond the fact that these two inmates regarded the Five Percenters as a gang.[30]

---

[30]     One, who claimed to be a former member and participant in illegal activities on behalf of the Five Percenters, also admitted to having participated in numerous stabbings and other acts of violence, including altercations with members of the Latin Kings gang and inmates he identified as "the Muslims," even after the period he was allegedly a Five Percenter. See Trial Tr. at 814:9-816:7, 818:3-820:12, 823:8-824:8, 826:5-20. Yet, he claimed that his safety is at risk because Five Percenters were seeking to retaliate against him for "going against" the gang in a fight and thereafter leaving the group. See Trial Tr. at 799:22-800:2; Trial Tr. at 805:18-806:11. The other, a former Latin Kings gang "captain," admitted to having "snitched" on four other Latin Kings members after they had killed a fellow prisoner who was a Five

44

DOCS' principal form of "hard evidence" concerning the nature of the Five Percenters consisted of compilations of facility reports concerning unusual incidents, inmate transfer requests, and inmate separation requests that contain gang-like references to Five Percenters and sometimes report violent acts attributed to individuals or groups identified as Five Percenters. See Trial Tr. at 363:23-364:10, 472:9-10, 502:5-8; Def. Trial Exhibit A (inmate transfer requests not received into evidence);   Def. Trial Ex. B (sample separatee reports not received into evidence); Def. Trial Exhibit C (unusual incident reports not received into evidence); Def. Trial Exhibit D (protective custody reports received into evidence);   Def. Trial Ex. M (summary of separatee report "hits" for "Five Percenters" and other groups from 1990 to 1999 not received into evidence).   Although there is no evidence to suggest that DOCS' decision-makers ever reviewed these reports, DOCS argues that they constitute the kind of evidence that its decision-makers would have known about when determining that the Five Percenters were a security threat group and provide an objective basis for its decision to treat the Nation exclusively as a gang.   See Def. Findings ¶¶ 77-78, 82.   The transfer reports were excluded at trial because they contained hearsay within hearsay and did not otherwise

---

Percenter, making it difficult for us to gauge his claims that he feared for his safety because of the potential for retaliation from Five Percenters in addition to the Latin Kings.   See Trial Tr. at 846:10-20, 851:20-852:1, 853:7-854:1.

exhibit indicia of reliability.[31]  See Trial Tr. at 434:11-453:3;

Fed. R. Enid. 802; Parsons v. Honeywell, Inc., 929 F.2d 901, 907

(2d Cir. 1991) (quoting with approval the Ninth Circuit's opinion

in United States v. Passant, 703 F.2d 420, 424 (9th Cir. 1983)

stating that "[it is well established that entries in a police

report which result from the officer's own observations and

knowledge may be admitted *but that statements made by third persons*

*under no business duty to report may not.*" (emphasis added by

Second Circuit)); Giles v. Rhodes, No. 94 Civ. 6835, 2000 WL

1425046, at *8-*9 (S.D.N.Y. Sept. 27, 2000) (ruling that prison

unusual incident reports are inadmissible hearsay not subject to

the Business Record Exception under Fed. R. Enid. 803(6)).  There

are, in fact, several additional reasons to doubt their

reliability, as well as the reliability of the reports underlying

DOCS' summary chart of separatee "hits" for the term "Five

Percenters," which was similarly excluded due to DOCS' failure to

comply with the Federal Rules of Evidence by providing plaintiff

with the underlying documents.[32]  See Trial Tr. at 468:17-480:25;

---

[31]     We note that, according to plaintiff's prison security and
administration expert Toni Bair, such reports are "[o]ne of the most
unreliable sources of information we have in prisons" because they are
obtained from individuals ("snitches") who are often desperate to get
themselves out of some kind of trouble and view it as beneficial to name
groups rather than individuals in order to insure that they be placed in
protective custody.  Trial Tr. at 244:10-245:14.

[32]     First, there are a substantial number of duplicates among the
transfer requests that DOCS submitted as trial exhibits, see e.g., Def.
Trial Ex. A at Bates Nos. 018 & 023, 019 & 024, 010 & 026, 012 & 027, 013
& 028, and it is possible that such duplicates could be affecting the

46

Fed. R. Enid. 1006 (stating that voluminous evidence "may be presented in the form of a chart, summary or calculation," but that the underlying documents "shall be made available for examination or copying, or both, by other parties"). Among the unusual incident reports – which document occurrences of violence or other serious disturbances – the number of relevant "hits" for references to Five Percenters was only 67 out of approximately 102,000 incidents over the ten year period from 1990 to 1999. See Trial Tr. at 241:13-24.

_____

number of "hits" contained in DOCS' separatee chart as well. Second, some of the transfer requests and unusual incident reports were of questionable relevance to the Five Percenter gang activities that were alleged, raising similar concerns about the relevance of the separatee reports underlying DOCS' summary chart of relevant "hits." See e.g., Def. Trial Ex. A at Bates Nos. 032, 109, 116 (transfer requests); Def. Trial Ex. C. at Bates Nos. 006, 043 (unusual incidents). Third, DOCS has defined the Five Percenters as a security threat group for some time and apparently trains its employees to recognize them as such, which undoubtedly affects the reports. See Trial Tr. at 488:12-19 (Dale Artus explaining that DOCS' crisis intervention unit devotes a four-hour portion of its two week basic training specifically to unauthorized groups); Trial Tr. at 632:19-23 (Superintendent Joseph Smith testifying that his understanding of the Five Percenters as a gang came in part "from training"). Fourth, because DOCS treats any organizing activity associated with an unauthorized group as a threat to prison safety and security, its classification of the Five Percenters as "unauthorized" is in some sense self-fulfilling. Activities that would be permissible were they conducted by a religious group, such as recruiting, gathering, passing on literature, are deemed threatening and fuel both the group's and individuals' negative reputations reflected in the various reports. See e.g., Trial Tr. 521:20-24 (John LoConte explaining that, at the time he first learned about the Nation, he was hearing that "[both the Nation of Islam, the Nation of Gods and Earths . . . they were attempting to infiltrate the Muslim community in order to establish a congregation the opportunity to the [sic] meet together. They were problematic."); Def. Trial Ex. D at Bates No. 014 (stating – with a negative connotation – that the Five Percenters were going to "take some action to establish themselves in the facility"); Def. Findings ¶¶ 89-90 (treating as negative the notion that plaintiff's alleged religious beliefs would require him to teach civilization to others).

Thus, DOCS' *post hoc* justifications for its ban are inadequate to establish that it has a principled basis for labeling the Nation a security threat group. Finding DOCS' absolute ban to be justified based on the episodic accounts of its witnesses and unreliable facility reports would require us to make a speculative leap concerning the nature of an entire group based on spotty evidence about some of its supposed members that would be in tension with what we have learned about the group's legitimate existence outside prison. We stress that we are not saying that there are not prisoners who would describe themselves as Five Percenters who have committed crimes or otherwise violated prison regulations. However, the limitations of this "fact" should be obvious. Cf. <u>Breland v. Goord</u>, No. 94 Civ. 3696, 1997 WL 139533, at *5 (S.D.N.Y. March 27, 1997) ("The mere fact that inmates identified as Five Percenters have been involved in altercations with other inmates and guards does not establish that the literature at issue here caused those incidents."). There are prisoners who would describe themselves as Catholics, Protestants, Jews, Muslims, NOI, etc. who likewise violate prison regulations, and it is easy to imagine a situation where the common ethnic or religious bond shared by members of a group could serve as the impetus for some to band together and at times act cohesively, but no one would suggest that such facts preclude the classification of these recognized groups as religions deserving of First Amendment

48

protection.[33]

A hypothetical dealing with a more mainstream group further illustrates the point: imagine, for example, that one or several gangs of inmates were to form within the New York State Correctional system each of whose membership is united by a common religious/ethnic identity – Judaism. The gangs could either be formal disruptive organizations or simply the result of an agreement among some Jewish inmates to "get each other's back" in a pinch. Imagine further that the members of the Jewish gang(s) identify themselves by displaying the Star of David, utilize Hebrew letters (which also stand for numbers) as a "code" similar to Five Percenters' alleged use of the Supreme Alphabet and Mathematics, and sometimes recruit new members by using the Bible and other traditional Jewish texts. DOCS' records would soon be replete with reports containing statements that "the Jews" were involved in violent and disruptive activities and such groups would clearly

---

[33]    For example, one of the inmates who testified on DOCS' behalf in this case referred repeatedly to altercations between himself and "Muslims" and replied "Yes sir" when he was asked whether there were any Muslim gangs. See Trial Tr. at 814:9-10. We also note that a number of the unusual incident reports containing the term "Five Percenter" proffered by DOCS also contain the term "Muslim." See Trial Tr. 243:16-21. Clearly, however, none of this would lead us to conclude either that Islam is not a religion or that Muslims would properly be classified by DOCS as a security threat group.
        Additionally, at least one Second Circuit decision appears to document a street gang whose teenage founders were apparently Five Percenters, but nonetheless existed separately from the Nation of Gods and Earths. See United States v. Miller, 116 F.3d 641 (2d Cir. 1997) (discussing the formation of the "Supreme Team" gang by a group of teenage Five Percenters in the mid-1980's).

pose a security threat to prison staff and inmates. But would this transform Judaism from a religion into a security threat group? Would DOCS, in such a situation, ban anyone who identified themselves as a Jew from possessing a Hebrew Bible and Alphabet or from displaying a Star of David? The trial testimony of DOCS officials convinces us that it would not, or that it would at least exhaust other avenues of redress before subjecting the "sincere believers" of a mainstream group to the type of blanket treatment that Nation members currently receive.[34]

While we do not question the sincerity of the witnesses who

---

[34] The Court posed a similar hypothetical to Shawangunk Superintendent Joseph Smith, see Trial Tr. at 646:2-21, who replied: "[are we going to say that we are no longer going to permit religious services or participation in religious holidays, I would say, no, that would be very unlikely, because I am going to go on a limb and say that this group that you have described would be limited to a few, and that once we were able to take proper action we should be able to go on as business as usual." Trial Tr. at 646:22-647:3. Superintendent Smith added, with regard to the Five Percenters: "Well, I can only answer that as we deal with them today. They are not an authorized religion at this point within our system." Trial Tr. at 647:25-648:2. Similarly, plaintiff's counsel posed hypothetical questions concerning violence by members of the NAACP to Dale Artus, the former director of DOCS' crisis intervention unit, who testified that he would recommend that the violent individuals "be held individually accountable for their acts" and "would not recommend that the overall program be disbanded" because he viewed the overall NAACP program as positive and it was, unlike the Five Percenters, an authorized organization. See Trial Tr. at 491:13-493:13. The DOCS officials' testimony stands in sharp contrast to that of Ron Holvey, who DOCS called as an expert on gangs and gang management, as well as the status Five Percenters in the New Jersey State Correctional system (which segregates those identified as "core members" from the rest of its prison population). When asked whether he would declare the Catholic Church to be a security threat group if numerous prisoners identified as Catholics were being written up for violent acts, he responded: "Within the prison, we would have to, yeah, oh yeah, and I'm sure I would be sitting in another courtroom for that one." Trial Tr. at 748:23-749:4.

50

testified as to their belief that there is a Five Percenters gang, their convictions alone are not sufficient. There must be admissible evidence to justify DOCS' policies, and no such evidence was introduced. Particularly lacking was evidence concerning the structure of the alleged Five Percenters gang. We are also troubled by the "Catch-22" aspect of its policies concerning the Nation, whereby the group's "unauthorized" classification leads DOCS to train its employees to recognize Five Percenters exclusively as gang members and otherwise innocuous literature and activities as threatening.[35] As such, we find the anecdotal evidence that DOCS has presented insufficient to justify after the fact its decision to treat the Nation solely as a gang under RLUIPA. Moreover, the trial testimony and submissions throughout this case suggest that, while DOCS now formally concedes that the Nation's literature does not contain violent or disruptive content, its officials' perception of the threat posed by the Nation and its literature was and potentially still is affected by their belief

---

[35]    For example, in addition to testifying that his perception of the Five Percenters as a gang came in part "from training," see Trial Tr. 632:19-23, Shawangunk Superintendent Joseph Smith agreed that the Nation's unauthorized status makes it "easy" for him to treat the whole group as a gang when he would otherwise seek to distinguish sincere believers from disruptive members of a mainstream religious group. Trial Tr. at 647:25-648:6. Similarly, in response to plaintiff's counsel's questioning about DOCS' basis for treating the Nation as a gang in comparison to other authorized groups, DOCS official Richard Roy responded: "I would go the other way; they were not an authorized organization, so therefore they could not participate as an organization." Trial Tr. at 390:10-12.

51

that it espouses an objectionable racist ideology.[36]  Cf. Marria v. Broaddus, 240 F.Supp.2d 280, 295 (S.D.N.Y. 2002) (""DOCS' argument that it bans Nation literature because of what it represents and not what it says seems disingenuous given DOCS' prior position in past litigation from the same time period that the literature itself encourages violence.").  Whether or not these lingering objections are justified as a matter of principle, they raise questions about whether DOCS' absolute ban on Nation literature is unrelated to the literature's content.  See generally Turner, 482 U.S. at 90 ("We have found it important to inquire whether prison regulations restricting inmates' First Amendment rights operated in a neutral fashion, without regard to the content of the expression."); Church of the Lukumi Babalu Aye, Inc. v. City of Hialeah, 508 U.S. 520, 547 (1993) ("The Free Exercise Clause commits government itself to religious tolerance, and upon even slight suspicion that proposals for state intervention stem from

---

[36]     DOCS official Richard Roy, for example, testified that he found an article in *The Five Percenter* expressing the opinion that the death penalty was a form of legalized genocide and that the white man has always used his laws to justify "devilishment" potentially dangerous to prison security because it was hateful toward members of another race, and moreover that he and other DOCS employees reviewed the content of *The Five Percenter* when DOCS was making the decision to ban the Nation's materials.  See Trial Tr. 419:15-412:14.  Joseph Smith also agreed that he believes that the Five Percenter materials are dangerous.  See Trial Tr. 673:16-18.  Ron Holvey – though not a DOCS official – testified that he found the racist aspects of the Nation lessons a threat to prison security and that he objected to the Nation's beliefs because "the overall nature of the group promotes violence," but that these views had nothing to do with his characterization of the Nation as a security threat group.  See Trial Tr. at 737:7-738:19.

animosity to religion or distrust of its practices, all officials must pause to remember their own high duty to the Constitution and to the rights it secures. Those in office must . . . ensure that the sole reasons for imposing the burdens of law and regulation are secular.").

As a result of the foregoing, we cannot find, based on the trial record, that DOCS' classification of the Nation as a security threat group and absolute ban on Nation literature further a compelling security interest and is the least restrictive means of doing so.[37]

---

[37]    We acknowledge that there is some case law in tension with our decision in this case.  See Fraise v. Terhune, 283 F.3d 506 (3d Cir. 2002) (finding the New Jersey Department of Corrections' treatment of Five Percenters as a security threat group justified for summary judgment purposes under a Turner v. Safley analysis); In re Long Term Administrative Segregation of Inmates Designated as Five Percenters, 174 F.3d 464 (4th Cir. 1999)(same with regard to the South Carolina Department of Corrections); Lord Natural-Self Allah v. Annucci, No. 97 Civ. 607, 1999 WL 299310 (W.D.N.Y. March 25, 1999) (Heckman, M.J.) (finding for preliminary injunctive purposes that DOCS' ban on Five Percenter materials was justified under Turner); Buford v. Goord, 258 A.D.2d 761, 686 N.Y.S.2d 121 (3d Dep't. 1999) (dismissing, in an Article 78 proceeding, a pro se litigant's claim that DOCS' policies banning his receipt of Five Percenter materials violated his first amendment rights). Each of these cases, however, applied a more deferential standard of review than the RLUIPA analysis we apply in this decision, and the three federal case involving free exercise claims all assumed that Five Percenter beliefs would receive free exercise protection, which accords with our ruling in this case. Morevoer, these other courts do not appear to have had an equally well-developed evidentiary record concerning the Nation's legitimate existence outside prison as we did in this case. Finally, we simply disagree with some of the findings and conclusions reached by those courts, most fundamentally the notion that prison policies classifying and treating an entire group as a gang can be upheld despite the fact that they are predicated on a faulty assumption that the group has no legitimate existence as a religion.

## D.  Relief

This case, like others in which prison inmates have asserted their First Amendment right to practice non-mainstream religions while incarcerated, "underscores the complex nature and difficulty of accommodating various religious belief systems and tenets within a prison system, wherein violence is a real and daily threat." Campos v. Coughlin, 854 F.Supp. 194, 197 (S.D.N.Y. 1994).  We have found that plaintiff is a sincere adherent to a religious belief system that qualifies for First Amendment protection, but are also prepared to accept for the purposes of this decision DOCS' claims that prison inmates identified as "Five Percenters" have been associated with instances of violence and disruption.  This raises the possibility that "the Five Percenters" may somewhat uniquely connote *both* a religion *and* a gang in the New York State prison system (though the sincere religious adherents and gang members may not be the same inmates).

It is apparent, however, that in pursuing its non-recognition policy DOCS has never fully considered the possibility or the policy consequences of the Nation qualifying for First Amendment protections, and did not do so at any time during the pendency of this case.  Based on our review of the evidence and applying RLUIPA's compelling interest and least restrictive means tests in light of our determination that plaintiff is entitled to free exercise protection, we have concluded that plaintiff has clearly

54

established his right to some of the relief requested. With
respect to other of plaintiff's requests, given the tradition of
judicial deference to the considered judgment of correction
officials and the indications that there are some nominal Five
Percenter inmates who violate prison rules, we remand them to DOCS
in order for DOCS to reevaluate its policies in light of our free
exercise ruling and to determine the appropriate accommodations
that can be made consistent with security needs.[38] Our conclusions
are set forth below.


### i. 120 Degrees

In our summary judgment opinion we noted that DOCS' position
concerning the 120 Degrees, "namely, that one religious group may
possess the same materials that if possessed by another contribute
to gang formation" was "a challenging one to sustain." See Marria
v. Broaddus, 200 F.Supp.2d 280, 295 (S.D.N.Y. 2002). Based on the
trial evidence, DOCS cannot properly prevent plaintiff from
receiving and possessing the 120 Degrees consistently with the Free
Exercise clause and RLUIPA. As the book serves as the central text

---

[38]    Such a remand, which was requested by DOCS at trial, see Def.
Findings at 26, is consistent with both the federal courts' tradition of
deference and the Supreme Court's guidance concerning their appropriate
supervisory role in prisoner litigation:   "We have said that '[t]he
strong considerations of comity that require giving a state court system
that has convicted a defendant the first opportunity to correct its own
errors . . . also require giving the States the first opportunity to
correct the errors made in the internal administration of their
prisons.'"   Preiser v. Rodriguez, 475 U.S. 475, 492 (1973).

in plaintiff's religious belief system, he is clearly substantially burdened if he is denied access to it. In any event, its content is identical to the texts DOCS currently permits NOI to use and possess. Thus, because the 120 Degrees is associated with more than one group, including a currently "authorized" religious group, DOCS cannot tenably argue that its mere presence in prison legitimizes gang activity. Therefore, we order DOCS to permit plaintiff to possess a copy of the 120 Degrees in accordance with his beliefs as a member of the Nation of Gods and Earths, and that his access cannot be conditioned upon his joining the Nation of Islam.[39]

### ii. Supreme Alphabet and Mathematics

We similarly grant plaintiff's request to be allowed to possess a copy of the Supreme Alphabet and Mathematics. As we noted earlier, these numerological devices are central aspects of the Nation's beliefs and practices, have remained unchanged since the 1960's, and are widely available to law enforcement on the Internet and elsewhere. DOCS admits that the alleged "code" is a simple one that can be learned by inmates orally even under its current ban, but maintains that the Supreme Alphabet and

---

[39]    In accordance with our remand of plaintiff's requests to possess Nation symbols and other materials, we make no ruling at this time concerning what symbols, if any, DOCS must permit plaintiff to receive and display along with the 120 Degrees.

Mathematics are sometimes used by Five Percenter inmates to send coded messages to one another in furtherance of gang activities and would require the expenditure of significant resources to train officers to recognize and decode if they were disseminated among the inmate population (DOCS has also argued that the *Five Percenter* newspaper poses a security threat because it contains "code"). See Def. Findings ¶¶ 60-63, 103-104; Trial Tr. 407:13-15; Trial Tr. 665:14-19; Trial Tr. 692:9-693:8.  While the Supreme Alphabet and Mathematics may indeed be susceptible to being used as a code, DOCS' arguments are unpersuasive.  Toni Bair, a professor of criminal justice, former Warden of Virginia's Mecklenberg Correctional Center "Supermax" facility, and former assistant commissioner of the New York City Department of Corrections who testified as plaintiff's expert on prison security, succinctly refuted DOCS' claims that the Supreme Alphabet and Mathematics threaten prison security:

> It's published.  The code is published.  It is on the Internet.  It is in the newspapers. It's everywhere.  In order for a code to be effective and used, you know, covertly to be subversive or create problems in the institution, the code must be unbreakable and must not be, you know, common knowledge. . . . To ban the Mathematics and Alphabet because it is a code, you know, would be ludicrous.  If we do that, why don't we ban Spanish, for example, because I would daresay that there is not a tremendous number of correctional officers in DOCS that are bilingual and yet we allow Spanish not only to be spoken but documents inside institutions that are Spanish . . . and they are much more difficult to

translate than this code would be.

Trial Tr. at 246:17-247:12.

We are persuaded that the Supreme Alphabet's and Mathematics' primary purpose is a religious one, and that, to they extent inmates might attempt to use them as a code, messages could be translated with minimal effort and training. Furthermore, the ability of inmates to communicate with each other by using the Supreme Alphabet and Mathematics in covert fashion would appear to be more challenging and limited than conversations in a foreign language not spoken by guards. Hence, we see no connection between DOCS' current ban on possessing the Supreme Alphabet and Mathematics and a compelling security interest, and order that plaintiff be permitted to possess them.[40]

### iii. Other Materials and Symbols, Gatherings, and Fasts

We remand the remainder of plaintiff's claims to DOCS to reevaluate its policies concerning the Nation and determine what materials and religious practices it can accommodate in light of our ruling that plaintiff's beliefs as a member of the Nation are entitled to free exercise and RLUIPA protection. It is incumbent upon DOCS to make a determination about the feasibility of allowing

---

[40]     Again, in accordance with our remand of the remainder of plaintiff's claims to DOCS, we make no ruling at this time about whether plaintiff can possess or display Five Percenter symbols in conjunction with his possession of the Supreme Alphabet and Mathematics.

sincere adherents like plaintiff to possess literature and to engage in religious practices in light of its security concerns.

In particular, DOCS must reevaluate how, if at all, it can accommodate plaintiff's request to receive *The Five Percenter*. In this regard, plaintiff has proposed two suggestions addressing DOCS' concerns about permitting security threat group members to use innocuous literature to recruit, control, and intimidate as less restrictive alternatives to a complete ban on the Nation's literature. First, plaintiff suggests that DOCS utilize the existing media review committee process to redact symbols that it views as posing a security threat. Alternatively, plaintiff proposes that DOCS maintain a copy of *The Five Percenter* in the prison library that plaintiff can presumably sign for and read individually during normal library time without removing the copies from the library. At trial, DOCS' efforts to address the library suggestion were particularly unconvincing.[41] On remand, because plaintiff has established that his religious beliefs are substantially burdened by DOCS' current ban on *The Five Percenter*, DOCS bears the burden of demonstrating why his proposals are

---

[41]    DOCS' claims that maintaining a library copy of *The Five Percenter* would be infeasible because it would entail "separating plaintiff from other inmates" and "designating a separate room for plaintiff, and a separate secure space to secure the newspapers, assigning one or more staff members to supervise his movement to and from the room and assigning one or more members to issue him the Newspaper [*sic*] and to retrieve it," as well as elevating the group's statute through such special treatment. See Def. Findings ¶¶ 106-108. This "parade of horribles" seems rather exaggerated.

infeasible on remand.

On the issue of congregative gatherings, such as parliaments, rallies, and civilization classes, DOCS has thus far dismissed the possibility of allowing such activities on the assumption that any sanctioned congregation of members of an unauthorized group would elevate that group's status and permit the group's members to conspire to engage in violent activities.    Here again, DOCS' position suffers from the incorrect assumption that all Five Percenters are gang members.   DOCS has also pinned its objections in part on the assumption that the gatherings would be unsupervised.    See Def's. Findings at ¶ 122 ("Permitting plaintiff to participate in *unsupervised* inmate led parliaments would create a security risk in the prison by allow [*sic*] Five Percenters to organize, recruit additional members and serve as a forum for criminal conspiracy.") (emphasis added); Trial Tr. at 461:3-11 (Dale Artus stating that his understanding of a parliament is "an unsupervised meeting place for the individuals who wish to be involved in this type of activity to be allowed to meet and learn" that he would view as "detrimental to the safety and security of the facility and the department").   Plaintiff's counsel, however, has made it clear that he is not requesting unsupervised parliaments, and we note that Born Justice Allah from the Allah Youth Center testified at trial that he and other Nation members from outside prison would volunteer to assist DOCS in accommodating

rallies and parliaments through advice and supervision. <u>See</u> Trial
Tr. at 316:20-317:9. We recognize, however, that DOCS must
consider security concerns, as well as considerations of limited
time, space, and resources, in evaluating whether and how
accommodations can be made for such gatherings.

Finally, DOCS must determine what can be done consistent with
security concerns with respect to plaintiff's requests to receive
late meals and gather with other inmates when he fasts in
observance of Holy Days.

**CONCLUSION**

Based on the foregoing, it is ordered that DOCS conform its
policies concerning the group known as the Nation of Gods and
Earths with this ruling, and further that DOCS report the results
of that policy reevaluation to the Court in sixty days.[42]

**IT IS SO ORDERED.**

DATED:    New York, New York
          July 31, 2003

NAOMI REICE BUCHWALD
UNITED STATES DISTRICT JUDGE

---

[42]    We would also be remiss if we failed to express the Court's
gratitude to *pro bono* counsel for their excellent effort and
professionalism throughout this case and to Sullivan & Cromwell for its
sponsorship of their *pro bono* positions.



Not Reported in F.Supp.2d
2004 WL 1724984 (S.D.N.Y.)
**(Cite as: 2004 WL 1724984 (S.D.N.Y.))**
H

Motions, Pleadings and Filings

Only the Westlaw citation is currently available.

United States District Court,
S.D. New York.
Rashaad **MARRIA**, Plaintiff,
v.
Dr. Raymond BROADDUS, Deputy Commissioner of
Programs; G. Blaetz, Chairperson
of Green Haven Correctional Facility Media Review
Committee; Warith Deen Umar,
Coordinator for Islamic Affairs; and Glenn Goord,
Commissioner of the New York
State Department of Corrections, Defendants.
No. 97Civ.8297(NRB).

July 30, 2004.

Damore Viola, Sullivan & Cromwell, New York, New
York, for Plaintiff.

Benjamin Lee, AAG, State of New York Office of the
Attorney General, New York, NY, for Defendant.

OPINION AND ORDER

BUCHWALD, J.

**\*1** Plaintiff Intelligent Tarref Allah, formerly known
as Rashaad **Marria**, brought this suit against defendant
Glenn S. Goord, Dr. Raymond Broaddus, G. Blaetz,
and Warith Deen Umar (both in their individual
capacities and in their official capacities as
decisionmakers at the New York State Department of
Correctional Services ("DOCS")), alleging that
defendants had violated the Religious Land Use and
Institutionalized Persons Act of 2000 ("RLUIPA") and
other laws by refusing to accommodate his religious
beliefs as a member of the Nation of Gods and Earths
("Nation"), also known as the Five Percenters. On July
31, 2003, we issued an opinion holding that the Nation
was a religion whose sincere adherents were entitled to
accommodations under RLUIPA (consistent with
legitimate security concerns), granting plaintiff certain
of the accommodations he sought, and remanding the
remainder of his claims to defendants to reevaluate
their policies in light of our holding. *Marria v.
Broaddus,* No. 97-8297, 2003 WL 21782633. [FN1]
Consistent with our directive, DOCS engaged in a
reevaluation process and produced a set of proposed
protocols which DOCS has furnished to plaintiff and
the Court. *See* Appendix. Now pending is defendants'

application for an order adopting these protocols. For
the reasons set forth below, defendants' application is
granted.

> FN1. That opinion contains a fuller account
> of the Nation's beliefs and practices.

DISCUSSION

In our July 31, 2003 opinion, we held that plaintiff
was entitled to receive and possess the group's central
text, the 120 Degrees, along with copies of two
numerology devices, the Supreme Alphabet and the
Supreme Mathematics. We remanded to DOC's for
reevaluation plaintiff's remaining requests for other
materials and symbols, gatherings, and fasts. [FN2]

> FN2. We note that DOCS had not, as an
> administrative matter, previously performed
> the balancing required by RLUIPA as,
> pursuant to its non-recognition policy, it had
> treated the Nation as a gang and not a
> religion.

Defendants have submitted protocols that provide for
access to the 120 Degrees and the Supreme Alphabet
and Mathematics, as well as to the Five Percenter
newspaper. [FN3] The Protocols also provide
guidelines for handling any other material identified by
the Nation as having religious significance. They
provide that DOCS will consider accommodations for
religious fast days identified by the Nation. Finally,
they allow for one-on-one meetings between inmates
and outside volunteers affiliated with the Nation.

> FN3. Specifically, inmates who identify
> themselves to DOCS may possess the 120
> Degrees and the Supreme Alphabet and
> Mathematics, provided they do not display
> them or any symbols taken from them or
> transfer them to inmates who have not so
> identified themselves. Moreover, the
> newspaper will be available in prison law
> libraries, subject to standard media review.

Plaintiff has agreed that these policies are consistent
with our rulings and otherwise unobjectionable, except
in one respect: they do not allow meetings, classes or
congregate services for inmates. Defendants argue that
allowing Nation members to congregate would pose an
unmanageable security risk, and therefore that their
prohibition of congregation satisfies the test under
RLUIPA, *i.e.,* is the "least restrictive means" of
furthering "compelling state interest[s]." [FN4]

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.2d
(Cite as: 2004 WL 1724984, *1 (S.D.N.Y.))

Plaintiff responds that allowing meetings would not pose a risk sufficient to justify such a restriction of his religious practice.

> FN4. *See* 42 U S C § 2000cc-1(a) ("No government shall impose a substantial burden on the religious exercise of a person residing in or confined to an institution ... unless the government demonstrates that imposition of the burden on that person (1) is in furtherance of a compelling governmental interest; and (2) is the least restrictive means of furthering that compelling governmental interest.")

As we acknowledged in our earlier opinion, defendants did produce some evidence that "prison inmates identified as 'Five Percenters' have been associated with instances of violence and disruption" and that the term "Five Percenters" "may somewhat uniquely connote both a religion and a gang in the New York State prison system " *Marria*, 2003 WL 21782633 at *18. While we directed defendants to provide access to Nation literature because defendants failed to show that such access would give rise to significant security concerns, we recognized that plaintiff's other requests, such as the request to congregate, might pose more serious problems, and therefore remanded the case to defendants for further consideration of its policies with respect to these requests.

*2 The supplementary record that defendants have since submitted to support their proposed protocols satisfies us that allowing plaintiff and other members to congregate would, in fact, pose serious security problems. [FN5] Deputy Commissioner for Correctional Facilities Lucien LeClaire has attested that group meetings would raise the risk of immediate group violence, Dec. ¶ 18, development of hierarchies that might undermine the authority of prison staff and might lead to violent competition, Dec. ¶ 19, and criminal conspiracies, Dec. ¶ 21. Mr. LeClaire has provided further support for defendants' claim that the Nation has been associated with violence in the New York prison system by identifying specific large-scale disturbances in the past two decades in which Nation members were involved. [FN6]

> FN5 Because we find defendants' submission persuasive, we do not address the question of which burdens apply at this stage in the litigation.

> FN6. We also take note that other courts have found the Nation to be a security threat based

on the record before them. *E g.*, *Fraise v Terhune*, 283 F 3d 506 (3d Cir 2002) (quotation omitted) ("[E]vidence links the group with numerous incidents of prison violence. Indeed, according to the Holvey report, many in the law enforcement community consider the Five Percent Nation to be 'one of the greatest threats to the social fabric' of the prisons."); *Self-Allah v. Annucci*, No. 97-607, 1999 WL 299310 (W.D.N.Y. March 25, 1999) ("Defendants have clearly shown that the Five Percenters act as an organized group within the prison system to receive new members, intimidate members of rival groups, and participate in criminal activity, including extortion, robbery, assaults and drug trafficking.").

Defendants' other declarant, Deputy Commissioner and Counsel for DOCS Anthony J. Annucci, has provided evidence of the fiscal hardship that would be posed by the requested meetings. Specifically, because of a state budget crisis, defendants are presently operating under a hiring freeze, with strict orders to minimize overtime expenditures. Although it is unclear what role, if any, financial hardship should play in comprising a "compelling state interest" under RLUIPA, defendants' financial situation is part of the reality of whether defendants could effectively manage the security challenge of Nation meetings.

We find, therefore, that the evidence supports defendants' determination that the law does not require them to allow Nation congregation. In reaching this conclusion, we find it significant that the protocols *do* provide for one-on-one meetings with outside volunteers.

CONCLUSION

Based on the foregoing, defendants' application for an order adopting DOCS's proposed protocols is granted. All issues now having been resolved. the Clerk of the Court is respectfully requested to close this case on the Court's docket.

IT IS SO ORDERED.

*APPENDIX*

PROTOCOLS FOR SINCERE ADHERENTS OF NATION OF GODS AND EARTHS RELIGIOUS PRACTICES

The following protocols, which have been accepted by the appropriate federal court, shall be in effect as provided herein:

© 2005 Thomson/West. No Claim to Orig U.S Govt Works.

Not Reported in F Supp.2d
(Cite as: 2004 WL 1724984, *2 (S.D.N.Y.))

1) Any inmate who professes to be a sincere religious adherent of the Nation of Gods and Earths and who wishes to be afforded the accommodations provided herein shall submit his or her name and department identification number (DIN) to the facility deputy superintendent for programs or functional equivalent.

2) DOCS will allow any inmate who professes to be a sincere adherent of the Nation of Gods and Earths to possess the 120 degrees for personal study, provided however, that such inmate will not be permitted to display the 120 degrees nor to remove from the 120 degrees the Universal Flag, or any other Nation of Gods and Earths symbol or emblem, for any separate display, copying or other use. Furthermore, if any such materials are sent to an inmate who has not submitted his or her name as a sincere adherent to the deputy superintendent for programs, then such materials will be returned by the facility to the sender.

*3 3) DOCS will allow any inmate who professes to be a sincere adherent of the Nation of Gods and Earths to possess the Supreme Alphabet and Mathematics for personal study, provided however, that such inmate will not be permitted to display the Supreme Alphabet nor to remove from the Supreme Alphabet and Mathematics the Universal Flag, or any other Nation of Gods and Earths symbol or emblem for any separate display, copying or other use. Furthermore, if any such materials are sent to an inmate who has not submitted his or her name as a sincere adherent to the deputy superintendent for programs, then such materials will be returned by the facility to the sender.

4) DOCS will arrange for the Five Percenter newspaper to be maintained within the law library at each correctional facility law library through a facility subscription, provided however, that the newspaper shall first have been reviewed and processed in accordance with the media review guidelines as set forth in 7 N.Y.C.R.R. Part 712 and Directive # 4572. To ensure uniformity, all media review determinations will be conducted by a Central Office Media Review Committee. If any redactions are required, the Central Office Committee will send the appropriate notice to all facilities and to the editor of the Five Percenter Newspaper. A copy of any such notice shall thereafter be posted in each facility's law library and general library.

5) DOCS will apply the above-referenced media review guidelines to any other documents or literature which are identified by an outside Nation of Gods and Earths organization as having religious significance for

sincere adherents, provided that such outside organization is identified by the Office of Ministerial and Family Services in accordance with Directive # 4202 and provided further that the Universal Flag, or any other Nation of Gods and Earths symbol or emblem may not be removed from such documents or literature for any separate display, copying or other use. Furthermore, if any such materials are sent to an inmate who has not submitted his or her name as a sincere adherent to the deputy superintendent for programs, then such materials will be returned by the facility to the sender.

6) DOCS will consider a request from an approved outside organization of the Nation of Gods and Earths in connection with the identification of days to be observed as religious fast days for sincere adherents within the confines of their individual housing locations.

7) DOCS will allow an inmate who professes to be a sincere adherent of the Nation of Gods and Earths to meet one-on-one in the facility legal visiting room during normal visiting hours with an outside volunteer affiliated with the Nation of Gods and Earths, who has been identified and designated as a volunteer by the Office of Ministerial and Family Services in accordance with Directive # 4202.

8) DOCS will ensure that each facility posts and maintains a copy of this document in the law library and general library.

2004 WL 1724984 (S.D.N.Y.)

Motions, Pleadings and Filings (Back to top)

. 2001 WL 34727714T1 (Trial Pleading) Reply Declaration of Rashaad Marria (Jul. 05, 2001)

. 2001 WL 34727849T1 (Trial Motion, Memorandum and Affidavit) Reply Memorandum in Support of Plaintiff's Motion to Exclude Defendants' Expert Testimony and Sur-Reply in Opposition to Defendants' Motion for Summary Judgment and to Exclude Plaintiff's Expert Testimony (Jun. 29, 2001)

. 2001 WL 34727848T1 (Trial Motion, Memorandum and Affidavit) Defendants' Memorandum of Law in Support of Their Motion to Exclude Plaintiff's Expert Testimony and Report and for Summary Judgment (Jun. 05, 2001)

. 2000 WL 34474967T1 (Trial Pleading) Answer to

© 2005 Thomson/West No Claim to Orig. U.S Govt Works.



Doc # 113

FILED
AUG 5 2004
U. S. DISTRICT COURT
S. D. OF N. Y.

# UNITED STATES DISTRICT COURT
# SOUTHERN DISTRICT OF NEW YORK
-----------------------------------------------------------X

RASHAAD MARRIA,

                    Plaintiff,                                    97 **CIVIL** 8297 (NRB)

          -against-                                              **JUDGMENT**

DR. RAYMOND BROADDUS, Deputy
Commissioner of Programs; et al.,
                              Defendants.
-----------------------------------------------------------X


          Defendants having moved for an order adopting DOC's proposed protocols, and the matter

having come before the Honorable Naomi Reice Buchwald, United States District Judge, and the

Court, on July 29, 2004, having rendered  its Opinion (90421) and Order granting defendants'

application for an order adopting DOC's proposed protocols, it is,

          **ORDERED, ADJUDGED AND DECREED:**  That for the reasons stated in the

Court's Opinion (90421) and Order dated July 29, 2004, defendants' application for an order

adopting DOC's proposed protocols is granted; accordingly, the case is closed.

**Dated:**  New York, New York
          August 5, 2004

                                        **J. MICHAEL McMAHON**
                                        _____
                                              **Clerk of Court**

                              **BY:**    _____
                                              **Deputy Clerk**


MICROFILM -9:00 AM
AUG - 6 2004

THIS DOCUMENT WAS ENTERED
ON THE DOCKET ON _8/5/04_

8/5/04

ORIGINAL

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

------------------------------------------x                        9 0 4 2 1

RASHAAD MARRIA,                                    :

                    Plaintiff,       :     **OPINION AND ORDER**

  - against -                                      :     97 Civ. 8297 (NRB)

DR. RAYMOND BROADDUS, Deputy                       :
Commissioner of Programs; G. BLAETZ,
Chairperson of Green Haven                         :
Correctional Facility Media Review
Committee; WARITH DEEN UMAR,                       :
Coordinator for Islamic Affairs;
and GLENN GOORD, Commissioner of the               :
New York State Department of
Corrections,                                       :

               Defendants.       :

------------------------------------------x

**NAOMI REICE BUCHWALD**
**UNITED STATES DISTRICT JUDGE**

      Plaintiff Intelligent Tarref Allah, formerly known as Rashaad

Marria, brought this suit against defendant Glenn S. Goord, Dr.

Raymond Broaddus, G. Blaetz, and Warith Deen Umar (both in their

individual capacities and in their official capacities as

decisionmakers at the New York State Department of Correctional

Services ("DOCS")), alleging that defendants had violated the

Religious Land Use and Institutionalized Persons Act of 2000

("RLUIPA") and other laws by refusing to accommodate his religious

beliefs as a member of the Nation of Gods and Earths ("Nation"),

also known as the Five Percenters.  On July 31, 2003, we issued an

opinion holding that the Nation was a religion whose sincere

MICROFILM
-9:00 AM
AUG - 2 2004

adherents were entitled to accommodations under RLUIPA (consistent with legitimate security concerns), granting plaintiff certain of the accommodations he sought, and remanding the remainder of his claims to defendants to reevaluate their policies in light of our holding. <u>Marria v. Broaddus</u>, No. 97-8297, 2003 WL 21782633.[1] Consistent with our directive, DOCS engaged in a reevaluation process and produced a set of proposed protocols which DOCS has furnished to plaintiff and the Court. <u>See</u> Appendix. Now pending is defendants' application for an order adopting these protocols. For the reasons set forth below, defendants' application is granted.

**DISCUSSION**

In our July 31, 2003 opinion, we held that plaintiff was entitled to receive and possess the group's central text, the 120 Degrees, along with copies of two numerology devices, the Supreme Alphabet and the Supreme Mathematics. We remanded to DOC's for reevaluation plaintiff's remaining requests for other materials and symbols, gatherings, and fasts.[2]

Defendants have submitted protocols that provide for access to

---

[1]That opinion contains a fuller account of the Nation's beliefs and practices.

[2]We note that DOCS had not, as an administrative matter, previously performed the balancing required by RLUIPA as, pursuant to its non-recognition policy, it had treated the Nation as a gang and not a religion.

2

the 120 Degrees and the Supreme Alphabet and Mathematics, as well as to the Five Percenter newspaper.[3]  The Protocols also provide guidelines for handling any other material identified by the Nation as having religious significance. They provide that DOCS will consider accommodations for religious fast days identified by the Nation.   Finally, they allow for one-on-one meetings between inmates and outside volunteers affiliated with the Nation.

Plaintiff has agreed that these policies are consistent with our rulings and otherwise unobjectionable, except in one respect: they do not allow meetings, classes or congregate services for inmates.   Defendants argue that allowing Nation members to congregate would pose an unmanageable security risk, and therefore that their prohibition of congregation satisfies the test under RLUIPA, i.e., is the "least restrictive means" of furthering "compelling state interest[s]."[4]  Plaintiff responds that allowing meetings would not pose a risk sufficient to justify such a restriction of his religious practice.

---

[3]Specifically, inmates who identify themselves to DOCS may possess the 120 Degrees and the Supreme Alphabet and Mathematics, provided they do not display them or any symbols taken from them or transfer them to inmates who have not so identified themselves. Moreover, the newspaper will be available in prison law libraries, subject to standard media review.

[4]See 42 U.S.C. § 2000cc-1(a) ("No government shall impose a substantial burden on the religious exercise of a person residing in or confined to an institution . . . unless the government demonstrates that imposition of the burden on that person (1) is in furtherance of a compelling governmental interest; and (2) is the least restrictive means of furthering that compelling governmental interest.")

3

As we acknowledged in our earlier opinion, defendants did produce some evidence that "prison inmates identified as 'Five Percenters' have been associated with instances of violence and disruption" and that the term "Five Percenters" "may somewhat uniquely connote both a religion and a gang in the New York State prison system." <u>Marria</u>, 2003 WL 21782633 at *18.   While we directed defendants to provide access to Nation literature because defendants failed to show that such access would give rise to significant security concerns, we recognized that plaintiff's other requests, such as the request to congregate, might pose more serious problems, and therefore remanded the case to defendants for further consideration of its policies with respect to these requests.

The supplementary record that defendants have since submitted to support their proposed protocols satisfies us that allowing plaintiff and other members to congregate would, in fact, pose serious security problems.[5] Deputy Commissioner for Correctional Facilities Lucien LeClaire has attested that group meetings would raise the risk of immediate group violence, Dec. ¶ 18, development of hierarchies that might undermine the authority of prison staff and might lead to violent competition, Dec. ¶ 19, and criminal conspiracies, Dec. ¶ 21.   Mr. LeClaire has provided further support

---

[5]Because we find defendants' submission persuasive, we do not address the question of which burdens apply at this stage in the litigation.

for defendants' claim that the Nation has been associated with violence in the New York prison system by identifying specific large-scale disturbances in the past two decades in which Nation members were involved.[6]

Defendants' other declarant, Deputy Commissioner and Counsel for DOCS Anthony J. Annucci, has provided evidence of the fiscal hardship that would be posed by the requested meetings. Specifically, because of a state budget crisis, defendants are presently operating under a hiring freeze, with strict orders to minimize overtime expenditures. Although it is unclear what role, if any, financial hardship should play in comprising a "compelling state interest" under RLUIPA, defendants' financial situation is part of the reality of whether defendants could effectively manage the security challenge of Nation meetings.

We find, therefore, that the evidence supports defendants' determination that the law does not require them to allow Nation congregation. In reaching this conclusion, we find it significant

---

[6]We also take note that other courts have found the Nation to be a security threat based on the record before them. E.g., Fraise v. Terhune, 283 F.3d 506 (3d Cir. 2002) (quotation omitted) ("[E]vidence links the group with numerous incidents of prison violence. Indeed, according to the Holvey report, many in the law enforcement community consider the Five Percent Nation to be 'one of the greatest threats to the social fabric' of the prisons."); Self-Allah v. Annucci, No. 97-607, 1999 WL 299310 (W.D.N.Y. March 25, 1999) ("Defendants have clearly shown that the Five Percenters act as an organized group within the prison system to receive new members, intimidate members of rival groups, and participate in criminal activity, including extortion, robbery, assaults and drug trafficking.").

5

that the protocols <u>do</u> provide for one-on-one meetings with outside volunteers.

## CONCLUSION

Based on the foregoing, defendants' application for an order adopting DOCS's proposed protocols is granted. All issues now having been resolved, the Clerk of the Court is respectfully requested to close this case on the Court's docket.

**IT IS SO ORDERED.**
DATED:     New York, New York
           July 29, 2004

_____
NAOMI REICE BUCHWALD
UNITED STATES DISTRICT JUDGE

Copies of the foregoing have been mailed on this date to the following:

<u>Counsel for Plaintiff</u>
Damore Viola, Esq.
Sullivan & Cromwell
125 Broad Street, 26th Floor
New York, New York 10004

<u>Counsel for Defendant</u>
Benjamin Lee, AAG
State of New York Office of the Attorney General
120 Broadway
New York, NY 10271

6

## PROTOCOLS FOR SINCERE ADHERENTS OF
## NATION OF GODS AND EARTHS
## RELIGIOUS PRACTICES

The following protocols, which have been accepted by the appropriate federal court, shall be in effect as provided herein:

1) Any inmate who professes to be a sincere religious adherent of the Nation of Gods and Earths and who wishes to be afforded the accommodations provided herein shall submit his or her name and department identification number (DIN) to the facility deputy superintendent for programs or functional equivalent.

2) DOCS will allow any inmate who professes to be a sincere adherent of the Nation of Gods and Earths to possess the 120 degrees for personal study, provided however, that such inmate will not be permitted to display the 120 degrees nor to remove from the 120 degrees the Universal Flag, or any other Nation of Gods and Earths symbol or emblem, for any separate display, copying or other use. Furthermore, if any such materials are sent to an inmate who has not submitted his or her name as a sincere adherent to the deputy superintendent for programs, then such materials will be returned by the facility to the sender.

3) DOCS will allow any inmate who professes to be a sincere adherent of the Nation of Gods and Earths to possess the Supreme Alphabet and Mathematics for personal study, provided however, that such inmate will not be permitted to display the Supreme Alphabet nor to remove from the Supreme Alphabet and Mathematics the Universal Flag, or any other Nation of Gods and Earths symbol or emblem for any separate display, copying or other use. Furthermore, if any such materials are sent to an inmate who has not submitted his or her name as a sincere adherent to the deputy superintendent for programs, then such materials will be returned by the facility to the sender.

4) DOCS will arrange for the Five Percenter newspaper to be maintained within the law library at each correctional facility law library through a facility subscription, provided however, that the newspaper shall first have been reviewed and processed in accordance with the media review guidelines as set forth in 7 N.Y.C.R.R. Part 712 and Directive #4572. To ensure uniformity, all media review determinations will be conducted by a Central Office Media Review Committee. If any redactions are required, the Central Office Committee will send the appropriate notice to all facilities and to the editor of the Five Percenter Newspaper. A copy of any such notice shall thereafter be posted in each facility's law library and general library.

5) DOCS will apply the above-referenced media review guidelines to any other documents or literature which are identified by an outside Nation of Gods and Earths organization as having religious significance for sincere adherents, provided that such outside organization is identified by the Office of Ministerial and Family Services in accordance with Directive #4202 and provided further that the Universal Flag, or any other Nation of Gods and Earths symbol or emblem may not be removed from such documents or literature for any

separate display, copying or other use. Furthermore, if any such materials are sent to an inmate who has not submitted his or her name as a sincere adherent to the deputy superintendent for programs, then such materials will be returned by the facility to the sender.

6) DOCS will consider a request from an approved outside organization of the Nation of Gods and Earths in connection with the identification of days to be observed as religious fast days for sincere adherents within the confines of their individual housing locations.

7) DOCS will allow an inmate who professes to be a sincere adherent of the Nation of Gods and Earths to meet one-on-one in the facility legal visiting room during normal visiting hours with an outside volunteer affiliated with the Nation of Gods and Earths, who has been identified and designated as a volunteer by the Office of Ministerial and Family Services in accordance with Directive #4202.

8) DOCS will ensure that each facility posts and maintains a copy of this document in the law library and general library.





**Ted Swedenburg**
Department of Anthropology
University of Arkansas
Old Main 330
Fayetteville, AR 72701
(501) 575-6624 (W)  (202) 521-3064 (H)
tsweden@uark.edu

## EDUCATION

| | |
|---|---|
| 1988 | University of Texas at Austin. Ph.D., Anthropology |
| | "Memories of Revolt: The 1936-39 Rebellion and the Struggle for a Palestinian National Past" |
| 1980 | University of Texas at Austin. M.A., History |
| | "The Development of Capitalism in Greater Syria, 1830-1914: an Historical-Geographical Approach" |

## RESEARCH

| | |
|---|---|
| 2003-04 | Gender, sexuality, power and female pop musicians, US South and Midwest (ongoing fieldwork with artists and fans) |
| 2001-2003 | Ongoing interviews with Middle Eastern and diasporic musicians in London, Philadelphia, Detroit, New York City, Fayetteville |
| 2000 | Nubian music and ethnic identity in Egypt; Heavy metal and devil worship in Egypt (fieldwork, 6 weeks) |
| 1999 | Gnawa music and global festivalization in Morocco (fieldwork, 2 months) |
| 1997, 1998 | Nubian music and ethnic identity in Egypt (fieldwork, 1 month each summer) |
| 1994-96 | Nubian music and ethnic identity in Egypt (fieldwork, intermittent) |
| 1992-93 | Palestinian expressive culture in the West Bank (fieldwork, 1 month each summer) |
| 1992 | French-Arab popular culture and hybridity, Avignon, France (fieldwork, 1 month) |
| 1984-85 | Palestinian memories of the 1936-39 revolt in the West Bank, Israel, and Gaza Strip (fieldwork and archival research, 14 months) |

## CURRENT WORK
Book manuscript (*Radio Interzone*) on the role of popular music in the construction of hybrid, ethnic and transnational identities on the "borders" of the Arabo-Islamic world, contracted to Duke University Press

## RESEARCH AND TEACHING INTERESTS

| | |
|---|---|
| Areas | Middle East, Mediterranean, North Africa, Urban US, Europe |
| Topics | Minority and Diasporic Cultures, Nationalism/Transnationalism, Cultural Studies, Social and Critical Theory, Popular Culture, Domination and Resistance, Islamic Social Movements, Historical Anthropology |

## PROFESSIONAL EMPLOYMENT

| | |
|---|---|
| August 2003-present | Professor of Anthropology, Department of Anthropology, University of Arkansas |
| October 2003-present | Inaugural Faculty, University of Arkansas Clinton School of Public Service |
| August 2000-July 2003 | Associate Professor of Anthropology, Department of Anthropology, University of Arkansas |
| August 1996-July 2000 | Assistant Professor of Anthropology, Department of Anthropology, University of Arkansas |
| September 1992-June 1996 | Assistant Professor of Anthropology, Department of Sociology-Anthropology, American University in Cairo |
| Fall 1991 | Lecturer, Liberal Studies Program, University of Washington-Tacoma |
| January 1988- July | Lecturer, Departments of Anthropology, Near Eastern Languages and |

1991                        Civilization, International Studies and Comparative Religion, University of
                            Washington-Seattle

## COURSES TAUGHT (SELECTED)

Undergraduate              Popular Culture; Sexual Meanings; Public Culture; Political Anthropology;
                           Arab Society; Middle Eastern Cinema; Third World Development; Third World
                           Cities; Popular Culture and Mass Media in the Middle East; Race, Ethnic, and
                           Minority Relations; Peoples and Cultures of the Middle East; Peasant Society and
                           Culture; Economic Anthropology; Peasants in Middle Eastern Society; Queer
                           Theory; Introduction to Islam; Anthropology of Israel and Palestine
Graduate                   Theorizing the Past: History and Anthropology; Domination and Resistance;
                           Public Culture; Middle Eastern Societies and Cultures

## GRANTS AND AWARDS

1999-2000                  Fellowship for Advanced Multi-Country Research, Council of American
                           Overseas Research Centers (CAORC)

1997, 1998                 Summer Research and Writing Grants, Middle East Studies Program, University
                           of Arkansas

1993, 1994                 Summer Research Grants, American University in Cairo

1992                       Advanced Research Grant, Social Science Research Council

1990-91                    Research Fellowship for Recent Recipients of the Ph.D., American Council of
                           Learned Societies

1984-86                    Fellowship for Doctoral Dissertation Research, Social Science Research Council

1982-83, 84-85, 86-87      University Graduate Fellowship, University of Texas

1979-82                    Foreign Language Area Studies Scholarship, Center for Middle Eastern Studies,
                           University of Texas

## PROFESSIONAL ORGANIZATIONS

Society for Cultural Anthropology
American Anthropological Association
Middle East Section, American Anthropological Association
International Association for the Study of Popular Music (IASPM)
Society for Ethnomusicology
Middle East Studies Association

## PROFESSIONAL ACTIVITIES

May 2004                   External Examiner, Swarthmore College Honors Program

November 2003              Participant, workshop on Classroom Strategies for Teaching about the Middle
                           East/North Africa and Islam. Sponsored by the Middle East Section. American
                           Anthropological Association Annual Meetings. Chicago

November 2003              Chair and co-organizer, invited session on Anthropology and the Middle East:
                           The Politics of Knowledge During a Time of Crisis. American Anthropological
                           Association Annual Meetings. Chicago

January 2002-present       Editorial board, *Cultural Anthropology*

| | |
|---|---|
| January 2001-<br>December 2002 | Chair, Editorial committee, *Middle East Report* |
| November 2001 | Chair and co-organizer, session on Israel, Palestine, and the Politics of Popular Culture. America Anthropological Association Annual Meetings, Washington, DC |
| 2000 | Vice Chair, Editorial committee, *Middle East Report* |
| June 1999 | Chair, session on Le Sacré à l'Heure de la Mondialization. Conference on Sacred Music and Aesthetics in North Africa, sponsored by American Institute of Maghreb Studies, Fez, Morocco |
| 1998-2001 | Executive Committee, Middle East Section, American Anthropological Association |
| May 1998 | External Examiner, Swarthmore College Honors Program |
| 1997 | Chair, session on Global Hip-Hop: Tokyo, Cairo, New York, Paris, Sydney, American Anthropological Association Annual Meetings, Washington, DC |
| 1996-2002 | Editorial committee, *Middle East Report* |
| 1996 | Co-organizer and chair, invited session on Splitting the Difference: Transnational Culture and the Politics of Localization, American Anthropological Association Annual Meetings, San Francisco |
| 1995 | Co-organizer and chair, invited session on Expressive Culture in the Middle East: Modernity, National Community, Transnational Contexts, American Anthropological Association Annual Meetings, Washington, DC |
| 1994 | Co-organizer and chair, session on Multiple Struggles and Multiple Sites: New Social Movements in Egypt. American Anthropological Association Annual Meetings, Atlanta |
| 1991 | Co-organizer and co-chair, invited session on Displacement, Diaspora, and Geographies of Identity American Anthropological Association Annual Meetings, Chicago |
| 1991 | Co-organizer and co-chair, session on Eurocentrism and the Tropics of Middle Eastern Identity. Middle East Studies Association Annual Meetings, Washington, D C |
| 1987 | Co-organizer and co-chair, session on Revealing and Concealing Difference: Tendentious Revisions of the Past in the Construction of Community American Anthropological Association Annual Meetings, Chicago |
| 1976-78 | Associate, *MERIP Reports* |

## LANGUAGES
Classical Arabic (reading)
Egyptian colloquial Arabic (speaking)
Palestinian colloquial Arabic (speaking)
French (reading and speaking)

Spanish (reading)

## ADMINISTRATIVE ACTIVITIES

| | |
|---|---|
| 2003 | Arts/Cultural Affairs Task Force, University of Arkansas Clinton School of Public Affairs |
| 2001-2004 | Personnel Committee, Anthropology Department, University of Arkansas |
| 2000-2001 | College Cabinet, Fulbright College, University of Arkansas |
| 1999-2001 | Planning and Fiscal Committee, Fulbright College, University of Arkansas |
| 1998-present | Gender Studies Committee, University of Arkansas |
| 1996-present | Anthropology Representative, Middle East Studies Program, University of Arkansas |
| 1995-1996 | Graduate Advisor, Sociology-Anthropology Program, AUC |
| 1993-95 | Anthropology Unit Head, AUC |
| 1993-95 | Sociology-Anthropology Representative, Middle East Studies Program, AUC |

## PRESENTATIONS

| | |
|---|---|
| 11/04 | Discussant, session on Representing Refugees: Voices of and Voices for Palestinians. Middle East Studies Association Annual Meetings, San Francisco |
| 10/04 | "Music in the Interzone: Enrico Macias, Arab-Jewish Music, and the Israel Palestine Question." Center for Middle Eastern Studies, University of Chicago |
| 3/04 | "Enrico Macias, Arab Jewish Music, and the Discourse of Anti-Normalization " Conference on Globalization and Violence. Department of Sociology and Anthropology, Swarthmore College |
| 11/03 | "Pop Culture and Suicide Bombings: Anti-Normalization and the Revival of Arab-Jewish Music." American Anthropological Association Annual Meetings, Chicago |
| 11/03 | Discussant, session on Palestine/Israel: Mapping Boundaries of Violence and Prospects for Peace. American Anthropological Association Annual Meetings, Chicago |
| 11/03 | Discussant, session on Television and Contemporary Experience: Egypt, Lebanon and Iraq. Middle East Studies Association Annual Meetings, Anchorage |
| 11/03 | Discussant, session on National Symbols and Commemorations: Palestinian Identity in Contest. Middle East Studies Association Annual Meetings, Anchorage |
| 7/03 | "Palestine/Israel, Anti-Normalization, and the Revival of Arab-Jewish Music in the Arab World." Conference on Cultures of Conflict - Reflections on Middle East Dilemmas. Sponsored by the Institute for the Study of Austrian Jews and the Austrian Institute for International Politics (OIIP). Vienna, Austria |

| | |
|---|---|
| 5/03 | "The White Devil as Expert Witness." Canadian Association for Social-Cultural Anthropology Annual Meetings, Halifax |
| 5/03 | "Sounds from the Interzone: The Middle East and Beyond." Department of Music, University of Washington |
| 5/03 | "Rai Music in Algeria and France." Hagop Kevorkian Center, New York University |
| 3/03 | "After 9/11. Is Pop Culture Relevant in a World of Suicide Bombings?" Society for Applied Anthropology Annual Meetings, Portland |
| 3/27/03-3/1/03 | Participant, Middle East Youth Culture Workshop, Watson Institute, Brown University |
| 9/02 | "Musical Interzones: The Middle East and Beyond." Center for the Humanities, Lecture Series on Transnationalisms, Past and Present, Wesleyan University |
| 9/02 | "Memory." Workshop on Oral History of the Expulsion Experienced. Sponsored by Nuffield College (Oxford), St Antony's College Middle East Center (Oxford) and the Refugee Studies Centre at Queen Elizabeth House (Oxford). Nuffield College, Oxford |
| 5/02 | "World Music, Globalization and the Middle East: The Arab Wave, Post 9/11." Canadian Association for Social-Cultural Anthropology Annual Meetings, Windsor |
| 3/02 | "Islamic and Arab Popular Music in the US." Ethnographic Research Projects Roundtable on Muslim Americans and Immigrants from Muslim Countries, Russell Sage Foundation, New York City |
| 2/02 | "The Disciple of Anthropology Applied to the Aftermath of Terrorism." University of New Orleans Anthropology Club and Student Government, University of New Orleans |
| 2/02 | "Crossing Cultures: A Holistic Perspective on September 11, 2001." Department of Anthropology, University of New Orleans |
| 12/01 | "Songs of the Bitter Migration: Nubian Music in Egypt." Middle East Center, University of Pennsylvania |
| 11/01 | "Trance-national Islam, World Music, and the Diaspora." Middle East Studies Annual Meetings, San Francisco |
| 11/01 | "Israel, Palestine, and the Politics of Popular Culture: An Introduction." Session on Israel, Palestine, and the Politics of Popular Culture, American Anthropological Association Annual Meetings, Washington, DC |
| 5/01 | Discussant, session on Challenging Difference and Inequality in Israel: Voices from the Margins. American Ethnological Society Annual Meetings, Montreal |
| 5/01 | Discussant, session on Transnational Telecommunications and Reterritorialized Identities: Dialing, Surfing, and Hacking Across Borders. American Ethnological Society Annual Meetings, Montreal |
| 3/01 | "Transglobal Islamic Underground." Conference on Islam in the Mix: Religion |

|  | and the Globalization of Hip Hop. Middle East Center, University of Pennsylvania |
|---|---|
| 2/01 | "The Palestinian Intifada and Historical Memory." Center for Middle East Studies, University of California at Santa Barbara |
| 2/01 | "Sounds from the Interzone." Department of Music Distinguished Lecture, University of California at Santa Barbara |
| 11/00 | "Islam in World Music." Society for Ethnomusicology Annual Meetings, Toronto |
| 11/00 | "Satanic Heavy Metal in Egypt." American Anthropological Association Annual Meetings, San Francisco |
| 10/00 | Discussant, Workshop on the British and French Mandates in the Middle East, Alta, Utah. Sponsored by Center for Middle Eastern Studies, University of Utah |
| 2/00 | "Sounds from the Interzone." Anthropology Department, Stanford University |
| 3/00 | "Sounds from the Interzone: Popular Music at the Middle East Crossroads." Hardy Chair Lecture, Anthropology Department, Hartwick College |
| 11/99 | "Arab 'World Music' in the US." American Anthropological Association Annual Meetings, Chicago. |
| 11/99 | Discussant, session on Forming and Transforming Cultural Memory: Circuits of Middle Eastern Expressive Culture. American Anthropological Association Annual Meetings, Chicago |
| 5/99 | "Sounds from the Interzone." Anthropology Department, University of Texas |
| 4/99 | "Arabs in 'World Music.'" Symposium on The Arts in Arab Societies: Culture in a Transnational Era. Center for Contemporary Arab Studies, Georgetown University |
| 11/98 | "Cultural Studies in the Interzone." American Anthropological Association Annual Meetings, Philadelphia |
| 11/98 | Discussant, session on Discourses of Cultural Identity in the European Union. American Association Annual Meetings, Philadelphia |
| 5/98 | "Songs of the Bitter Migration: Displacement in Nubian Popular Music." American Ethnological Society Annual Meetings, Toronto |
| 11/97 | "Islamic Hip-Hop vs Islamophobia: Aki Nawaz, Natacha Atlas, Akhenaton." American Association Annual Meetings, Washington, DC |
| 9/97 | Discussant, session on Palestinian Memories and the Future of Palestine. Oral History Association Annual Meetings, New Orleans, September 25-28. |
| 8/97 | "Popular Memory as an Approach to Oral History." Research Program Workshop on UNRWA: A History Within History. Centre d'Etudes et de Recherches sur le Moyen-Orient Contemporain (CERMOC), Amman, Jordan |
| 6/97 | Discussant, session on "Confronting the Needs of Marginalized Groups in |

|       |                                                                                                                                                                                                                                         |
|-------|-----------------------------------------------------------------------------------------------------------------------------------------------------------------------------------------------------------------------------------------|
|       | Sudan." Fourth Triennial Meetings of the International Sudan Studies Association and the Sudanese NGO Forum, Cairo                                                                                                                         |
| 5/97  | "Saida Sultan/Danna International: Transgender Pop and the Polysemiotics of Sex, Nation, and Ethnicity on the Israeli-Egyptian Border." Colloquium on Politics of Culture in Arab Societies in an Era of Globalization, Princeton University |
| 11/96 | "Islam in the Mix. Rap Lessons of the Five Percent." American Anthropological Association Annual Meetings, San Francisco                                                                                                                  |
| 11/96 | "Danna International/Saida Sultan: Sex, Nation, Ethnicity at the Israeli-Egyptian Border." Center for Middle Eastern Studies. Villanova University; Department of Sociology-Anthropology, Swarthmore College                               |
| 11/95 | "Saida Sultan a.k.a. Danna International. (Trans)Sexuality-Nationality at the Israeli-Egyptian Border." American Anthropological Association Annual Meetings, Washington, D.C.                                                              |
| 12/94 | "Social Movements and Expressive Culture: Egyptian Nubian Identity." American Anthropological Association Annual Meetings, Atlanta                                                                                                        |
| 5/93  | Discussant, Workshop on Questions of Modernity: Strategies for Post-Orientalist Scholarship on South Asia and the Middle East." Sponsored by the Social Science Research Council, Cairo                                                    |
| 11/93 | "Between and Among the Boundaries of Culture: Bridging Text and Lived Experience in the Third Timespace" (with Smadar Lavie). American Anthropological Association Annual Meetings, Washington, DC.                                        |
| 12/92 | "Arab Noise and World Beat: The Transnational Travels of *Rai*." Anthropology Department, University of California-Berkeley                                                                                                               |
| 12/92 | Discussant, session on Breaking Boundaries: New Voices on Israel/Palestine. American Anthropological Association Annual Meetings, San Francisco                                                                                           |
| 12/92 | "Terror/Identity: The Palestinian Field." American Anthropological Association Annual Meetings, San Francisco                                                                                                                             |
| 5/92  | "Displacement, Diaspora, and Geographies of Identity" (with Smadar Lavie). Minority Discourse Group, Humanities Research Institute, University of California-Irvine                                                                        |
| 2/92  | "(Un)popular Memories: Collaboration, Resistance and Palestinian Nationalism (1938/1991)." Cultural Anthropology Department, Duke University                                                                                              |
| 11/91 | "The Cultural Politics of *Rai*: Syncretism in the Franco-Maghrebi Diaspora" (with Joan Gross and David McMurray). American Anthropological Association Annual Meetings, Chicago                                                           |
| 2/91  | "Seeing Double: Palestinian-American Histories of the *Kufiya*." Department of Anthropology, University of Michigan                                                                                                                       |
| 11/90 | "'The Revolution *Will* Be Marketed': How Rap Sells Social Insubordination." American Anthropological Association Annual Meetings, New Orleans                                                                                             |

| 2/90 | "The British Mandate in Palestine." Peace and Conflict Studies, University of California-Berkeley |
| 12/89 | "Palestinian Women in the 1936-39 Revolt: Implications for the *Intifada*." Marxism Now: Tradition and Difference conference, sponsored by *Rethinking Marxism*, University of Massachusetts-Amherst |
| 11/89 | "Plundering the Plunderers: The Politics of Hip-Hop." American Anthropological Association Annual Meetings, Washington, DC |
| 11/88 | "Occupational Hazards: Palestine Ethnography." American Anthropological Association Annual Meetings Annual Meetings, Phoenix |
| 3/88 | "The Palestinian Peasant as National Signifier." Department of Anthropology, New School for Social Research |
| 3/88 | "The Palestinian *Kufiya* and Semiotic Guerrilla Warfare." American Ethnological Society Annual Meetings, St. Louis |
| 11/87 | "'Representing' the Palestinian Peasant in a National Past." American Anthropological Association Annual Meetings, Chicago |
| 3/87 | "The Transformation of Palestine in the Nineteenth Century." Peace and Conflict Studies, University of California-Berkeley |
| 12/86 | "Memories of Revolt." American Anthropological Association Annual Meetings, Philadelphia |
| 4/86 | "The Struggle over Palestinian Popular Memory." Center for Near Eastern Studies, Cornell University |

## PUBLICATIONS

### a) Books

| In progress | *Radio Interzone* Contracted to Duke University Press. |
| 1995/2003 | *Memories of Revolt: The 1936-39 Rebellion and the Palestinian National Past.* Minneapolis: University of Minnesota Press. Reprinted by University of Arkansas Press with new afterword, 2003. |

### b) Edited Collections

| 2005 | *Palestine, Israel and the Politics of Popular Culture.* Durham: Duke University Press. With Rebecca Stein. |
| 1996 | *Displacement, Diaspora, and Geographies of Identity.* Durham: Duke University Press. With Smadar Lavie |
| 1990 | *Tendentious Revisions of the Past in the Construction of Community.* Special issue of *Anthropological Quarterly* 63(1). Guest editor (with James Brow). |

### c) Articles

| 2005 | "White Devil as Expert Witness." In Anne Meneley and Donna Young, eds., *Auto-Ethnographies of Academic Practices.* Peterborough: Broadview Press. |

| 2005 | "Against Hybridity: The Case of Enrico Macias/Gaston Ghrenassia." In Rebecca Stein and Ted Swedenburg. eds., *Palestine, Israel and the Politics of Popular Culture.* Durham: Duke University Press. |
|------|------|
| 2005 | "Popular Culture and the Question of Power: Towards a Rethinking of Palestine and Israel" (with Rebecca Stein). In Rebecca Stein and Ted Swedenburg, eds., *Palestine, Israel and the Politics of Popular Culture.* Durham: Duke University Press. |
| 2004 | "The 'Arab Wave' in World Music after 9/11." *Anthropologica* 46(2). (Special issue on "Commodities, Capitalism and Globalization") |
| 2004 | "Popular Culture, Relational History, and the Question of Power in Palestine and Israel" (with Rebecca Stein). *Journal of Palestine Studies* 33(4): 1-16. |
| 2004 | "Musical Interzones: The Middle East and Beyond." *Music & Anthropology. Journal of Musical Anthropology of the Mediterranean.* Issue 8. (www.muspe.unibo.it/period/ma/index/number8/ma_ind8.htm) |
| 2003 | "Rai's Travels." *MESA Bulletin* 36(2):190-193. |
| 2002 | "Islamic Hip-Hop vs. Islamophobia." *Ruminator Review* 11.20-21. |
| 2002 | "The Post-September 11 Arab Wave in World Music." *Middle East Report* 224:44-48. |
| 2002 | "Hip Hop Music in the Transglobal Islamic Underground." *Black Arts Quarterly* 7(1): 6-8. |
| 2001 | "Nubians in Cairo." In Virginia Danielson and Dwight Reynolds, eds., *Garland Encyclopedia of World Music, Volume 7: "The Middle East,"* pp. 641-645. Hamden CT: Garland Publishing. |
| 2001 | "Transglobal Islamic Underground: Aki Nawaz, Natacha Atlas, Akhenaton." In Salah Hassan and Iftikhar Dadi, eds., *Unpacking Europe*, pp. 256-274. Rotterdam: NAI. |
| 2001 | "Arab 'World Music' in the US." *Middle East Report* 219:34-41. (Reprinted on the National Instititute for Technology and Liberal Education Arab World project website, arabworld.nitle.org/texts.php?module_id=5&reading_id=23) |
| 2001 | "Islamic Hip-Hop vs. Islamophobia: Aki Nawaz, Natacha Atlas, Akhenaton." In Tony Mitchell, ed., *Global Noise: Rap and Hip Hop Outside the USA*, pp. 57-85 Middletown: Wesleyan University Press. |
| 2000 | "Saida Sultan/Danna International: Transgender Pop and the Polysemiotics of Sex, Nation, and Ethnicity on the Israeli-Egyptian Border." In Walter Armbrust, ed., *Mass Mediations: New Approaches to Popular Culture in the Middle East and Beyond*, pp. 88-119. Berkeley: University of California Press. (texts.cdlib.org/dynaxml/servlet/dynaXML?docId=ft8k4008kx&chunk.id=ch4) |
| 1997 | "Saida Sultan/Danna International: Transgender Pop and the Polysemiotics of Sex, Nation, and Ethnicity on the Israeli-Egyptian Border." *The Musical Quarterly* 81(1):81-108 |
| 1996 | "Introduction: Displacement, Diaspora, and Geographies of Identity" (with |

Smadar Lavie). In Smadar Lavie and Ted Swedenburg, eds., *Displacement, Diaspora, and Geographies of Identity*, pp. 1-25. Durham: Duke University Press.

1996    "Between and Among the Boundaries of Culture: Bridging Text and Lived Experience in the Third Timespace" (with Smadar Lavie), *Cultural Studies* 10(1): 154-179. Hebrew translation in *Teoria uvikoret* (Theory and Criticism) 7: 67-86, 1995 (Jerusalem/Tel Aviv).

1996    "Arab Noise and Ramadan Nights: Rai, Rap and Franco-Maghrebi Identity" (with Joan Gross and David McMurray). In S. Lavie and T. Swedenburg, eds., *Displacement, Diaspora, and Geographies of Identity*, pp. 119-155. Durham: Duke University Press. Reprinted in Jonathan Xavier Inda and Renato Rosaldo, eds., *Anthropology of Globalization: A Reader*, pp. 198-230. London: Blackwell Publishers, 2001.

1995    "Prisoners of Love: With Genet in the Palestinian Field." In Carolyn Nordstrom and Antonius Robben, eds., *Fieldwork under Fire: Contemporary Studies of Violence and Culture*, pp. 24-40. Berkeley: University of California Press. Reprinted in Nancy Scheper-Hughes and Philippe Bourgeois, eds., *Violence in War and Peace*, London: Blackwell Publishers, 2003.

1994    "Arab Noise and Ramadan Nights: Rai, Rap and Franco-Maghrebi Identity" (with Joan Gross and David McMurray). *Diaspora* 3(1): 3-39. Reprinted in Inderpal Grewal and Caren Caplan, eds., *An Introduction to Women's Studies: Gender in a Transnational World*, pp. 471-475. New York: McGraw Hill, 2001.

1992    "Homies in the 'Hood: Rap's Commodification of Insubordination." *New Formations* 18: 53-66. Reprinted in Murray Forman & Mark Anthony Neal, eds., *That's the Joint! The Hip-Hop Studies Reader*, New York: Routledge, 2004.

1992    "Rai, Rap and Ramadan Nights: Franco-Maghrebi Cultural Identities" (with Joan Gross and David McMurray). *Middle East Report* 22(5) 11-16. Revised version in Joel Beinin and Joe Stork, eds., *Political Islams*. Berkeley, University of California Press, 1996.

1992    "Occupational Hazards Revisited: Reply to Moshe Shokeid." *Cultural Anthropology* 7(4): 478-495.

1992    "Seeing Double: Palestinian-American Histories of the *Kufiya*." *Michigan Quarterly Review* 31(4): 557-577.

1991    "Popular Memory and the Palestinian National Past." In Jay O'Brien and William Roseberry, eds., *Golden Ages, Dark Ages: Imagining the Past in History and Anthropology*, pp. 152-79. Berkeley: University of California Press.

1991    "Rai Tide Rising" (with David McMurray). *Middle East Report* 21(2): 39-42.

1990    "The Palestinian Peasant as National Signifier." *Anthropological Quarterly* 63(1): 18-30. Reprinted in Ian Lustick, ed. *Religion Culture and Psychology in Arab-Israeli Relations*, pp. 304-316. New York: Garland Publishing, 1994.

1989    "Occupational Hazards: Palestine Ethnography." *Cultural Anthropology* 4(3): 265-72. Reprinted in George Marcus, ed., *Rereading Cultural Anthropology*, pp. 69-76. Durham: Duke University Press, 1992



| | |
|---|---|
| 1988 | "The Role of the Palestinian Peasantry in the Great Revolt (1936-39)." In Edmund Burke III and Ira Lapidus, eds., *Islam, Politics, and Social Movements*, pp. 169-203. Berkeley: University of California Press. Reprinted in Albert Hourani *et al*, eds., *The Modern Middle East: A Reader*, London: I.B. Tauris and Berkeley: University of California Press, 1993; revised edition, London: I.B. Tauris, 2004. Reprinted in Ilan Pappe, ed., *The Israel/Palestine Question (Rewriting Histories)*. London and New York: Routledge, 1999. |
| 1987 | "Al-Qassam Remembered." *Alif: Journal of Comparative Poetics* 7: 9-24. |
| 1986 | "Problems of Oral History: The 1936 Revolt in Palestine." *Birzeit Research Review* 2: 30-42. |

**d) Reviews**

| | |
|---|---|
| 1992 | Smadar Lavie, *The Poetics of Military Occupation: Mzeina Allegories of Bedouin Identity Under Israeli and Egyptian Rule*. In *Middle East Report* 22(5): 44-45. |
| 1992 | Ella Shohat, *Israeli Cinema: East/West and the Politics of Representation*. In *Minnesota Review* 38. |

**e) Reports**

| | |
|---|---|
| 2002 | "Snipers and the Panic Over Five Percent Islamic Hip-Hop." MERIP Press Information Note 111, November 10, 2002 (http://merip.org/pins/pin111.html) |
| 1997 | "Popular Memory as an Approach to Oral History." In CERMOC (Centre d'Etudes et de Recherches sur le Moyen-Orient Contemporain) Research Programme, UNRWA, A History within History. Special focus on: Oral History and Popular Memory. Proceedings of the August 25-27 Workshop. Amman, Jordan, 1997, pp. 159-165. |

**CREATIVE ENDEAVORS**

| | |
|---|---|
| 1999-present | Weekly world music radio show, "Interzone Radio," on KXUA FM, University of Arkansas student radio. (Live web broadcast, Tuesdays 6-8 p.m., www.kxua.com) |
| 2000-present | Various music reviews for *Pop Matters* (www.popmatters.com) and *Rootsworld* (http://www.rootsworld.com/rw/) |
| Spring 2002 | Curator for Gender Studies Film Series on Male Hysteria, University of Arkansas |
| Spring 2001 | Curator for Gender Studies Film Series on Gender Trouble (http://comp.uark.edu/~tsweden/gendertrouble.html), University of Arkansas |
| 1990 | Board of Directors, Arab Film Festival, Seattle |

# UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF MASSACHUSETTS

C.A. NO.

-----------------------------------------------------------

 SEAN ELLIS

**Plaintiff**

**V.**

**KATHLEEN M. DENNEHY, LOIS RUSSO,**
**in their official capacities as a Commissioner and**
**Superintendent respectively of the Commonwealth of Massachusetts;**
**THE COMMONWEALTH OF MASSACHUSETTS**
**DEPARTMENT OF CORRECTION**

**Defendants**

-----------------------------------------------------------

## AFFIDAVIT OF TED SWEDENBURG

I, Ted Swedenburg, Professor of Anthropology and Middle East Studies at the University of Arkansas-Fayetteville have been asked by the plaintiff to testify on his behalf and offer my opinions concerning matters within my expertise, including the religious nature of the Nation of Gods and Earths (also referred to as Five Percenters) and state the following to be true upon my own personal knowledge:

## I.        BACKGROUND AND QUALIFICATIONS

1.        I did my undergraduate studies at Swarthmore College and the American University of Beirut from 1968 to 1974.  I received my Master of Arts in History (Middle East) from the University of Texas-Austin in 1980, and completed my doctorate in Cultural Anthropology (Middle East concentration) at the University of Texas-Austin in 1988.

2.        I taught in the departments of Anthropology, Religious Studies, and Near Eastern

1

Languages and Civilizations at the University of Washington-Seattle as a Visiting Assistant

Professor and as an adjunct from 1988 to 1991. In 1992 I joined the faculty of the American

University in Cairo as an Assistant Professor in the Department of Sociology-Anthropology-

Psychology, where I taught until 1996. In 1996 I joined the faculty of the University of

Arkansas-Fayetteville. From 1996 through 2000 I was Assistant Professor of Anthropology from

2000 to 2003, Associate Professor of Anthropology, and since 2003, Professor of Anthropology.

I have also been a member of the faculty of the King Fahd Center for Middle East and Islamic

Studies at the University of Arkansas since 1996. A copy of my *curriculum vitae* is attached to

this report as <u>Exhibit "A."</u>

     3.     Among my areas of expertise is African-American Islamic movements, heterodox

Islamic "sects" in the Middle East, and popular music, with a special focus on Islamic rap music.

I have published a number of articles about Middle Eastern and Middle-Eastern related popular

music (including Islamic hip-hop), and am working on a book manuscript on this subject, to be

published by Duke University Press. In addition, my teaching responsibilities at the University

of Arkansas include courses on Cultural Anthropology, Race and Ethnicity, Popular Culture and

a range of courses on the Middle East in which Islam is a key component.

## II.   MATERIALS CONSIDERED

     4.     For this report, I am drawing upon all books, articles, musical texts, and

interviews that I have used over the past seventeen years in the course of my studies of African-

American Islam and Islamic hip-hop (in the United States, France and the U.K.).

## III.   COMPENSATION

     5.     I am participating in this case on a pro bono basis and am not charging for my

time and effort.  I understand, however, that I will be reimbursed for my out-of-pocket expenses arising from this case.

## IV.    PREVIOUS CASES

6.    During the past four years, I have testified, been deposed, or submitted an expert report in the case of <u>Marria v. Broaddus</u> U.S. District Court for the Southern District of New York C.A. No. 97-8297.

## V.    STATEMENT OF OPINIONS AND THEIR BASES

7.    In connection with this case, I have considered and will offer testimony concerning:

A.    The anthropological definition of religion.
B.    How the beliefs and practices of the Nation of Gods and Earths accord with standard definitions of religion.
C.    The relationship between the Nation of Gods and Earths and other recognized religions.

## A.    ANTHROPOLOGICAL DEFINITION OF RELIGION

8.    From the perspective of the discipline of anthropology, the Nation of Gods and Earths (henceforth, the Nation) clearly constitutes a religion.  Anthropologist John Bowen, in a standard text (*Religions in Practice:  An Approach to the Anthropology of Religion*, 2002), defines religion as "ideas and practices that postulate reality beyond that which is immediately available to the senses." (p. 5.)  In addition, Bowen views religious traditions as "ever-changing complexes of beliefs (including those authoritative beliefs called 'doctrine'), practices (including formalized rituals), and social institutions." (p. 4.)  Bowen, in his study of the anthropology of religion, is also very concerned with religious practices, that is, how beliefs in the sacred or the

3

divine are materialized through everyday action. Finally Bowen takes care to explain:  What we call religion may look quite different from one society to another   in the relative importance of a shared belief system, in the degree to which religious practice involves strong emotions, and in the social functions and contexts associated with religious practices.  (p.5.)

## B.  HOW THE BELIEFS AND PRACTICES OF THE NATION OF GODS AND EARTHS ACCORD WITH STANDARD DEFINITIONS OF RELIGION

9.   As far as a relation to the divine or the sacred, the Nation teaches that divinity resides within, that the Black Man himself (one who has knowledge of self) is a God.  Divinity, according to the Nation, is manifest here on earth, in humanity, and does not reside in some other, supernatural dimension. The Nation distinguishes itself from other religions (chiefly Christianity) that assert the existence of a Supreme Being external to humanity. These religions, according to the Nation, have used the notion of a  mystery god  and an afterlife to hoodwink, suppress, and enslave black people. In the understanding of the Nation, traditional Judeo-Christian views of the afterlife serve to mollify and pacify the masses.

10. The Nation asserts that it is not a religion but a  way of life.  It should be understood that this claim is made in order to distinguish the Nation from religions which have used the notion of a  mystery god  to exploit black people. The Nation also wants to assert its distinction from  religions  which have been the cause of sectarian strife and conflict. From an anthropological point of view, this claim in no way negates the Nation s essential religious character. Instead, such assertions simply constitute another facet of the Nation s belief system, and confirm the Nation s religious character.

11.    In addition to having a conception of the divine or the sacred, the Nation constitutes a religion in terms of how it is practiced.  For analytical purposes, the Nation's everyday religious manifestations could be broken down as follows:  (a) beliefs; (b) rituals and community celebrations; (c) symbols; (d) holy days; (e) teaching/proselytism; and (f) structure.

4

12. The beliefs of the Nation of Gods and Earths are articulated through a number of means. The basic written texts for the Nation are the 120 Degrees (also known as the "Lost-Found Muslim Lessons"), a set of questions given by Master Fard Muhammad and answered by Elijah Muhammad, as well as the Supreme Mathematics and the Supreme Alphabet, the teachings of Allah (the Father), the founder of the Nation. These texts constitute the bases of the nation's belief system, the keys to understanding the universe and man's relationship to it. The Bible and Quran are also important texts for Nation members to study. The Nation's beliefs are also articulated through various publications (such as the monthly newspaper published by Allah School in New York City, *The Five Percenter*), pamphlets and articles written by Gods (male adherents of the Nation) and Earths (female adherents), on websites (such as http://www.allahsnation.net), individual oral teachings, and at rituals and community events. The main themes of these teachings are: calls to education, self-improvement, self-worth and calls for peace within the community.

13. Because the Nation is a non-hierarchical and decentralized organization (see below, paragraph 18), newspapers like *The Five Percenter* are very important vehicles for communicating with the Nation's adherents, explaining and elaborating upon the Nation's basic teachings, conveying information about Nation activities, and commenting upon current social and political affairs from the Nation's perspective. Over the last eight years, *The Five Percenter* has, among other things: reprinted excerpts from the writings of Kahlil Gibran; enjoined members to read books, asserted that the Father (Allah) "taught us that we should not be anti-white" and that the Nation's message is a universal message; underlined that the Nation is not a gang; and enjoined male adherents (Gods) to treat Earths (women adherents) with respect and not to be God-arrogant.

14. Important rituals and community celebrations for the Nation include parliaments (monthly gatherings of members) and rallies, Show and Prove Science Fairs (where youths present science projects); and Family Day.

15.     The key symbol for the Nation is the Universal Flag, a seven-pointed star with a star and crescent and the number "7" inside, encircled by the words, "In the Name of Allah." "7" in the Nation's cosmology signifies God, the supreme black man; the letter "G"," the 7th letter of the alphabet, also stands for God. The Universal Flag shows up on virtually all of the Nation's publications, is used as a banner, and is emblazoned on jackets and sweatshirts worn by Gods, and worn as a pendant.

16.     Members of the Nation observe the birthdays of Elijah Muhammad (founder of the Nation of Islam), Allah (founder of the Nation of Gods and Earths), and Master Fard Muhammad as holy days.

17.     Adherents of the Nation of Gods and Earths are encouraged to teach. As members of the Five Percent who have "knowledge of self," it is their duty to bring their knowledge, that they call "science," to the Eighty-Five Percent, the mentally deaf, dumb and blind who are exploited by the Ten Percent, the bloodsuckers of the poor, who mystify and exploit the poor with their notion of a "mystery god."

18.     Not only do the Gods preach their message in the street, but also many of them have used the medium of rap music to bring their message to the masses. Members of the Nation of Gods and Earths, as well as sympathizers with the Nation and its teachings, have been among the most socially important and commercially successful hip-hop artists, and it is in part due to their efforts that the Nation has gained increasing numbers of adherents throughout the United States. Among the major artists who belong (or have belonged) to the Nation or are closely allied with the Nation are : Eric B. and Rakim, the Wu-Tang Clan (including the late Old Dirty Bastard, Method Man, Ghostface Killah, Raekwon, and RZA), Busta Rhymes, Erykah Badu, Digable Planets, and Poor Righteous Teachers. Many of these Islamic rappers have played a major role in the building of a "positive" trend in rap music, as contrasted with the "gangsta" trend. ("Positive" rap focuses on issues of social concern to African-Americans, promotes education and ethnic pride, and seeks to eliminate destructive behavior within the community.

"Gangsta" rap, on the other hand, tends to celebrate and glamorize the "thug life:" pimping, drug-dealing, violent confrontation , and the like.)

19.    The organization of the Nation of Gods and Earths is non-hierarchical and rather informal.  The non-hierarchical system is in keeping with the Nation's belief system, which asserts that the formal hierarchies of mainstream religions have been a cause of sectarian strife and oppression of the masses.  Nonetheless, chapters of the Nation are found throughout the United States, and, there is a kind of decentralized organization structure.  Nation chapters in cities throughout the United States meet monthly in parliaments.  A key organization is the Allah School in New York City, which offers "civilization classes," has established a Correspondence Committee that maintains contact with Gods who are incarcerated, publishes the newspaper, *The Five Percenter*, and organizes other activities.  Chapters in other cities have also organized schools, but the Allah School is the oldest and perhaps the most important.  In addition, while the Nation has no organized hierarchy, it does have elder members who younger Gods recognize and respect informally for their superior knowledge and wisdom.

### C.    THE RELATIONSHIP BETWEEN THE NATION OF GODS AND EARTHS AND OTHER RECOGNIZED RELIGIONS

20.    The Nation of Gods and Earths is one among many religious groups within an Islamic orbit that grew up within the African-American community during the twentieth century and that preached a message of black empowerment.  The most important of such predecessors of the Nation of Gods and Earths are the Moorish Science Temple (whose founder, Noble Drew Ali, preached that blacks were original Asiatic men, with a Moorish identity) and the Nation of Islam, founded by Master Fard Muhammad and Elijah Muhammad, of which the Nation of Gods and Earths is an offshoot.  Black nationalist beliefs have a long pedigree within African-American religious traditions, and particularly within religious groups in the Islamic sphere.

21.    The Nations' preaching of the divinity of man is one that is shared by a number of

other religions. One encounters Gnostic tendencies in various brands of Christianity, Judaism, and Islam, especially in Sufi and Shi'ite spheres (including heterodox Shi'ite sects like Isma'ilism and Druze). In Gnostic conceptions, God is conceived as a spirit that is manifested in man and only in man. For the Druze, the founder al-Hakim is God in person; for Ismai'ilis, the imams are embodiments of divine light, and they show the divine potential of man. The Nation could be regarded as simply giving Gnostic conception of divinity an afrocentric interpretation.

22.    The use of numbers and letters to divine the secrets of the universe is also a practice shared by other religions. Such beliefs are basic to the Jewish Kabbala, and are also shared by Isma ilis and Druze, esoteric offshoots from mainstream Islamic Shi ism.

23.    The catechistic organization of the 120 Degrees ( Lost-Found Muslim Lessons ) is similar in structure to the Roman Catholic catechism and that used by the Masons.

24.    The Nation is eclectic in its influences, and draws on a number of sources in its system of beliefs and practices. Members of the Nation read the Quran and the Bible for relevant lessons and teachings. Such a combination of apparently heterogeneous elements in the making of a religious belief system is very common cross-culturally, and is given the name of  syncretism  by anthropologists.

25.    For the preceding reasons, it is my opinion that the Nation of Gods and Earths meets the criteria that define a distinct religion.


SIGNED UNDER THE PAINS AND PENALTIES OF PERJURY THIS DATE: 6/1/05


 _/s/ T. Swedenburg_____

TED SWEDENBURG

8



UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MASSACHUSETTS

C.A. NO. 05-11221 NG

------------------------------------------------------------

 SEAN ELLIS
                    Plaintiff

V.

KATHLEEN M. DENNEHY *ET AL*

                    Defendants

------------------------------------------------------------


AFFIDAVIT OF MR. BORN KING ALLAH


     I,  Mr. Born King Allah, am a Keeper of Records for the Office of Cultural Affairs for the Nation of Gods and Earths with a usual place of business at 2122 Seventh Avenue, New York, New York 10027.  I state the following to be true upon my own personal knowledge:

     1.     My duties with the Office of Cultural Affairs for the Nation of Gods and Earths consist of being in charge of national/local prison issues. I have an administrative as well as coordinative capacity. As such, I instruct departments of correction regarding recognition of our God-centered culture showing them how to meet the needs of our incarcerated numbers. My office is the contact for any departments of correction regarding the Nation of Gods and Earths. Thus I am personally familiar with the writings and teachings of the Nation of Gods and Earths and with any material or teachings that it publishes for distribution.

     1.     Attached as Exhibit A is a true and accurate copy of the Supreme Alphabet and Supreme Mathematics of the Nation of Gods and Earth.

     2.     Attached as Exhibit B are seven printings of *The Five Percenter* newspaper that were published beginning 10 October 2004..

     3.     For a $20 annual subscription fee, anyone can receive *The Five Percenter*.

1

SIGNED UNDER THE PAINS AND PENALTIES OF PERJURY THIS DATE: 27 June 05


/s/ Born King Allah


MR. BORN KING ALLAH

UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MASSACHUSETTS

C.A. NO. 05-11221 NG

-------------------------------------------------------------
 SEAN ELLIS
                        Plaintiff

V.

KATHLEEN M. DENNEHY *ET AL*

                        Defendants

-------------------------------------------------------------


NOTICE OF FILING WITH CLERK S OFFICE


    Notice is hereby given that the documents, exhibits, or attachments listed below have

been manually filed with the Court and are available in paper form only:


    Exhibits A & B of the Affidavit of Mr. Born King Allah consisting of *The 120 Degrees*,

*The Supreme Alphabet*, *The Supreme Mathematics, and* ten copies of *The Five Percenter*

newspaper


    The original documents are maintained in the case file in the Clerk s Office.



Plaintiff by his attorney,

/s/ Valeriano Diviacchi
Valeriano Diviacchi
BBO# 555940
Diviacchi Law Office
59 Temple Place    Suite 507
Boston, MA 02111
(617) 542-3175                              Date: 30 June 05

1